**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N Main Avenue,<br>Tucson, AZ 85701,<br><br>SIERRA CLUB,<br>408 C Street, N.E.,<br>Washington, D.C. 20002,<br><br>COAL RIVER MOUNTAIN WATCH,<br>7503 Coal River Road,<br>Naoma, WV 25140,<br><br>OHIO VALLEY ENVIRONMENTAL COALITION,<br>725 W 14th Street,<br>Huntington, WV 25704,<br><br>      Plaintiffs,<br><br>v.<br><br>DANIEL M. ASHE,<br>Director, U.S. Fish and Wildlife Service,<br>1849 C Street, NW,<br>Washington, DC 20240,<br><br>SALLY JEWELL,<br>Secretary, U.S. Department of the Interior,<br>1849 C Street, NW,<br>Washington, DC 20240,<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street, NW,<br>Washington, DC 20240,<br><br>      Defendants. | Civ. No. 1:15-cv-00477-EGS |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Seeking to save northern long-eared bats (*Myotis septentrionalis*) from the brink of extinction, Plaintiffs challenge several decisions by the U.S. Fish and Wildlife Service (Service) pertaining to the bat that fail to comply with the mandates of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347.

2.      Once prevalent throughout the Northeast, Appalachia, and the Midwest, northern long-eared bats played an essential role in keeping insect populations in check.  Today, northern long-eared bat numbers have plummeted with populations declining as much as 99 percent due primarily to the spread of an invasive and often deadly fungal bat disease commonly referred to as White-Nose Syndrome.  The Center petitioned in 2010 to protect the northern long-eared bat under the ESA due to threats to the species from disease, habitat loss, environmental contamination, and other impacts.

3.      The northern long-eared bat was finally proposed to be listed as endangered in 2013 primarily due to staggering population declines from White-Nose Syndrome.  After the proposed listing, the Service faced political backlash generated by the timber and energy industries.  In response, in January, 2015, the Service proposed a host of exemptions from the prohibitions in Section 9 of the ESA, 16 U.S.C. § 1538, pursuant to Section 4(d) of the ESA, 16 U.S.C. § 1533(d).  However, the Service did not propose to list northern long-eared bats as threatened, a requisite for Section 4(d) to apply.  Nevertheless, on April 2, 2015, the Service back tracked from its endangered listing proposal and protected northern long-eared bats as only a threatened species under the ESA.  This decision allowed the agency to also adopt an interim rule under Section 4(d) with exemptions from the ESA's protections called a 4(d) rule.

2

4.      In listing northern long-eared bats as threatened, instead of endangered, the Service violated the ESA and APA.  The Service did not engage in a public notice and comment period for the threatened listing, in violation of the ESA and the APA.  It appears the Service's decision to list the species as threatened was driven at least in part by political pressure and the Service's simultaneous plan to create a 4(d) rule under the ESA, 16 U.S.C. § 1533(d), which impermissibly trumped the Service's consideration of the best available science and the ESA's listing factors in violation of the ESA and led to arbitrary decision-making under the APA.  The Service further relied upon a litigation memorandum defining the statutory terms "in danger of extinction" that was developed for the polar bear during the pendency of that lawsuit and which was not developed through notice and comment proceedings as required by the APA, 5 U.S.C. § 553, and Section 4(h) of the ESA, 16 U.S.C. § 1533(h).  Supplemental Explanation for the Legal Basis of the Department's May 15, 2008, Determination of Threatened Status for Polar Bears (Dec. 22, 2010) (hereafter "Polar Bear Memo").

5.      In making its threatened determination, the Service also improperly relied on an unlawful 2014 "Significant Portion of its Range" policy.  Following this policy, the Service never determined whether northern long-eared bats are in danger of extinction now in a significant portion of their range, including in the core of the bat's range where the species has declined between 90 and 99 percent.  Plaintiffs challenge the 2014 Significant Portion of the Range Policy and its application to the northern long-eared bat and as being inconsistent with the plain language of the ESA and in violation of the APA.

6.      Nine months after the threatened listing, the Service adopted a final 4(d) rule for the northern long-eared bat.  The final 4(d) rule fails to provide measures that are necessary and advisable for the conservation of the species.  The Section 7 consultations and resulting

biological opinion for the final 4(d) rule are arbitrary and capricious and contrary to the ESA.

Plaintiffs challenge the interim 4(d) rule and the final 4(d) rule for the bats as violating NEPA.

Simply put, the final 4(d) rule and the process leading up to it resulted in very little of the

northern long-eared bats habitat receiving protections despite the Congressional goal that the

Service protect the ecosystems upon which imperiled species depend.

7.      Plaintiffs respectfully request that the court leave the threatened listing of the

northern long-eared bat in place and remand the decision to Defendants for further consideration

of whether the species should be listed as endangered.  Plaintiffs further seek vacatur of the final

4(d) rule as unlawful under the ESA, 16 U.S.C. §§ 1533(d), 1532, 1536, and the APA, 5 U.S.C. §

706, and the final and interim 4(d) rules as unlawful under NEPA and the APA, and request

reinstatement of the protections that are normally afforded threatened species in 50 C.F.R. §

17.31(a).

## JURISDICTION AND VENUE

8.      This action arises under the ESA, 16 U.S.C. §§ 1531-1544, the APA, 5 U.S.C. §§

551-559, 701-706, and NEPA, 42 U.S.C. §§ 4321-4347.

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 28

U.S.C. §§ 2201-2202, 5 U.S.C. § 702, and 16 U.S.C. § 1540(g).

10.     As required by Section 11(g) of the ESA, on September 15, 2015, the Center for

Biological Diversity provided Defendants with written notice of the violations associated with

the decision to list the northern long-eared bat as threatened, instead of endangered, that require

notice via electronic mail and certified mail/return receipt requested.  On February 12, 2016,

Plaintiffs reaffirmed the violations associated with the threatened listing of the northern long-

eared bat and provided notice of the violations requiring notice pertaining to the final 4(d) rule

for the species via electronic mail and certified mail/return receipt requested.

11.     Additionally, on January 6, 2015, the Center for Biological Diversity provided

Defendants with notice of their intent to challenge the final 2014 Significant Portion of the

Range policy.

12.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) and

16 U.S.C. § 1540(g)(3)(A), as this civil action is brought against officers and employees of the

United States acting in their official capacities and under the color of legal authority, a

substantial part of the events giving rise to the claim occurred in the District of Columbia and the

species at issue occurs here, no real property is involved in this action, and several Plaintiffs

maintain offices in this judicial district.

## PARTIES

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit

Internal Revenue Service Code Section 501(c)(3) corporation that works through science, law,

and policy to secure a future for all species, great or small, hovering on the brink of extinction.

The Center is actively involved in species and habitat protection issues and has more than 44,000

members throughout the United States and the world.  The Center is headquartered in Tucson,

Arizona, with offices in Washington, D.C.; San Francisco, Joshua Tree, and Los Angeles,

California; St. Petersburg, Florida; Portland, Oregon; Silver City, New Mexico; Anchorage,

Alaska; Richmond, Vermont; Minneapolis and Duluth, Minnesota; and Seattle, Washington.

14.     The Center brings this action on its own institutional behalf, and on behalf of its

members who derive scientific, aesthetic, recreational, and spiritual benefits from northern long-

eared bats and their habitat.  The Center has devoted significant institutional resources in trying

to gain ESA protection for the northern long-eared bat.  The Center petitioned the Service to list

the northern long-eared bat under the ESA in 2010.  The Center negotiated and entered into a

landmark settlement agreement that requires the Service to make hundreds of overdue findings

on whether to list species under the ESA.  This agreement set a deadline for the Service to decide

whether to list the northern long-eared bat under the ESA.  The Center submitted comments on

the proposed endangered listing and on the proposed 4(d) rule.  The Center has also submitted

petitions and engaged in advocacy work to halt the spread of the fungal pathogen known as

White-Nose Syndrome in the United States.

15.     Plaintiff SIERRA CLUB is a national nonprofit organization with 64 chapters and

over 630,000 members dedicated to exploring, enjoying, and protecting the wild places of the

earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to

educating and enlisting humanity to protect and restore the quality of the natural and human

environment; and to using all lawful means to carry out these objectives.

16.     Sierra Club brings this action on its own institutional behalf, and on behalf of its

members who enjoy and explore the forests of Appalachia and who work to protect the pristine

waters, incredible biodiversity and important ecosystems of those forests where the northern

long-eared bat lives.

17.     Plaintiff COAL RIVER MOUNTAIN WATCH is a West Virginia nonprofit

organization that works to stop the destruction of communities and the environment from

mountaintop removal mining, to improve the quality of life of residents, and to help rebuild

sustainable communities.  Coal River Mountain Watch has roughly 500 members.

18.     Coal River Mountain Watch brings this action on its own institutional behalf, and

on behalf of its members who enjoy watching, looking for, recreating near, and deriving

ecosystem benefits from northern long-eared bats and their habitat.  Coal River Mountain

Watch's work to halt destructive coal mining practices is hampered by the failure of the Service

to protect northern long-eared bats as an endangered species.  Coal River Mountain Watch's

members' ability to enjoy their land and outdoor recreational activities is greatly hampered by

the decline in bats, including northern long-eared bats, in Appalachia because bats consume

insects including mosquitoes.  Moreover, the Service's failure to extend northern long-eared bats

the ESA's full protections harms Coal River Mountain Watch's members ability to watch and

otherwise enjoy these bats and their forested habitat and to continue doing so into the future.

19.     Plaintiff OHIO VALLEY ENVIRONMENTAL COALITION (OVEC) is a

regional organization dedicated to the improvement of the environment and communities

through education, grassroots organizing and coalition building, leadership development,

strategic litigation and media outreach.  OVEC has roughly 500 members.

20.     OVEC brings this action on its own institutional behalf, and on behalf of its

members who benefit from observing and looking for northern long-eared bats and their habitat

and the insects northern long-eared bats consume, which contributes to increased outdoor

recreation and enjoyment.

21.     Plaintiffs' members have ongoing interests in the northern long-eared bat and its

habitat in the eastern and Midwestern regions of the United States.  Plaintiffs' members have

viewed northern long-eared bats, and have concrete plans to visit bat habitat and try to observe

the species in the wild.  The interests of Plaintiffs and their members in observing, studying, and

otherwise enjoying northern long-eared bats and their habitat and in obtaining and disseminating

information regarding the survival of northern long-eared bats have been harmed by Defendants'

northern long-eared bat decisions – e.g., the decision to list the species as threatened instead of

endangered, the decisions to adopt final and interim 4(d) rules for northern long-eared bats, and the final Environmental Assessment and Biological Opinion for the final 4(d) rule. The decrease in northern long-eared bat populations to which these decisions contribute also curtails the number of insects that are consumed by the bats thus decreasing Plaintiffs' use and enjoyment of the outdoors and certain recreational activities because the bats are no long providing ecosystem services.

22. Defendants' northern long-eared bat decisions have reduced protections normally afforded by the ESA for imperiled species and authorize activities that directly and indirectly harm, injure, and even kill members of the species. These decisions reduce Plaintiffs' ability to enjoy northern long-eared bats and their habitat. Unless the requested relief is granted, Plaintiffs and Plaintiffs' members' interests will continue to be injured by Defendants' unlawful northern long-eared bat decisions which violate the ESA, APA, and NEPA. The injuries described above are actual, concrete injuries that are caused by Defendants and presently suffered by Plaintiffs and their members, and will continue to occur unless relief is granted by this Court. The relief sought herein, which includes an order that the court leave the final threatened listing in place and remand it to Defendants and set aside the final and interim 4(d) rules, order Defendants to reconsider the listing of the northern long-eared bat, and issue a new listing decision within six months would redress Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law.

23. Defendant DANIEL M. ASHE is Director of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior that is authorized and required by law to protect and manage the fish, wildlife and native plant resources of the United States, including enforcing and implementing the ESA, and for compliance with all other federal laws that apply to the Service. The Service has primary authority for day-to-day administration of the ESA with

respect to terrestrial species. The Director signed the 4(d) rule challenged in this lawsuit. Director Ashe is sued in his official capacity.

24.     Defendant SALLY JEWELL, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of the ESA with regard to terrestrial endangered and threatened species, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Jewell is sued in her official capacity.

25.     Defendant the U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial species, including the northern long-eared bat. The Service's headquarters in Washington, D.C. issued the 4(d) rule that is being challenged in this case.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Endangered Species Act

#### 1.     Listing Species Under the ESA

26.     Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of [such species]." 16 U.S.C. § 1531(b). Today, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978).

27.     The ESA delegates responsibility for administering the ESA to two cabinet-level Secretaries: Interior and Commerce. 16 U.S.C. § 1532(15). The Secretary of the Interior has, in turn, delegated her authority for terrestrial species to the Service. 50 C.F.R. § 402.01(b).

28.     The Act protects imperiled species by listing them as "endangered" or "threatened."  16 U.S.C. §§ 1533, 1532(6), 1532(20).  An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range," and a threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. §§ 1532(6), (20).

29.     Section 4 of the ESA imposes a non-discretionary duty requiring the Service to list a species as endangered or threatened if any one or any combination of five statutory factors is met: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting its continued existence.  16 U.S.C. §§ 1533(a)(1)(A)-(E).

30.     In making its listing determinations, the Service must use the "best scientific and commercial data available . . . ."  16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b).  The ESA requires the Service, "not less than 90 days before the effective date of the [listing] regulation," to "publish a general notice and the complete text of the proposed regulation in the Federal Register . . . ."  Id. § 1533(b)(5)(A)(i).  Before the Service may establish any criteria or guidelines for use in making listing decisions, those guidelines must first be issued in proposed form for public comment.  16 U.S.C. § 1533(h).

31.     In listing species, the Service must also define the foreseeable future and articulate why the species is not threatened with extinction now.  Solicitor General Memo on Foreseeable Future, M-37021 (Jan. 16, 2009).

//

a.        The 2014 Significant Portion of the Range Policy

32.     In making its listing decisions, the Service must determine whether the species is endangered or threatened "throughout all or a significant portion of its range."  16 U.S.C. §§ 1532(6), (20).

33.     For more than a decade the Service and the National Marine Fisheries Service (NMFS and collectively the "Services") grappled with and failed at lawfully defining and applying the phrase "significant portion of its range" within the definition of an "endangered species" and a "threatened species."  16 U.S.C. §§ 1532(6), 1532(20).  In a landmark decision rejecting a Service definition of this phrase, the Ninth Circuit explained "the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'"  *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).  Several efforts to apply and define these terms were vacated by subsequent reviewing courts, and in 2007 the Services adopted an interpretation often called the "M-Opinion."  That M-Opinion was withdrawn in May of 2011.

34.     In December 2011, the Services proposed a draft Significant Portion Of its Range (SPR) Policy.  76 Fed. Reg. 76,987 (Dec. 9, 2011).  In the draft SPR policy, the Service proposed to first look at a species' range-wide status, and after doing that, to separately consider the status of the species in any significant portion of its range.  If a species is determined to be endangered throughout a significant portion of its range, it will be listed "across the species' entire range" as endangered.  76 Fed. Reg. at 76,990.  Likewise, if a species was threatened throughout a significant portion of its range, it would be listed as threatened throughout its range.  *Id.*  If the species were endangered in a significant portion of its range, the species would be listed as

endangered irrespective of whether the species might be threatened throughout the entirety of its range.  This proposal reversed a central element of the M-Opinion.

35.     On July 1, 2014, the Services issued the final SPR Policy. 79 Fed. Reg. 37,578. In the final SPR Policy, the Services radically changed course and announced that if a species is found to be threatened throughout its range, that would end the analysis, and the Services would not separately consider whether the species should be listed as endangered because it is "in danger of extinction" in "a significant portion of its range," 16 U.S.C. § 1532(6).  79 Fed. Reg. at 37,609.

36.     This fundamental about-face from the proposed SPR Policy was made to accommodate complaints from State agencies and others who argued that allowing a species threatened range-wide to be listed as endangered based on its status in a SPR "is undesirable overregulation that would produce needless economic dislocation."  79 Fed. Reg. at 37,599.  The Services sought to justify their departure from the proposed SPR Policy and long-standing agency practice by claiming it would be "confusing" were a species to be both "threatened" (based on its range-wide status) and "endangered" (based on its status in a significant portion of its range).  79 Fed. Reg. at 37,579.  The Services did not explain why it would be confusing to apply this approach, which was set forth in the proposed SPR Policy.

37.     Indeed, in the draft SPR Policy, the Service explained that "each of the four categories [endangered throughout its range, endangered in a SPR, threatened throughout its range, and threatened in a SPR] retains unique and independent meaning" and that "[i]n many cases, a species that is endangered in a significant portion of its range would also qualify as endangered in a rangewide review of its status.  In other cases, because the determination that a portion of a species' range is significant is largely independent of the determination of the

species' current status rangewide, the best available scientific and commercial information may simultaneously support determinations that a species appears to have the status of 'endangered' in a significant portion of its range and also to have the status of 'threatened' throughout its range." 76 Fed. Reg. at 76,996.  In the final SPR Policy, the Services dropped the four steps down to two steps, and suggested the change was necessary to ensure a distinction between a species' status "throughout all" of its range and its status in a significant portion of its range, claiming that by putting the terms "throughout all" ahead of "a significant portion of its range" in the definitions of endangered and threatened, "Congress intended that an analysis based on consideration of the entire range should receive primary focus, and thus that the agencies should do an SPR analysis as an alternative to a rangewide analysis only if necessary." 79 Fed. Reg. at 37,580.  The Services did not explain how that interpretation could be reconciled with Congress's instruction to determine whether to list a species as "an endangered species or a threatened species" based on the listing factors, 16 U.S.C. § 1533(a)(1), which makes plain that full consideration must first be given to whether a species is an "endangered species" in all or a significant portion of its range before turning to whether, if not endangered, the species may nonetheless be "threatened."

38.     In providing its new interpretation, the Services also failed to explain how the significant portion of its range language is not rendered superfluous by listing a species as "threatened" without considering whether it may be "endangered" in a "significant portion of its range."

39.     Likewise, the Services failed to address the final SPR Policy's disparate treatment of a species threatened range-wide as compared to a species that may be only endangered in a significant portion of its range.  Under the final SPR Policy, the former species, with range-wide

13

threats, may only be listed as threatened (even if it is endangered in a significant portion of its range), while the latter species, because it is not threatened range-wide, may be listed throughout its range as endangered based on its endangered status in a significant portion of its range. The Service did not explain how this result, in which a species that is more imperiled range-wide may receive less protection, can be reconciled with the ESA.

40. The final SPR Policy represents the first time the Services announced this novel approach to considering whether a species is imperiled in a significant portion of its range. The Services provided no public comment opportunity concerning this new interpretation of "significant portion of its range" provided in the final SPR Policy, which significantly changed the agencies' approach to their listing process and responsibilities.

### b. The Polar Bear Memorandum

41. The Service has never adopted by regulation or otherwise a formal interpretation of the phrase "in danger of extinction" that is used in the definition of "endangered species." 16 U.S.C. § 1532(6).

42. In *In re Polar Bear Endangered Species Act Listing*, MDL 1993, No. 1:08-764, this Court provided a remand of the polar bear listing decision to the Service so it could better explain its interpretation of the phrase "in danger of extinction." Remand Order (Nov. 4, 2011) (ECF No. 236 at 22 n. 17) (D.D.C.).

43. On December 22, 2010, the Service finalized a memorandum related to the decision to list the polar bear as a threatened species under the ESA that purported to define "in danger of extinction" as used in the polar bear listing decision. Supplemental Explanation for the Legal Basis of the Department's May 15, 2008, Determination of Threatened Status for Polar Bears (Dec. 22, 2010).

44.     The Polar Bear Memo was prepared during the course of litigation concerning the listing of the polar bear at the request of the court and represents the agency's litigation position in that court proceeding.  The Service never provided a notice in the Federal Register requesting public comment on the Polar Bear Memo.  The Service never provided the public an opportunity to comment upon the explanation in the Polar Bear Memo for the Service's interpretation of "in danger of extinction."  In fact, the Service previously represented to this Court that such notice and comment was not necessary because the agency would not use the Polar Bear Memo for making listing determinations for any other species.

45.     In listing the northern long-eared bat as a threatened species, the Service directly relies on the interpretation of law contained in the Polar Bear Memo.  The Service has also relied upon the Polar Bear Memo in making other listing determinations under the ESA.  The Polar Bear Memo has not gone through public notice and comment, and was not available on regulations.gov as part of the supporting materials for the northern long-eared bat rule.  The Polar Bear Memo is not available online except through the Court's ECF system under the docket for *In re Polar Bear Endangered Species Act Listing*, MDL 1993, No. 1:08-764 (D.D.C.).

## 2.     The Act's Protections and Section 4(d) Rules

46.     The ESA and its implementing regulations protect endangered and threatened species in several ways, including by: (1) requiring the Service to develop and implement a recovery plan for listed species, 16 U.S.C. § 1533(f); and (2) requiring all federal agencies to carry out their programs for the conservation of listed species, *id*. § 1536(a)(1).

47.     The ESA provides more stringent and far-reaching protections for species that are listed as "endangered" rather than "threatened."  For example, endangered species generally receive higher priority for the preparation and implementation of recovery plans.  The listing of a

species as endangered under the ESA triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take" of species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(18); 50 C.F.R. § 17.3 (harm means "means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.").

48.     The ESA's take provisions do not automatically apply to species that are listed as threatened. 16 U.S.C. § 1538(a)(1).  Instead, Section 4(d) of the Act provides that the Service "may" extend the prohibitions in Section 9 of the Act to threatened species. *Id*. § 1533(d). Section 4(d) further specifies that the Service "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation" of threatened species. *Id*. § 1533(d).

49.     The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.  Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." 16 U.S.C. § 1532(3).

50.     Two years after the ESA was enacted, the Service exercised its authority and responsibility under Section 4(d) to extend the prohibition on "take" in Section 9 of the ESA to all threatened species.  50 C.F.R. § 17.31(a); 40 Fed. Reg. 44,412, 44,414 (Sept. 26, 1975); *Sweet*

*Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5-8 (D.C. Cir. 1993) (upholding

the Service's general 4(d) rule) *rev'd on other grounds* 515 U.S. 687 (1995).

### 3.     Section 7 Consultations and Conferences

51.     Once a species is listed, Section 7 of the ESA requires all federal agencies to

"insure" that their actions neither "jeopardize the continued existence" of any listed species nor

"result in the destruction or adverse modification" of its "critical habitat."  16 U.S.C. §

1536(a)(2).  Section 7 also affords protections for species proposed for listing providing that

"[e]ach Federal agency shall confer with the Secretary on any agency action which is likely to

jeopardize the continued existence of any species proposed to be listed . . . ."  16 U.S.C. §

1536(a)(4).

52.     An action would "jeopardize the continued existence of" a species if it

"reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the reproduction,

numbers, or distribution of that species."  50 C.F.R. § 402.02.

53.     If the Service determines that its proposed action may affect any listed species or

critical habitat, it must engage in formal or informal consultations.  50 C.F.R. §§ 402.13, 402.14.

Informal consultation is appropriate when the action is not likely to adversely affect listed

species or critical habitat.  *Id.* § 402.13(a).  Otherwise, formal consultation is required.

54.     To complete formal consultation if the agency action is not likely to result in

jeopardy or destruction or adverse modification of critical habitat, the Service must provide the

action agency with a biological opinion, explaining how the proposed action will affect the listed

species based upon the environmental baseline for that species, together with an incidental take

statement and any reasonable and prudent measures necessary to avoid jeopardy.  16 U.S.C. §

1536(b); 50 C.F.R. §§ 402.02, 402.14(g)-(i).

55.    Section 7 consultations require the use of "the best scientific and commercial data

available" to evaluate the impacts the action will have on listed species.  16 U.S.C. §§ 1536(a)(2)

& (b)(3); 50 C.F.R. § 402.14(g).

**B.    The Administrative Procedure Act**

56.    The ESA requires that listing decisions must comply with the rulemaking

provisions of the APA, which provides general rules governing the issuance of proposed and

final regulations by federal agencies.  16 U.S.C. §§ 1533(b)(4), 1533(h).  Fundamental to the

APA's procedural framework is the requirement that, absent narrow circumstances, a federal

agency publish as a proposal any rule that it is considering adopting and allow the public the

opportunity to submit written comments on the proposal.  5 U.S.C. § 553.

57.    A "rule" is defined by the APA as "the whole or a part of an agency statement of

general or particular applicability and future effect designed to implement, interpret, or prescribe

law or policy or describing the organization, procedure, or practice requirements of an agency . .

. ." 5 U.S.C. § 551(4).  Specifically, the APA provides that all federal agencies must give

"general notice" of any "proposed rule making" to the public by publication in the Federal

Register.  *Id.* § 553(b).  The publication must, at a minimum, include: "(1) a statement of the

time, place, and nature of public rule making proceedings; (2) reference to the legal authority

under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a

description of the subjects and issues involved." *Id.*

58.    In addition, "the agency shall give interested persons an opportunity to participate

in the rule making through submission of written data, views, or arguments with or without

opportunity for oral presentation," and, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).

59.     An agency may only short-circuit the public notice and comment requirements of the APA if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).

60.     The APA also provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

61.     The APA provides that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), or agency action that is undertaken "without observance of procedure required by law," *id.* § 706(2)(D).

## C.     The National Environmental Policy Act

62.     Congress passed the National Environmental Policy Act in 1969 to ensure that federal agencies properly consider the environmental impacts of, and alternatives to, their activities.  42 U.S.C. § 4332.  Today, NEPA is the Nation's "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).

63.     Among the critical purposes of the statute are to "insure that environmental information is available to public officials and citizens before . . . actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences." 40 C.F.R. §§ 1500.1(b)-(c).  Thus, NEPA is action-forcing in that it requires "agencies to consider all environmental consequences of choosing one course of action over another before

making a final decision." *Nat'l Park and Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 24

(D.D.C. 1999); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989) ("NEPA

ensures that the agency will not act on incomplete information, only to regret its decision after it

is too late to correct").

64.     NEPA requires each federal agency to prepare and circulate for public review and

comment a detailed Environmental Impact Statement (EIS) prior to undertaking any major

federal action that may significantly affect the environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R.

§§ 1501.4; 1502.5; 1508.3.  Major federal actions include "[a]doption of official policy, such as

rules, regulations, and interpretations" pursuant to the APA.  40 C.F.R. § 1508.18(b)(1).

65.     The Council on Environmental Quality (CEQ) has promulgated regulations

implementing NEPA, which are binding on all federal agencies.  40 C.F.R. § 1507.1.

66.     When a federal agency is not certain whether a federal action will have a

significant environmental effect, it must prepare an Environmental Assessment (EA).  40 C.F.R.

§§ 1501.4(b), 1508.9.  If the agency concludes in an EA that a project may have significant

impacts on the environment, then an EIS must be prepared.  *Id.* § 1501.4.  If an EA concludes

that there are no significant impacts to the environment, the federal agency must provide a

detailed statement of reasons why the project's impacts are insignificant and issue a "finding of

no significant impact" to accompany its decision on the project.  *Id.* § 1508.13.

67.     In determining whether a proposed action may significantly affect the

environment, NEPA requires consideration of both the context and intensity of that action.  40

C.F.R. § 1508.27.  In considering context, "[s]ignificance varies with the setting of the proposed

action."  *Id.* § 1508.27(a).  Intensity "refers to the severity of the impact," including: "[t]he

degree to which the action may adversely affect an endangered or threatened species or its

[critical] habitat"; "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"; and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." *Id.* §§ 1508.27(b)(4), (6), (9).

68.     The CEQ regulations also provide that each federal agency shall identify in its NEPA procedures those classes of actions that normally do not require either an EIS or an EA. 40 C.F.R. § 1507.3(b)(2)(ii).  These "categorical exclusions" are actions that do not individually or cumulatively have a significant effect on the human environment.  If an agency action falls within one of the defined categorical exclusions, then no EIS or EA is required, unless one or more exceptions apply, which are also defined by the agency's NEPA procedures.

69.     As part of the NEPA process, federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," and describe the "underlying purpose and need to which the Agency is responding in proposing the alternatives, including the proposed action." 40 C.F.R. §§ 1502.13, 1502.14(a).  The consideration of alternatives to the proposed action is described by the regulations as the "heart" of proper NEPA analysis.  *Id*. § 1502.14.

70.     NEPA documents must assess the environmental impacts of the proposed action, including direct effects, indirect effects, and cumulative impacts.  40 C.F.R. §§ 1502.16, 1508.8. In conducting their analyses, federal agencies are directed to use high quality, accurate scientific information and to ensure the scientific integrity of their NEPA document.  *Id.* §§ 1500.1(b), 1502.24.

71.     Congress will, in rare circumstances, provide statutory exemptions from NEPA's requirements.  For example, Section 7(k) of the ESA, 16 U.S.C. § 1536(k), provides that decisions of the Endangered Species Committee (the so-called "God Squad") exempting federal

agency actions found to violate section 7(a)(2) of the Act, *id*. § 1536(a)(2), "shall not be major

Federal action" for purposes of NEPA.

72.     No similar provision in the ESA exempts the 4(d) rulemaking process from

NEPA's requirements, nor are 4(d) rulemakings subject to any categorical exclusion adopted by

the Department of Interior.

## FACTUAL ALLEGATIONS

### A.     The Northern Long-Eared Bat

73.     Known for their long ears and secretive roosting and hibernating strategies, the

northern long-eared bat is a wide-ranging species found in 37 states and the District of Columbia.

The core of the species range in the United States is in the northeast.  Northern long-eared bats

also occur in Canada where they are protected as endangered.

74.     Northern long-eared bats hibernate in one location and then migrate, typically

between 40 and 50 miles, to summer roosting areas.  The bats rely primarily upon mature,

interior forests for roosting, feeding, and migrating habitat.  In the summer, bats rely on trees and

snags to serve as roosts including during the pup season, when females give birth.  This season

generally occurs, depending on the geographic area, between mid-May and mid-August.

75.     Northern long-eared bats switch roost trees during the summer and have been

documented to do so as often as every three nights.  The bats use a .27 to .43 mile radius of

habitat around their summer roosts for foraging.  Due to their reliance on interior forest habitat,

northern long-eared bats are more susceptible than other bat species to impacts from logging and

other land clearing activities.

76.     Northern long-eared bats hibernate during the winter and use caves and other

structures to hibernate in, which are referred to as "hibernacula."  It is common for northern

long-eared bats and other species of bats to hibernate in the same hibernacula.  Northern long-eared bats move between hibernacula during the winter and may not return to the same hibernacula each year although the species is documented to return to established hibernacula over the long term.

77.     Northern long-eared bats use up to 8.2 miles around their hibernacula for roosting, foraging, and swarming in the fall.  Swarming is a rendezvous of bats during the breeding season in late summer that consists of bats flying around in a large, loose aerial mass, and mating on the wing.  Swarming precedes hibernation and usually occurs near a cave or mine that is used for that purpose.

78.     Like other bat species, northern long-eared bats are susceptible to the rapidly spreading infectious fungus known as *Pseudogymnoascus destructans* (Pd) and commonly referred to as White-Nose Syndrome.  "The fungus grows on and within exposed soft tissues of hibernating bats" and leads to "[e]xcessive or unexplained mortality at or near the hibernaculum."  80 Fed. Reg. at 17,995.

79.     The Service and State biologists estimate that at least 5.7 million to 6.7 million bats of different species have died from White-Nose Syndrome.  White-Nose Syndrome is currently documented in 30 out of the 37 states in the northern long-eared bat's range.  Within the core range of the northern long-eared bats in the northeastern U.S., White-Nose Syndrome is close to saturation in hibernacula.

80.     Northern long-eared bats have suffered up to 99 percent declines in hibernacula count data from eight states.  Summer data corroborate and confirm this 99 percent decline.  In the winter of 2014-15, White-Nose Syndrome continued to spread to states in the Midwest and

South.  In the Midwest, bat mortalities are being documented in Michigan and Wisconsin after White-Nose Syndrome was first documented in these states in 2014.

81.    All models agree that White-Nose Syndrome will spread throughout the northern long-eared bat's range.  In 2015, the Service estimated the disease would reach all of the bat's range in the U.S. in roughly eight to thirteen years or sooner.

**B.    Protecting the Northern Long-Eared Bat Under the ESA**

82.    In 2010, the Center petitioned the Service to protect northern long-eared bats under the ESA due to the threats the species faces from White-Nose Syndrome, logging, hydraulic fracturing and other forms of energy development, environmental contaminants (such as pesticide and herbicide applications), and other impacts to the species' habitat.

83.    On September 9, 2011, this Court issued an order approving a settlement agreement between the Center and the Service, which among other things, required the Service, by September 30, 2013, to submit to the Federal Register either a proposed rule to list the northern long-eared bat or a determination that listing the northern long-eared bat is not warranted, in response to the Center's petition and according to the listing process that is set forth in the ESA.  Orders Granting Motions for Settlement, *In re Endangered Species Act Section 4 Deadline Litigation*, MDL 2165, No.10-00377 (Sept. 9, 2011) (ECF Nos. 55, 56).

84.    On October 2, 2013, the Service proposed to list the northern long-eared bat as an endangered species.  In so doing the Service found the threat to the bats from disease "is ongoing, is expected to increase in the future, and is significant because it continues to extirpate northern long-eared bat populations as it spreads and is expected to continue to spread throughout the species' range."  The agency found "that the northern long-eared bat is presently in danger of extinction throughout its entire range based on the severity and immediacy of threats

currently affecting the species.  The overall range has been significantly impacted because a large portion of populations in the eastern part of the range have been extirpated due to WNS." At the time, White Nose Syndrome was "found in 22 of 39 States where the northern long-eared bat occurs."  The Service concluded "that a threatened species status is not appropriate for the northern long-eared bat because the threat of WNS has significant effects where it has occurred and is expected to spread rangewide in a short timeframe."

85.     On January 6, 2014, the Service issued an interim guidance document for planning and conducting conferences under Section 7(a)(4) of the ESA.  The interim guidance determined that bats can be negatively impacted by human activities that: (1) impact the bats and/or their hibernacula; (2) impact the bats and/or their summer habitat; or (3) impact migrating bats.

86.     The guidance specified that bats are threatened by the following: (a) the use of clothing, footwear, or equipment that was used in a White-Nose Syndrome-affected state or region in a cave or mine in an unaffected state or region; (b) impacts to hibernacula openings, which may restrict bat flight and movement and/or may modify air flow or microclimate, reducing suitability of the hibernaculum for bats or decreasing survivorship; (c) entry into hibernacula; (d) clearing trees within five miles of caves or mines where the bats hibernate, reducing staging/swarming habitat; (e) permanent or temporary removal of forested habitat available for roosting, foraging, or travel; (f) types of timber management (e.g., clear-cutting) which reduce the viability of northern long-eared bat populations if key areas of a home range are removed; (g) lethal bat removal from occupied homes or structures; (h) blasting or drilling within a half-mile of caves or mines where the bats hibernate during the winter, which may disturb hibernating bats; (i) use of pesticides and herbicides in a way that exposes the bats (e.g.,

aerial application at night) or significantly reduces their prey; and (j) loss of clean water sources (e.g., through fill or water quality degradation), which can reduce northern long-eared bat water sources, foraging habitat, and/or prey.

87.     Relying upon this guidance, the Service conferred upon numerous federal actions both when the northern long-eared bat was proposed to be listed and once it was listed as threatened.

88.     In response to the proposed endangered listing of the northern long-eared bat, members of the timber industry, energy industry, and others raised complaints about the proposed listing to the Service and to state officials within the range of the bat – prompting political pressure from state and congressional officials on the Service to not protect the species under the ESA.  On June 30, 2014, the Service took a six-month extension for making its listing decision, citing "disagreement regarding the sufficiency or accuracy of the available data relevant to our determination . . . ."  As a result of this extension, the Service's final decision for the northern long-eared bat was due on April 2, 2015.

89.     On January 16, 2015, the Service re-opened the public comment period on the proposed endangered listing and proposed a 4(d) rule for the northern long-eared bat.  The Service acknowledged that a 4(d) rule could only be adopted for the species if it was listed as threatened, but the Service did not propose a threatened listing of the bat.  The proposed 4(d) rule extended the prohibitions in Section 9 of the ESA to the bat, and then carved out exemptions from the prohibition on take.  The Service provided a 60-day comment period on the proposed 4(d) rule.

90.     The Service did not undertake a NEPA process or review for the proposed 4(d) rule.  The Service did not issue a draft environmental assessment or draft environmental impact

statement for the proposed 4(d) rule. The Service did not propose any alternatives to the proposed 4(d) rule.

91.     On March 17, 2015, the Center and other organizations submitted comments to the Service objecting to the listing of the northern long-eared bat as a threatened species instead of an endangered species (even though the Service never proposed a threatened listing), objecting to the proposed 4(d) rule, and among other things asking the Service to undertake a NEPA review before adopting a 4(d) rule for the northern long-eared bat.

**C.     The Listing Decision and Interim 4(d) Rule**

92.     On April 2, 2014, the Service listed the northern long-eared bat as a threatened species.

93.     The Service never proposed a threatened listing of the northern long-eared bat or held a public comment period on such a proposal.

94.     In the time between the proposed endangered listing and the final threatened listing, White-Nose Syndrome spread further throughout the northern long-eared bats' range.

95.     In their determination to list the species as threatened, the Service relied on its illegal 2014 SPR Policy. Specifically, the Service concluded that the northern long-eared bat was threatened throughout its range. The threatened listing determination failed to analyze whether northern long-eared bats are endangered in any significant portion of their range, including the core of their range in the northeastern United States. The Service did not consider whether the core of the northern long-eared bats range, where the species has declined the most, is "significant." Nor did the Service analyze whether, given the concentration of threats, namely disease, in the core of the species' range, the bats are endangered in that portion of their range.

96.     The 2014 SPR Policy's interpretation of the ESA violates Section 4 of the ESA, is contrary to the definitions of "endangered" and "threatened" in the ESA, and is arbitrary, capricious, and otherwise contrary to law.

97.     The Service also improperly and explicitly relied upon the "Supplemental Explanation for the Legal Basis of the Department's May 15, 2008 Determination of Threatened Status for the Polar Bear" (the Polar Bear Memo) in reaching its determination that the northern long-eared bat is a threatened species.

98.     The reliance on the Polar Bear Memo violates Section 4(h) of the ESA, violates the APA's notice and comment requirements, and is arbitrary and capricious and contrary to law.

99.     The application of the Polar Bear Memo led the Service to unlawfully conclude that while the White-Nose Syndrome fungus "will extend throughout the bat's entire range in about 8 to 9 years," "because no significant declines have occurred to date in the portion of the range not yet impacted by the disease, and because some bats persist many years later in some geographic areas impacted by WNS (for unknown reasons), we conclude that the northern long-eared bat is not currently in danger of extinction throughout all of its range."

100.     Along with the threatened listing on April 2, 2014, the Service adopted an "interim final" 4(d) rule for the northern long-eared bat.  50 C.F.R. § 17.40(o).  In so doing the Service stated it was "establishing an interim rule under the authority of section 4(d) of the Act" and "seeking public comments on this interim rule" and would "publish either an affirmation of the interim rule or a final rule amending the interim rule after we consider all comments we receive."  The Service did not comply with NEPA before adopting the final interim 4(d) rule.

101.     The interim 4(d) rule divided the northern long-eared bat's range in the U.S. into areas with White-Nose Syndrome and buffers around those areas, and areas without the disease.

28

Outside the White-Nose Syndrome areas and buffers, the interim 4(d) rule authorized: all incidental take of the species during otherwise lawful activities; purposeful take of northern long-eared bats during removal of the bats from human dwellings; and purposeful take for one year during scientific research.  Inside the White-Nose Syndrome areas and buffers, the interim 4(d) rule authorized incidental take of bats from:  forest management, maintenance and expansion of existing rights-of-way and transmission corridors, native prairie management, and minimal tree removal projects.  These activities are authorized subject to these restrictions:

a.   Occur more than 0.25 mile (0.4 km) from a known, occupied hibernacula.

b.   Avoid cutting or destroying known, occupied maternity roost trees during the pup season (June 1–July 31).

c.   Avoid clearcuts within 0.25 (0.4 km) mile of known, occupied maternity roost trees during the pup season (June 1–July 31).

102.    The interim 4(d) rule also authorized removal of hazardous trees for the protection of human life and property, but without any required measures.  Inside the White-Nose Syndrome areas and buffers, the interim 4(d) rule also authorized purposeful take of northern long-eared bats during removal of the bats from human dwellings and purposeful take for one year during scientific research.

103.    The Center again provided comments on the interim 4(d) rule explaining why and how it failed to conserve the species and proposing an alternate 4(d) rule for the Service's consideration.

104.    On information and belief, the Service continued to be subjected to lobbying and political pressure from the timber and energy industries and other interests.

D.      **The Final 4(d) Rule**

105.    On January 14, 2016, Defendants' final 4(d) rule for the northern long-eared bat

was published in the Federal Register.  4(d) Rule for the Northern Long-Eared Bat, 81 Fed. Reg.

1900 (Jan. 14, 2016).

106.    The final 4(d) rule provided even fewer protections for northern long-eared bats

than the interim 4(d) rule provided.  Instead of applying Section 9's take prohibition and carving

out exemptions from it, the final 4(d) rule only prohibited take of bats in very limited instances.

107.    The final rule prohibits purposeful take of northern long-eared bats subject to the

following exemptions: public safety; hazardous tree removal; removal from human structures in

compliance with state law; permitted capture and handling until May, 2016; and by federal or

state employees under certain circumstances.

108.    The final rule prohibits incidental take in areas with White-Nose Syndrome and

buffers around them in only the following instances: in known hibernacula; in the entrance of a

known hibernacula; tree removal within 1/4 mile of a known hibernacula; removing a known

occupied roost tree from June to July; and removing trees within 150 feet of a known occupied

roost tree from June to July.  All other incidental take of northern long-eared bat is allowed.

109.    Under the final 4(d) rule, the majority of northern long-eared bat habitat can be

removed or destroyed so long as it is not within a quarter mile of a known hibernacula or while a

known roost tree is occupied by bats during June and July.  All summer habitat, all roost trees,

all migratory corridors, and virtually all spring staging and fall swarming habitat for northern

long-eared bats can be logged or cleared without any consequences, so long as the logging takes

place from August to May.  This is antithetical to the ESA's goal of conserving the ecosystems

upon which imperiled species' depend.

110.    In proposing to list the northern long-eared bat as endangered, the Service found that habitat destruction, contaminants, wind energy development, and other threats cumulatively with White-Nose Syndrome "may further adversely impact the species."  In developing guidance for Section 7 conferences the Service found that "[s]mall or declining populations may be increasingly vulnerable to other impacts, even impacts to which they were previously resilient. These other impacts may include indirect impact (e.g., clearing important roosting or foraging habitat) or direct impact (e.g., cutting down occupied roost trees while pups are non-volant [unable to fly])."  And they concluded that bats sick and weakened from White-Nose Syndrome would likely be more vulnerable to other stressors such as habitat loss.

111.    As for the habitat protections the final rule provides, originally the Service determined that a five-mile radius of habitat around hibernacula should be protected, but the final rule only protects a quarter mile radius around known hibernacula.  Similarly, the Service originally proposed a quarter mile radius to protect roost trees, but then only protected 150 feet around known occupied roost trees.  The protections for known occupied roost trees only apply for two months, which fails to cover the entire northern long-eared bat pup season.  The Service previously identified several other life stages as critical for northern long-eared bats but provided no protections for those life stages under the final 4(d) rule.

112.    Under the final 4(d) rule there is no reason or incentive to survey for northern long-eared bats.  In fact the rule has the opposite effect because the prohibition on incidental take only applies to *known* hibernacula and *known* roost trees.  Therefore, so long as the hibernacula or roost tree is unknown it is lawful to destroy it.  This is significant given that few hibernacula and roost trees are known.  For example, in consulting upon forestry activities on 15 national forests in 2015, the Service concluded that only 99 hibernacula were known on eight of the 15

national forests, but estimated the forests supported roughly 436,950 northern long-eared bats.  If a hibernacula supports up to 100 bats (a generous estimate), then 4,369 hibernacula should exist on the 15 forests of which only 99 or only two percent are known.

113.    On January 5, 2016, the Service completed formal intra-agency Section 7 consultations that resulted in a Biological Opinion for the final 4(d) rule for the northern long-eared bat.

114.    The environmental baseline in the Biological Opinion, against which the effects of the action are supposed to be measured, 50 C.F.R. § 402.02, is simply equated with the status of the species and the Service makes no effort to quantify the past impacts to northern long-eared bats that have been authorized under Section 7(a)(4) since the species was proposed to be listed in 2013 or under Section 7(a)(2) after the species was listed.

115.    In the Biological Opinion, the Service acknowledges that coal mining, hydrologic fracturing, and other oil and gas industry and mining techniques can destroy hibernacula and that logging and other practices can alter the internal environment of hibernacula, but the agency fails adequately analyze the impacts to northern long-eared bats from the loss of hibernacula as authorized under the final 4(d) rule.

116.    The Biological Opinion for the final 4(d) rule estimates the population of northern long-eared bats based upon the entire forested areas of each state in the northern long-eared bat's range.  For past Section 7 consultations for the species, the Service looked at "suitable" and "likely suitable" habitat and not at all forested areas.  In estimating the impacts to northern long-eared bats from the 4(d) rule, the Biological Opinion fails to address impacts to the bats from activities such as road building for logging and mining.

117.    Prior Section 7 consultations were either based upon or called for greater protections around roost trees and hibernacula, yet these conservation measures are not provided in the Biological Opinion for the final 4(d) rule.  Prior Section 7 consultations and many scientific and other comments called for the marking and protection of all known roost trees, yet this conservation measure is not provided in the Biological Opinion for the final 4(d) rule.  Prior Section 7 consultations considered the impacts to northern long-eared bats during life stages that are not protected by the final 4(d) rule such as migration, fall staging, and spring swarming, yet impacts to bats during these life stages are not adequately addressed under the Biological Opinion.

118.    The Environmental Assessment for the final 4(d) rule is unlawful.  By using the interim 4(d) rule (for which NEPA was not complied with) as the baseline for the NEPA analysis, the Service never fully or adequately considered the environmental impacts of the final rule.  The final Environmental Assessment also supports a predetermined outcome to amend the interim 4(d) rule, without providing for consideration of a full range of alternatives to that rule or the final rule.  Therefore, the Service's final 4(d) rule decision-making process was tainted by the lack of a NEPA review for the interim 4(d) rule and undertaken without the benefit of NEPA's required consideration of alternatives and environmental impacts before a decision was made.  Nor was the public provided any opportunity to participate in this NEPA process.

**CLAIMS FOR RELIEF**

**FIRST CLAIM**

**The Decision to List the Northern Long-Eared Bat as Threatened, Instead of Endangered, Violates the ESA and APA**

119.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

120.    The ESA permits the listing of any "species," which is defined to include any "subspecies of fish, wildlife or plant" and "any distinct population segment of species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  The Act defines an "endangered" species as one that is "in danger of extinction throughout all or a significant portion of its range."  *Id*. § 1532(6).  A "threatened" species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id*. § 1532(20).

121.    The Service makes listing determinations on the basis of an analysis of the following factors: 1) the present or threatened destruction, modification, or curtailment of its habitat or range; 2) over-utilization for commercial, recreational, scientific, or educational purposes; 3) disease or predation; 4) the inadequacy of existing regulatory mechanisms; or 5) other natural or manmade factors affecting its continued existence.  16 U.S.C. § 1533(a)(1). Under the ESA, the Service is obligated to list a species if any one or a combination of the five listing factors is triggered.  *Id.*

122.    In addition to the listing factors outlined in 16 U.S.C. § 1533(a), the ESA requires that listing determinations be based "solely on the basis of the best scientific and commercial data available . . . ."  *Id*. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b).

123.    The ESA requires the Service, "not less than 90 days before the effective date of the [listing] regulation," to "publish a general notice and the complete text of the proposed regulation in the Federal Register . . . ."  16 U.S.C. § 1533(b)(5)(A)(i).

124.    The Service failed to: adequately evaluate the ESA's statutory listing factors; utilize the best scientific data available; consider whether the northern long-eared bat meets the definition of an endangered species in a "significant portion of its range," determine whether the

northern long-eared bats' core range is significant and whether the ongoing threat of disease in

that core range warrants an endangered listing; and define the foreseeable future for the northern

long-eared bat.  The Service violated the APA and ESA by failing to provide the public with

notice and the opportunity to comment on the proposed threatened listing of the northern long-

eared bat.  In doing so, the Service has violated the APA, 5 U.S.C. § 553; the ESA, 16 U.S.C. §§

1533(a)(1), 1533(b)(1)(A), 1533(b)(5), 1532(6), 1532(20); and otherwise acted without

observance of procedure required by law, acted arbitrarily, capriciously, and not in accordance

with law, and abused its discretion in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

125.    Defendants' violations of law pose actual and imminent harm to the protected

interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision

will prevent or redress such injury.

## SECOND CLAIM

**By Relying Upon the Polar Bear Memo to Reach its Threatened Determination for the
Northern Long-Eared Bat, the Service Violated the APA and ESA**

126.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

127.    The APA, 5 U.S.C. § 553, and Section 4(h) of the ESA, 16 U.S.C. § 1533(h),

require public notice and the opportunity for comment on Service regulations and policies.

128.    By relying on the interpretation of "in danger of extinction" in the Service's Polar

Bear Memo in listing the northern long-eared bat as threatened – without providing public notice

and an opportunity to comment on the Polar Bear Memo – the Service violated the APA, 5

U.S.C. § 553; the ESA, 16 U.S.C. § 1533(h); and otherwise acted without observance of

procedure required by law and acted arbitrarily, capriciously in violation of the APA, 5 U.S.C. §

706(2)(A), (D).

129.    Notwithstanding the Service's procedurally improper reliance on the statutory interpretation contained in the Polar Bear Memo, the Memo also articulates an improper and incomplete standard for determining when a species is "in danger of extinction" that is arbitrary and capricious, not in accordance with law, and contrary to the ESA.  5 U.S.C. § 706(2); 16 U.S.C. § 1532(6).

130.    Furthermore, even if the standard outlined in the Polar Bear Memo were appropriate to apply to the northern long-eared bat, the Service misapplied that standard in this case.  The northern long-eared bat meets the Polar Bear Memo standard for an endangered listing and the decision to list the species as threatened is arbitrary and capricious and not in accordance with law, including the ESA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1532, 1533.

131.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

### THIRD CLAIM

**The Final 2014 SPR Policy's Interpretation of "Significant Portion of Its Range"
Violates the ESA and is Otherwise Arbitrary and Capricious**

132.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

133.    An "endangered species" is any species as defined by the Act "which is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a "threatened species" is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

134.    By adopting a Final SPR Policy that is drastically different from the Proposed SPR Policy, the Service violated the ESA, 16 U.S.C. § 1533(h), and APA, 5 U.S.C. § 533, and

acted without observance of procedure required by law.  5 U.S.C. § 706(2)(D).  Further, by adopting a Final SPR Policy that prohibits the Services, where they have first determined that a species is a "threatened species" throughout its entire range, from also considering whether the species may be an "endangered species" based on its status in a "significant portion of its range," the Service has violated the ESA, 16 U.S.C. §§ 1532(6), 1532(20), 1533, and acted arbitrarily, capriciously, and not in accordance with law, and abused its discretion in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

135.     By failing to determine whether the northern long-eared bat is endangered in a significant portion of its range and by applying the Final SPR Policy to this species, the Service has also acted arbitrarily, capriciously, and not in accordance with law, and abused its discretion in violation of the APA, 5 U.S.C. § 706(2)(A), (D), and ESA.  16 U.S.C. §§ 1532, 1533.

136.     Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

**FOURTH CLAIM**

**The Service's final 4(d) rule for the northern long-eared bat violates the ESA, 16 U.S.C. §§ 1533(d), 1532, 1536, and is contrary to the APA, 5 U.S.C. § 706.**

137.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

138.     Section 4(d) of the ESA requires the Service to establish regulations that are necessary and advisable for the conservation of threatened species.  16 U.S.C. § 1533(d).

139.     If the Service violated the ESA and APA by listing the northern long-eared bat as threatened, the 4(d) rule must be vacated, as the provisions of Section 4(d) of the ESA do not apply to endangered species.  16 U.S.C. § 1533(d).

140.    The final 4(d) rule for the northern long-eared bat is neither necessary nor advisable for the conservation of the species.  The Service violated the clear commands and plain language of the ESA, 16 U.S.C. §§ 1533(d) (the Service "shall issue" regulations "necessary and advisable" for the conservation of the species and "may" issue regulations extending Section 9's prohibitions), 1532(3) (defining conservation), and its own stated intent to establish a 4(d) rule that is necessary and advisable for the conservation of the species.

141.    The Service's attempts to justify the final 4(d) rule and explain its finding that the rule meets Section 4(d)'s intent are arbitrary and capricious and contrary to law, including the ESA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d), 1532(3).

142.    Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## FIFTH CLAIM

**The Service Violated Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), the Section 7 Regulations, and the APA in Its Consultations on the Final 4(d) Rule**

143.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

144.    The final 4(d) rule Biological Opinion violates Section 7, 16 U.S.C. § 1536(a)(2), and its implementing regulations and is arbitrary and capricious because it fails to provide an adequate environmental baseline for analyzing the effects of the final 4(d) rule.  50 C.F.R. § 402.02 (defining effects of the action); *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) ("There must be an analysis of the status of the environmental baseline given the listed impacts, not simply a recitation of the activities of the agencies").

145.    The final 4(d) rule Biological Opinion is arbitrary and capricious because the

Service fails to adequately account for the impacts to and destruction of unknown hibernacula.  5

U.S.C. § 706(2)(A).

146.    The Service failed to use the best available science and otherwise acted arbitrarily

and capriciously in consulting under Section 7 in estimating northern long-eared bat populations,

in failing to adopt conservation measures for the species, and in analyzing the impacts to bats at

only certain life stages and from only certain activities.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.14(d), (f)(8).

147.    Defendants' violations of law pose actual and imminent harm to the protected

interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision

will prevent or redress such injury.

## SIXTH CLAIM

**The Service Failed to Comply with NEPA, 42 U.S.C. §§ 4321-4347, the CEQ's
Implementing Regulations, 40 C.F.R. §§ 1500.1-1508.28, and the APA, 5 U.S.C. § 706 in
Adopting the Interim and Final 4(d) Rules**

148.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

149.    NEPA is designed to "insure that environmental information is available to public

officials and citizens *before* . . . actions are taken," and to "help public officials make decisions

that are based on understanding of environmental consequences."  40 C.F.R. §§ 1500.1(b), (c)

(emphasis added).

150.    The Service's promulgation of the interim 4(d) rule authorizing take of northern

long-eared bats is a major federal action significantly affecting the quality of the human

environment.  The Service's adoption of an interim 4(d) rule that authorizes activities that the

Service previously identified as adversely affecting or posing a threat to northern long-eared bats has an environmental impact that at least requires review in an environmental assessment. The Service's failure to prepare an environmental assessment or an environmental impact statement prior to adopting the interim 4(d) rule authorizing take of northern long-eared bats is a violation of NEPA, 42 U.S.C. §§ 4321-4347.  The Service's subsequent NEPA process for the final 4(d) rule is unlawful because it relies upon the interim 4(d) rule, which was established in violation of NEPA, as the baseline for its analysis of environmental impacts and range of alternatives.  The failure to undertake a NEPA process while developing the interim rule, led to an unlawful NEPA process for the final 4(d) rule.  The final and interim 4(d) rules fail to comport with NEPA, 42 U.S.C. §§ 4321-4347, and the CEQ's implementing regulations, 40 C.F.R. §§ 1500.1-1508.28, and are arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706.

151.     The Service cannot cure its violations of NEPA and the APA without vacatur of the final and interim 4(d) rules for the northern long-eared bat and the agency undertaking a new rulemaking process to ensure the Service has before it all relevant information and alternatives when making its decision.  This relief is necessary to protect against a predetermined outcome for the NEPA process and final rulemaking.

152.     Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests this Court:

1)     Declare that Defendants' April 2, 2015 final rule listing the northern long-eared bat as a threatened species, rather than an endangered species, violates the ESA and APA;

2)      Declare that the Service unlawfully relied upon the 2014 "Significant Portion of its Range" policy when making the threatened determination;

3)      Declare that the 2014 "Significant Portion of its Range" policy is unlawful and invalid under the ESA and APA;

4)      Declare that the Service unlawfully relied upon the "Polar Bear Memo" when making the threatened determination;

5)      Declare that the Service's final 4(d) rule for the northern long-eared bat is arbitrary and capricious and contrary to the ESA;

6)      Declare that the Service violated Section 7 of the ESA in its consultations upon the final 4(d) rule for the northern long-eared bat;

7)      Declare that the Service violated NEPA by failing to undertake an analysis of the interim 4(d) rule and then relying upon that rule in the subsequent NEPA process for the final 4(d) rule making that process inadequate and unlawful;

8)      Vacate the final and interim 4(d) rules for the northern long-eared bat;

9)      Leave the threatened listing of the northern long-eared bat in place and remand the listing decision to Defendants for further consideration consistent with the Court's decision;

10)     Order Defendants to reconsider the listing of the northern long-eared bat and issue a new Final Rule within six months;

11)     Order Defendants to undertake proper public notice and comment procedures consistent with the APA and ESA prior to any further reliance upon the 2014 "Significant Portion of its Range" policy or the Polar Bear Memo;

12)     Award Plaintiffs their fees and costs; and

13)     Grant Plaintiffs such other relief as the Court deems just and proper.

DATED:  April 15, 2016           Respectfully submitted,

/s/ Tanya M. Sanerib
Tanya M. Sanerib (D.C. Bar No. 473506)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Telephone: (971) 717-6407
tsanerib@biologicaldiversity.org

*Attorney for Plaintiffs*