## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY *et al.*, | ) ) ) | No. 1:15-cv-00477-EGS |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JIM KURTH[1] *et al.*, | ) ) | |
| Federal Defendants, | ) ) | |
| AMERICAN FOREST & PAPER ASSOCIATION *et al.*, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |
| DEFENDERS OF WILDLIFE, | ) ) | No. 1:16-cv-00910-EGS |
| Plaintiff, | ) ) | (Consolidated Case) |
| v. | ) ) | |
| JIM KURTH[2] *et al.*, | ) ) | |
| Federal Defendants, | ) ) | |
| AMERICAN FOREST & PAPER ASSOCIATION *et al.*, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT
## ON THEIR LISTING CLAIMS

---

[1]      Pursuant to Fed. R. Civ. P. 25(d), Jim Kurth, Acting Director, U.S. Fish and Wildlife Service, and Ryan Zinke, Secretary, U.S. Department of the Interior, are substituted in their official capacities for Defendants Daniel M. Ashe and Sally Jewell in No. 1:15-cv-00477-EGS.
[2]      Pursuant to Fed. R. Civ. P. 25(d), Jim Kurth, Acting Director, U.S. Fish and Wildlife Service, and Ryan Zinke, Secretary, U.S. Department of the Interior, are substituted in their official capacities for Defendants Daniel M. Ashe and Sally Jewell in No. 1:16-cv-00910-EGS.

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 7(h), and this Court's Minute Orders of January 13, 2017 providing for bifurcated briefing of Plaintiffs' Listing and 4(d) rule claims and February 22, 2017 extending the briefing schedule. Plaintiffs in No. 1:15-cv-00477-EGS ("Center Matter") the Center for Biological Diversity, Sierra Club, Coal River Mountain Watch, and Ohio Valley Environmental Coalition and Plaintiff in No. 1:16-cv-00910-EGS ("Defenders Matter") Defenders of Wildlife (collectively, "Plaintiffs") hereby move for summary judgment on their listing claims challenging Federal Defendants' decision to list the northern long-eared bat as a threatened species instead of an endangered species under the Endangered Species Act, 16 U.S.C. §§ 1531-1544.

In the Center Matter, Plaintiffs move for summary judgment on Claims I through III of their first Amended Complaint (ECF No. 27). In the Defenders Matter, Plaintiff moves for summary judgment on Claims I and II of their Complaint (ECF No. 1). These claims generally overlap and are being briefed together in the accompanying memorandum. However, Plaintiffs note that in the Center Matter, Plaintiffs challenge the Service's procedurally improper reliance on the Polar Bear Memo in the final rule, because that Memo violates the Endangered Species Act and Administrative Procedure Act's notice and comment requirements. The Defenders matter does not assert this claim.

Because Plaintiffs' claims challenging the listing rule will be determined based on the administrative record, no statement of undisputed material facts is required. Local Rule 7(h)(1). For the reasons set forth in the accompanying memorandum of points and authorities, Plaintiffs in these consolidated cases respectfully request that this Court grant their Motion for Summary Judgment on their listing claims and deny any cross-motion for summary judgment filed by any other Party. This motion is supported by the accompanying memorandum, the exhibits and

declarations filed concurrently, the administrative Records lodged by Defendants, and a

proposed order.

Respectfully submitted this 14th day of April, 2017,

*/s/ Tanya M. Sanerib*
Tanya M. Sanerib (D.C. Bar No. 473506)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
(971) 717-6407 (tel)
tsanerib@biologicaldiversity.org

Counsel for Plaintiffs Center for
Biological Diversity, Sierra Club,
Coal River Mountain Watch, and
Ohio Valley Environmental Coalition

*/s/ Jane P. Davenport*
Jane P. Davenport (D.C. Bar. No. 474585)
DEFENDERS OF WILDLIFE
1130 17th St NW
Washington, DC 20036
(202) 772-3274 (tel)
jdavenport@defenders.org

Counsel for Plaintiff Defenders of Wildlife

# TABLE OF CONTENTS

Introduction..................................................................................................................1

Statutory Background ....................................................................................................3

    A.   How ESA Listing Decisions Are Made ..............................................................5

    B.   FWS' Interpretations of the "Endangered" and "Threatened" Definitions........6

        1.   Significant Portion of Its Range and the SPR Policy....................................6

        2.   "In Danger of Extinction" and the Polar Bear Memo..................................7

        3.   "Foreseeable Future" .................................................................................8

Statement of Facts .........................................................................................................8

    A.   The Northern Long-Eared Bat and White-Nose Syndrome................................8

    B.   The Listing Process ...........................................................................................13

Standard of Review.......................................................................................................19

Statement of Jurisdiction ..............................................................................................21

Argument .......................................................................................................................21

I.   The Threatened Determination Relies on Unreasonable Interpretations
of Statutory Definitions, Fails to Base its Supporting Rationales on the Best
Available Scientific Data, and is Not a Logical Outgrowth of the Proposed Rule.................23

    A.   FWS Improperly Pairs an Unreasonably Narrow Interpretation of "In
Danger of Extinction" and an Unreasonably Amorphous Conception of
"Foreseeable Future" to Deny the Bat Endangered Status.................................23

    B.   The Four Rationales FWS Invokes to Support the Threatened Determination
Are Contradicted by the Best Available Scientific Data....................................26

        1.   The 8 to 13-Year Timeframe for Rangewide Pd/WNS Spread Neither
Justifies the Threatened Determination Nor Differs Meaningfully from the
"Short Timeframe" of the Proposed Endangered Determination.............................27

        2.   The "40% of the Total Geographic Range" Rationale Ignores that Bats
are Uncommon to Rare in the Periphery of their Range ............................................29

3.  To the Extent "Potentially Millions of Bats" Existed, They Were
    in Areas Already Infected by WNS by April 2015 ....................................................32

4.  There is No Credible Evidence that "Some Bats Persist" in
    WNS-Infected Areas ..................................................................................................34

C.  FWS Arbitrarily Failed to Consider the Cumulative Effects of Threats
    Under Other Listing Factors in Determining to List the Bat as Threatened ...................39

D.  FWS Violated ESA and APA Notice and Comment Requirements ...............................41

II.  FWS Developed and Relied Upon an Unlawful Significant Portion of
     Its Range Policy ...........................................................................................................44

A.  The Service Has a Long History of Improperly Interpreting
    "Significant Portion of Its Range" ...................................................................................45

B.  The Final SPR Policy is Contrary to the Plain Language of the ESA ..........................47

C.  The SPR Policy is an Unreasonable Interpretation of the ESA
    Under Chevron Step Two ................................................................................................51

D.  FWS Unlawfully Applied the SPR Policy to List the Bat as
    Threatened Without Considering if the Bat is Endangered in a
    Significant Portion of Its Range ......................................................................................55

Remedy ................................................................................................................................58

Conclusion ...........................................................................................................................60

# TABLE OF AUTHORITIES

**page(s)**

**Cases**

*AFL-CIO v. Chao,*
 496 F. Supp. 2d 76 (D.D.C. 2007) ..........................................................................43

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.,*
 719 F. Supp. 2d 26 (D.D.C. 2010) ..........................................................................47

*Alaska Oil & Gas Ass'n v. Pritzker,*
 840 F.3d 671 (9th Cir. 2016) ..................................................................................24

*Allied-Signal, Inc. v. Nuclear Regulatory Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) ................................................................................58

*Am. Wildlands v. Kempthorne,*
 478 F. Supp. 2d 92 (D.D.C. 2007) ..........................................................................19

*Am. Wildlands v. Norton,*
 193 F. Supp. 2d 244 (D.D.C. 2002) ....................................................6, 32, 38, 60

*Ariz. Cattle Growers' Ass'n v. USFWS,*
 273 F.3d 1229 (9th Cir. 2001) ..........................................................................20, 26

*\*Chevron, U.S.A, Inc. v. NRDC,*
 467 U.S. 837 (1984).................................................................45, 47, 49, 51, 54

*Citizens Coal Council v. Norton,*
 330 F.3d 478 (D.C. Cir. 2003) ................................................................................47

*City of Las Vegas v. Lujan,*
 891 F.2d 927 (D.C. Cir. 1989) ..................................................................................6

*Colo. River Cutthroat Trout v. Salazar,*
 898 F. Supp. 2d 191 (D.D.C. 2012) ..................................................................46, 57

*Conner v. Burford,*
 848 F.2d 1441 (9th Cir. 1988) ..................................................................................6

*\*CSX Transp., Inc. v. Surface Transp. Bd.,*
 584 F.3d 1076 (D.C. Cir. 2009)....................................................42, 43, 44, 53

*\*Ctr. for Biological Diversity v. Jewell,*
 No. CV-14-02506-TUC-RM slip op. (D. Ariz. Mar. 29, 2017) ..................................... *passim*

iii

*Ctr. for Native Ecosystems v. Fish and Wildlife Serv.*,
   795 F. Supp. 2d 1199 (D. Colo. 2011) ...................................................................41

*Defenders of Wildlife v. Babbitt*,
   958 F. Supp. 670 (D.D.C. 1997) ...........................................................6, 20, 41

*Defenders of Wildlife v. Jewell*,
   176 F. Supp. 3d 975 (D. Mont. 2016) ............................................................38, 42

*Defenders of Wildlife v. Norton*,
   239 F. Supp. 2d 9 (D.D.C. 2001),
   *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004) ....................4, 54, 55, 57

*Defenders of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001) ......................................................4, 32, 46, 50, 52

*Defenders of Wildlife v. Salazar*,
   729 F. Supp. 2d 1207 (D. Mont. 2010) .............................................................46

*Esch v. Yeutter*,
   876 F.2d 976 (D.C. Cir. 1989) .......................................................................60

*Fed'n of Fly Fishers v. Daley*,
   131 F. Supp. 2d 1158 (N.D. Cal. 2000) ...............................................................4

*Franks v. Salazar*,
   751 F. Supp. 2d 62 (D.D.C. 2010) ...................................................................60

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000).................................................................................21

*Grand Canyon Air Tour Coal. v. FAA*,
   154 F.3d 455 (D.C. Cir. 1998) .......................................................................42

*Greater Yellowstone Coal. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) ........................................................32, 34, 38, 39

*Home Box Office, Inc. v. FCC*,
   567 F.2d 9 (D.C. Cir. 1977) .........................................................................43

*Humane Soc'y of the U.S. v. Jewell*,
   76 F. Supp. 3d 69 (D.D.C. 2014) ....................................................20, 46, 48, 59

*Humane Soc'y of the U.S. v. Kempthorne*,
   579 F. Supp. 2d 7 (D.D.C. 2008) ....................................................................58

*Humane Soc'y of the U.S. v. Pritzker*,
   75 F. Supp. 3d 1 (D.D.C. 2014) ......................................................................5

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977)..........................................................................................21

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ...........................................................................58

*Int'l Longshoremen's Ass'n, AFL-CIO v. Nat'l Mediation Bd.*,
  870 F.2d 733 (D.C. Cir. 1989)..........................................................................56

*Martin v. Occupational Safety & Health Review Comm'n*,
  499 U.S. 144 (1991)..........................................................................................24

*McDonnell Douglas Corp. v. Dep't of the Air Force*,
  375 F.3d 1182 (D.C. Cir. 2004).........................................................................20

*McLouth Steel Prods. Corp. v. Thomas*,
  838 F.2d 1317 (D.C. Cir. 1988).........................................................................42

*Methodist Hosp. v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994)...........................................................................53

*Mohamad v. Rajoub*,
  634 F.3d 604 (D.C. Cir. 2011)...........................................................................49

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).............................................................................20, 42, 55

*Nat'l Parks Conserv. Ass'n v. Jewell*,
  62 F. Supp. 3d 7 (D.D.C. 2014).........................................................................59

*Northpoint Tech. Ltd. v. FCC*,
  412 F.3d 145 (D.C. Cir. 2005)...........................................................................51

*Otter v. Salazar*,
  11-cv-00358-CWD, 2012 WL 3257843,
  2012 U.S. Dist. LEXIS 111743 (D. Idaho Aug. 8, 2012)...............................24, 25

*In re Polar Bear ESA Listing and 4(d) Rule Litigation*,
  794 F. Supp. 2d 65 (D.D.C. 2011) ................................................................6, 39

*Rocky Mountain Wild v. Fish and Wildlife Serv.*,
  No. 13-042, 2014 WL 7176384 ...............................................................36, 37, 39

*San Luis & Delta-Mendota Water Auth. v. Badgley*,
  136 F. Supp. 2d 1136 (E.D. Cal. 2000)..........................................................6, 32

*Sw. Ctr. for Biological Diversity v. Norton*,
  No. 98–934, 2002 U.S. Dist. LEXIS 13661 (D.D.C. July 29, 2002)......................57

*Sw. Gen. Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015) ...................................................................49

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) ...............................................................................53

*Trout Unlimited v. Lohn*,
645 F. Supp. 2d 929 (D. Or. 2007) ..........................................................23

*Tucson Herpetological Soc. v. Salazar*,
566 F.3d 870 (9th Cir. 2009) ...................................................................36

*United States v. Woods*,
– U.S. –, 134 S. Ct. 557 (2013).................................................................48

*Western Watersheds Project v. Forest Serv.*,
535 F. Supp. 2d 1173 (D. Idaho 2007) ....................................................42

*\*WildEarth Guardians v. Salazar*,
741 F. Supp. 2d 89 (D.D.C. 2010) ..................................................20, 39, 41, 46

**Statutes**

5 U.S.C. § 553(b) ...............................................................................41, 54, 56

5 U.S.C. § 553(c) ...............................................................................41, 54, 56

5 U.S.C. §§ 701–706 .................................................................................. *passim*

5 U.S.C. § 706(2) ...............................................................................20, 58

5 U.S.C. § 706(D) ...............................................................................20

16 U.S.C. §§ 1531–1544 ............................................................................ *passim*

16 U.S.C. § 1531 ...............................................................................53

16 U.S.C. § 1531(b) ...............................................................................3, 52

16 U.S.C. § 1532(3) ...............................................................................4, 52

16 U.S.C. § 1532(6) .................................................................................. *passim*

16 U.S.C. § 1532(15) ...............................................................................4

16 U.S.C. § 1532(19) ...............................................................................4

16 U.S.C. § 1532(20) .................................................................................. *passim*

16 U.S.C. § 1533(a) ...................................................................................................4

16 U.S.C. § 1533(a)(1) ...............................................................................39, 49, 52

16 U.S.C. §§ 1533(a)(1)(A)–(E) ...............................................................................5

16 U.S.C. § 1533(b)(1)(A) .......................................................................................52

16 U.S.C. § 1533(b)(1)(A)(i) .....................................................................................6

16 U.S.C. § 1533(b)(5) .............................................................................................56

16 U.S.C. § 1533(b)(5)(A)(i) ................................................................................5, 41

16 U.S.C. § 1533(d) ......................................................................................... *passim*

16 U.S.C. § 1533(h) ..........................................................................5, 23, 54, 56

16 U.S.C. § 1538(a)(1) ....................................................................................4, 5, 48

16 U.S.C. § 1540(c) .................................................................................................21

16 U.S.C. § 1540(g) .................................................................................................21

28 U.S.C. § 1331 ......................................................................................................21

28 U.S.C. § 1361 ......................................................................................................21

28 U.S.C. § 2201 ......................................................................................................21

**Code of Federal Regulations**

50 C.F.R. § 17.3 ........................................................................................................4

50 C.F.R. § 17.31 ................................................................................................5, 19

50 C.F.R. § 402.01(b) ................................................................................................4

50 C.F.R. § 424.11(b) ..........................................................................................6, 52

50 C.F.R. § 424.11(c) ...............................................................................................39

**Federal Register Notices**

49 Fed. Reg. 38,900 (Oct. 1, 1984) ...................................................................52, 53

73 Fed. Reg. 28,212 (May 15, 2008) .......................................................................25

76 Fed. Reg. 38,095 (June 29, 2011) .......................................................................13

76 Fed. Reg. 76,987 (Dec. 9, 2011) ...................................................................7, 23, 46, 54

78 Fed. Reg. 61,046 (Oct. 2, 2013) ..................................................................... *passim*

78 Fed. Reg. 72,058 (Dec. 2, 2013) ...................................................................16

79 Fed. Reg. 19,974 (Apr. 10, 2014) ..................................................................23

79 Fed. Reg. 36,698 (June 30, 2014) ..................................................................16

79 Fed. Reg. 37,577 (Jul. 1, 2014) ..................................................... *passim*

79 Fed. Reg. 68,657 (Nov. 18, 2014) ...........................................................16, 18, 42

81 Fed. Reg. 1900 (Jan. 14, 2016) ..................................................................19

80 Fed. Reg. 2371 (Jan. 16, 2015) ..................................................................18, 44

80 Fed. Reg. 17,974 (Apr. 2, 2015) ..................................................... *passim*

**Other**

H.R. Rep. No. 93-412 (1973) ..........................................................................50

## GLOSSARY OF TERMS

| | |
|---|---|
| 4AR | Administrative Record for the final 4(d) Rule |
| APA | Administrative Procedure Act |
| ESA | Endangered Species Act |
| Bat | Northern long-eared bat (*Myotis septentrionalis*) |
| FWS | U.S. Fish and Wildlife Service |
| Hibernacula | Where northern long-eared bats hibernate for the winter |
| LAR | Administrative Record for the NLEB Listing Determination |
| MYSE | *Myotis septentrionalis* or northern long-eared bat |
| NLEB | Northern long-eared bat |
| NLEB- | Administrative Record for the NLEB Interim 4(d) Rule |
| Polar Bear Memo | Supplemental Explanation for the Legal Basis of the Department's May 15, 2008, Determination of Threatened Status for Polar Bears (Dec. 22, 2010), Exhibit 1 to Federal Defendants' Notice of Completion of Remand (ECF No. 237–1) in *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, 1:08-mc-00764-EGS (D.D.C.) (LAR 23067–23084) |
| Pd | *Pseudogymnoascus destructans*, the fungus that causes WNS |
| Roost | Where northern long-eared bats summer |
| Service | U.S. Fish and Wildlife Service |
| SPR | Phrase "significant portion of its range" from the definitions of "endangered species" and "threatened species" |
| SPR Policy | Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species," 79 Fed. Reg. 37,578 (July 1, 2014). |
| SuppAR | Supplemental Administrative Record |
| WNS | White-nose syndrome |

# INTRODUCTION

Plaintiffs' lawsuit seeks review of the U.S. Fish and Wildlife Service's decisions to deny the highly imperiled northern long-eared bat the full statutory protections of the Endangered Species Act that the species needs to protect it from extinction and ensure its recovery. Plaintiffs hereby submit this memorandum of points and authorities in support of their motion for partial summary judgment.

White-nose syndrome (WNS) is a deadly fungal disease affecting hibernating bats. The disease gets its name from the distinctive white fungal growths on the muzzles, ears, and wing membranes of infected bats. Since its detection in New York little more than a decade ago, WNS has spread like wildfire to 30 States and five Canadian provinces, killing millions of North American bats and causing precipitous population declines. There is no treatment for fungus-infected habitats and no cure for WNS.

Of the seven hibernating bat species afflicted by WNS, the northern long-eared bat (Bat) has been one of the hardest-hit. Once abundant throughout the northeastern portion of its range in the United States and eastern Canada and common in the midwestern portion, the Bat has suffered catastrophic declines to the point that populations are extirpated or near extirpation across the core of its range. WNS continues its inexorable spread across the Bat's remaining peripheral range, moving at an average rate of 175 miles per year and leaving dead or dying bats in its wake.

In response to a petition in January 2010 by Plaintiff Center for Biological Diversity, in October 2013, the U.S. Fish and Wildlife Service (FWS or Service) proposed to list the Bat as an endangered species under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, based on the severity and immediacy of the threats facing the species. During the furor that followed

1

the proposed rule, FWS extended its deadline for a final determination by six months. In December 2014, the Service abruptly reversed course. At a two-day meeting, regional directors and other agency decision-makers decided to proceed with a threatened listing and a section 4(d) rule. A proposed 4(d) rule was rushed to publication one month after the December meeting.

In a highly irregular move, the Service bifurcated the listing rulemaking process into two separate tracks. On one track, Service biologists from multiple regional offices drafted the entire rule (minus the determination). On the other, a small group of Service staff drafted the threatened determination (without benefit of the draft rule). The review processes were also bifurcated. The biologists reviewed and commented on the draft rule without the draft threatened determination, and the regional directors reviewed and commented on the draft threatened determination without the draft rule.

The April 2015 final rule is a product of this bifurcated decision making process, in which the facts found and the conclusions reached simply fail to align. The rationales that FWS propounds to support the threatened determination ignore the best available scientific data on the Bat's life history and ecology as well as the devastation that WNS has wrought on Bats throughout the species' core range. The Service pairs an unreasonably narrow interpretation of "in danger of extinction" (explicitly drawn from the Polar Bear Memo) with a wholesale failure to define the Bat's "foreseeable future," setting the endangered bar so high that the Bat will be functionally extinct throughout most of its range before the agency will concede that an endangered listing is warranted. The threatened determination dismisses the cumulative effects of non-WNS threats, flatly contradicting the express finding to the contrary in the rule. Relying on its newly-minted Significant Portion of Range (SPR) Policy, once FWS determined that the

Bat is threatened throughout its range, it did not analyze whether the Bat is endangered in a significant portion of its range.

The Service compounded these substantive violations with procedural ones. Although the final rule cannot by any stretch of the imagination be considered a logical outgrowth of the proposed rule, the agency denied Plaintiffs—and the public—any opportunity to comment on the basis for the final rule, including its brand-new rationales, the decision to rely on the Polar Bear Memo's interpretation of "in danger of extinction," and the decision to rely on its newly-minted SPR Policy to forego any analysis of whether the Bat is endangered in a significant portion of its range. Because the SPR Policy advances a reading of the term "significant portion of its range" that is inconsistent with the plain language of the ESA, and because the final policy was not a logical outgrowth of the draft policy, Plaintiffs challenge the SPR Policy both facially and as applied to the Bat.

Based on the Service's clear violations of its substantive and procedural obligations under the ESA and the APA, Plaintiffs are entitled to partial summary judgment on their listing claims and on their facial challenge to the SPR Policy.[1]

## STATUTORY BACKGROUND

Congress enacted the Endangered Species Act of 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). Congress defined "conserve" broadly to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the

---

[1]     FWS produced several administrative records for this matter. Plaintiffs cite to the listing record as LAR, the SPR Policy record as SAR, the supplemental record as SuppAR, the interim 4(d) rule record as NLEB-, and the final 4(d) rule record as 4AR.

point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). "If a species is listed under the ESA, the Secretary must not merely avoid elimination of that species, but is required to bring the species back from the brink sufficiently to obviate the need for protected status." *Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1163 (N.D. Cal. 2000) (internal citations omitted).[2]

Only species listed as either "endangered species" or "threatened species" receive protection under the statute. 16 U.S.C. § 1533(a). An endangered species is "in danger of extinction throughout all or a significant portion of its range . . . ." *Id.* § 1532(6). A threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Congress' inclusion of two categories for listing species (threatened and endangered) "provide[s] incremental protection to species in varying degrees of danger . . . ." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) (citation omitted).

In keeping with this two-tiered approach, "[e]ndangered species are entitled to greater legal protection under the ESA than threatened species." *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 13 (D.D.C. 2001), *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004). The ESA automatically extends the prohibitions in Section 9, including the prohibition against "take," to all endangered species. 16 U.S.C. § 1538(a)(1).[3] Conversely, threatened species do not automatically receive any Section 9 protections. Section 4(d) provides that FWS

---

[2]     The Secretaries of Interior and Commerce administer the ESA. 16 U.S.C. § 1532(15). The Secretary of Interior has delegated authority to FWS to administer the ESA for terrestrial species such as the Bat. 50 C.F.R. § 402.01(b). The National Marine Fisheries Service (NMFS) administers the ESA for marine species.

[3]     "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Harass" and "harm" are further defined by regulation. 50 C.F.R. § 17.3.

"shall" issue regulations that are "necessary and advisable to provide for the conservation" of any species listed as threatened and that it "may by regulation" extend any of the Section 9 prohibitions to that species. *Id.* § 1533(d). FWS has a long-standing rule that automatically extends all the prohibitions of Section 9 to threatened species. 50 C.F.R. § 17.31. When FWS promulgates species-specific Section 4(d) rules, these often provide far fewer protections than the species would receive if listed as endangered.

### A.       How ESA Listing Decisions Are Made

FWS is required to list a species as endangered or threatened if it determines that the species is facing extinction because of the individual or cumulative effects of five factors:

(A) the present or threatened destruction, modification, or curtailment of its
     habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational
     purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. §§ 1533(a)(1)(A)–(E). To qualify for listing, a species need only face a sufficient threat under a single statutory factor. *Humane Soc'y of the U.S. v. Pritzker*, 75 F. Supp. 3d 1, 7 (D.D.C. 2014) (citation omitted). The ESA requires the Service, "not less than 90 days before the effective date of the [listing] regulation," to "publish a general notice and the complete text of the proposed regulation in the Federal Register . . . ." 16 U.S.C. § 1533(b)(5)(A)(i). Before FWS may establish any criteria or guidelines for use in making listing decisions, those guidelines must first be issued in proposed form for public comment. *Id.* § 1533(h).

FWS must make listing determinations

*solely* on the basis of the best available scientific and commercial data available to
[it] after conducting a review of the status of the species and after taking into
account those efforts, if any, being made by any State or foreign nation, or any
political subdivision of a State or foreign nation, to protect such species . . . .

16 U.S.C. § 1533(b)(1)(A)(i) (emphasis added). "The Secretary shall make [listing decisions] *solely* on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b) (emphasis in original).

Courts have interpreted the "best available data" standard broadly. FWS may not ignore available biological information, *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), and must address all such available data in its decision making, *San Luis & Delta-Mendota Water Auth. v. Badgley*, 136 F. Supp. 2d 1136, 1147 (E.D. Cal. 2000). Even if data is "inconclusive," *City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989), or speculative, the "agency need not stop in its tracks when it lacks sufficient information." *In re Polar Bear ESA Listing and 4(d) Rule Litigation*, 794 F. Supp. 2d 65, 106 (D.D.C. 2011) (quotation and citation omitted). The statutory mandate to make listing decisions based on the best available scientific data, as opposed to absolute scientific certainty, "is in keeping with congressional intent" that the agency "take preventive measures before a species is 'conclusively' headed for extinction." *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679–80 (D.D.C. 1997); *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002).

**B.     FWS' Interpretations of the "Endangered" and "Threatened" Definitions**

FWS has propounded several interpretations of the language used in the statute's definitions of "endangered" and "threatened" that are relevant here.

**1.     Significant Portion of Its Range and the SPR Policy**

The definitions of "endangered species" and "threatened species" require consideration of threats to a species "throughout out all . . . of its range" and in "a significant portion of its range." 16 U.S.C. §§ 1532(6), (20). The ESA does not define "significant portion of its range." *Ctr. for*

*Biological Diversity v. Jewell*, No. CV-14-02506-TUC-RM slip op. at 5-6 (D. Ariz. Mar. 29, 2017) (Ex. 1). In December, 2011, FWS proposed a draft SPR Policy stating that "a species would be able to qualify as an endangered species in two different situations: (1) If it is in danger of extinction throughout all of its range, or (2) if it is in danger of extinction in a significant portion of its range." 76 Fed. Reg. 76,987, 76,991 (Dec. 9, 2011). In July 2014, FWS issued the final SPR Policy. 79 Fed. Reg. 37,577 (Jul. 1, 2014) (SPR Policy). In a 180 degree turn from the draft policy, the Final Policy stated that FWS will not consider whether a species is "endangered" in a significant portion of its range if the species is first determined to be "threatened" throughout its range. *Id.* at 37,609; *id.* at 37,579 ("[i]f a species is endangered or threatened throughout its range, no portions of its range can qualify as 'significant'").

### 2.     "In Danger of Extinction" and the Polar Bear Memo

The ESA does not define or explain the meaning of the phrase "in danger of extinction" in the statutory definition of an "endangered species." 16 U.S.C. § 1532(6). Nor has FWS ever adopted by regulation, guidance, or otherwise a formal interpretation of this phrase. Instead, in response to this Court's remand order in *In re Polar Bear ESA Listing*, MDL 1993, No. 1:08-764, (D.D.C.) (ECF No. 236), on December 22, 2010, FWS finalized a memorandum that set forth its interpretation of "in danger of extinction" as applied in listing the polar bear as threatened. LAR 23067–84 (Polar Bear Memo). FWS vigorously opposed providing the opportunity for notice and comment on the Polar Bear Memo, informing this Court that "nothing in the Service's written explanation would establish, nor would the Service intend to establish, a binding norm of general applicability with prospective effect." *In re Polar Bear*, No. 08-764-EGS (ECF No. 230 at 7); *id.* (ECF No. 242 at 11) ("neither the Court, nor the Service ever intended the [Polar Bear Memo] to be judged standing alone; rather, both intended that the

[Memo] be considered together with the interpretation previously employed in the Listing Rule"). The Polar Bear Memo has never subsequently been published in the Federal Register for public comment.

### 3.   "Foreseeable Future"

The ESA does not define or explain the meaning of the phrase "foreseeable future" in the statutory definition of a "threatened species." 16 U.S.C. § 1532(20). Pursuant to a Solicitor's Office opinion, to determine a species' future conservation status, FWS must analyze the best available scientific data on the foreseeability of threats and correlate the impacts of those threats over that foreseeable timeframe with the species' life history and response to the threats. Solicitor's Memorandum Opinion M-37021, The Meaning of "Foreseeable Future" in Section 3(20) of the Endangered Species Act (Jan. 16, 2009) (Ex. 2).

### STATEMENT OF FACTS

### A.   The Northern Long-Eared Bat and White-Nose Syndrome

The northern long-eared bat (*Myotis septentrionalis*)[4] is a medium-sized insectivorous mammal distinguished from other bat species by its relatively long ears. 80 Fed. Reg. 17,974, 17,975 (Apr. 2, 2015) (final rule); 78 Fed. Reg. 61,046, 61,057 (Oct. 2, 2013) (proposed rule). The Bat's range extends over all or portions of 37 States, the District of Columbia, and 12 Canadian provinces and territories. 80 Fed. Reg. at 17,975.

---

[4]     The record frequently refers to the species as NLEB (northern long-eared bat) or MYSE (*Myotis septentrionalis*).



LAR 23121

The Bat is a social animal. In the winter, it hibernates with its own kind and other bat species in caves, abandoned mines, and other structures (collectively termed hibernacula). In the summer, it forms social groups that roost in colonies. In the fall, it engages in swarming behaviors, again with its own kind and often with other bats species as well. *Id.* at 17,984–88. The Bat is long-lived and slow-reproducing. Its maximum lifespan is up to 18½ years. Adult females birth a single pup each year. *Id.* at 17,998.

Many bat species are highly susceptible to WNS, which has been "responsible for unprecedented mortality of insectivorous bats in eastern North America." 80 Fed. Reg. at 17,993–94. WNS is caused by a cold-loving fungus known as *Pseudogymnoascus destructans* (Pd or fungus), which is likely non-native to North America and appears to have arrived on the continent approximately a decade ago. 78 Fed. Reg. at 61,062; 80 Fed. Reg. at 17,995. Pd grows readily in the cold and humid environments in hibernacula, and persists year-round, allowing hibernacula to serve as a reservoir for the fungus in the absence of bats during the summer. 80 Fed. Reg. at 17,995. WNS infects bats when they hibernate, causing physical damage to their bodies as well as abnormal behaviors such as arousal from hibernation and torpor, leading to energy depletion and death. 80 Fed. Reg. at 17,995–97. The social and migratory behaviors of bat species facilitate the spread of WNS. 80 Fed. Reg. at 17,995.

9



Although the Bat has a wide geographic range, it is not equally distributed across that range. The core of the species' U.S. range, where its pre-WNS population densities were highest, is in the northeastern and parts of the midwestern and southern U.S. 80 Fed. Reg. 17,975–83 (*Distribution and Relative Abundance*), *id.* at 17,998 ("the area currently (as of 2015) affected by WNS likely constitutes the core of the species' range, where densities . . . were highest prior to WNS"). About 40 percent of the Bat's global range is in Canada, with higher abundances in the eastern part of the country, where WNS has decimated Bat populations in five provinces. 80 Fed. Reg. at 17,983–84.[5]

WNS' impact on the Bat has been nothing short of cataclysmic. Since the disease was first detected in New York in 2006, WNS has spread rapidly throughout the northeastern, southeastern, Midwestern U.S., and eastern Canada. 80 Fed. Reg. at 17,994. As of February 2015, WNS had been confirmed present[6] in 25 states and five Canadian provinces, while an

---

[5]    Per an emergency assessment in 2014, Canada listed the Bat as endangered due to WNS under the Canadian Species at Risk Act. *See* 80 Fed. Reg. at 18,019–20.

[6]    Meaning one or more bats (of any species susceptible to WNS infection) in the state have been analyzed and confirmed with the disease. 80 Fed. Reg. at 17,994.

additional three states were Pd-positive.[7] *Id*. Based on consistent observations of the progression

of the disease, "northern long-eared bat declines are severe once WNS is confirmed at a site[.]"

*Id.* at 18,009. As of April 2015, the available data showed that, for 103 sites in 11 states (New

York, Pennsylvania, Vermont, West Virginia, Virginia, New Hampshire, Maryland, Connecticut,

Massachusetts, North Carolina, and New Jersey) and one Canadian province (Quebec), the

number of Bats counted in winter hibernacula surveys had declined by an average of 96%, and

up to 99%, after the onset of WNS. Sixty-eight percent of these sites had *zero* Bats based on cave

surveys. *Id.* at 18,012. The following maps graphically illustrate the Bat's pre-WNS relative

population densities in the U.S. and its dramatic post-WNS population declines in the core of its

U.S. range. LAR 35655–66.



Of the seven North American bat species experiencing unprecedented mortality due to

WNS, the Bat is one of the most highly susceptible. 80 Fed. Reg. at 17,998. Likely as a

consequence of its lengthy hibernation periods and preference for hibernacula temperatures and

humidity levels that are optimal for fungus growth, the Bat suffers higher rates of WNS infection

---

[7]     FWS concluded that it is reasonable to assume that any Bat populations in Rhode Island
and the District of Columbia have been affected by WNS, given these jurisdictions' size and
proximity to heavily affected WNS-confirmed states. 80 Fed. Reg. at 17,994.

than other bat species such as the federally endangered Indiana bat. *Id.*; *id.* at 18,018. The Bat demonstrates the highest Pd-load per individual animal (i.e. how infected with the fungus the individual is) compared to five other cave bat species that are also afflicted with WNS. *Id.*; LAR 28457–64, LAR 28461 ("The [Bat] has the *most* fungus and the *greatest* declines. [F]requently nearly extinct in the 1st year of WNS. [I]n NE, most populations extinct after 4 years") (emphasis added); LAR 28500–84. Pd loads predict WNS mortality. LAR 28502. In the first year of WNS infection, WNS prevalence in the Bat increases rapidly; after that first year, the environment is contaminated and the Bats are dead. LAR 28515–16; *see also* LAR 28508–09; LAR 28530.

As FWS acknowledges, the best available scientific data have not shown that individual Bats or WNS-affected Bat populations are capable of surviving WNS. To date there is no evidence that any individual Bat has survived WNS infection. 80 Fed. Reg. at 18,010; *see also id.* at 18,012 ("[S]ome little brown bats have survived multiple years of WNS exposure and infection . . . there is little, if any, data to support the same trend for [Bats].") ; LAR 41188 ("Looking for answer to a question: Do we see any surviving [Bat] populations? Are we looking or do we just not even know?" "None that we are aware of. We have long term study sites where [Bats] are no longer found. We have no recaptures."); LAR 41200 (same); LAR 41203 ("There is no direct evidence of a surviving individual [Bat] that we know of"); LAR 43137 ("[T]here is no evidence of local population persistence that would suggest [Bats] are not declining precipitously and on a trajectory towards extinction.").

The Bat's life history as a social, colonial animal with a low reproductive rate raises serious concerns that, even if individual Bats or small remnant populations avoid or escape

WNS, they may not be able to persist if their numbers are too low. FWS' national WNS

coordinators summarized the issue thus:

> A key biological constraint is that [the Bats] function as colonies, not individuals.
> Disruption of colony structure such as major reductions in colony sizes can
> significantly alter biological functions such as breeding, which subsequently can
> have species-level effects. The colonial life history and site fidelity of [the Bats]
> are key elements in the evolutionary biology of this species, which means focus
> has to be on effects to maternity colonies and local populations rather than just on
> individuals. Those traits also raise our concern that population declines from the
> disease may result in cascading demographic effects once the disease has moved
> through an area.

LAR 41175.

### B.   The Listing Process

On January 21, 2010, the Center for Biological Diversity petitioned FWS to list the Bat

as endangered or threatened and to designate critical habitat for the species. *See* 78 Fed. Reg. at

61,047. The petition presented evidence that the Bat warranted listing due to the threats of

disease, habitat loss, particularly from logging, hydraulic fracturing and other forms of energy

development, and environmental contaminants (such as pesticide and herbicide use). Am.

Compl. ¶ 2 (ECF No. 27); Defs.' Answer ¶ 2 (ECF No. 36). The Service published its positive

90-day finding on June 29, 2011. 76 Fed. Reg. 38,095. On October 2, 2013, FWS proposed to

list the Bat as an endangered species. 78 Fed. Reg. 61,046.

In the proposed rule, FWS found that WNS "is currently the predominant threat to the

species, and if WNS had not emerged or was not affecting the northern long-eared bat

populations to the level that it has, we presume the species would not be experiencing the

dramatic declines that it has since WNS emerged." *Id.* at 61,058. It described the severe and

rapid decline in Bat populations in the portion of the range to which WNS had already spread. *Id*.

at 61,064. It specifically described this portion as the "core of the [Bat's] range, where the

species was most common prior to WNS." *Id.* at 61,065. It concluded that, although WNS had

not yet spread throughout the entire range of the Bat, the current rate of spread was rapid and

would be expected to have the same devastating impact observed in the portions of the range

already affected. *Id.* at 61,064–65.

FWS also found that the cumulative effects of non-WNS threats such as habitat

destruction, timber harvest, wind energy development, climate change, and contaminants, when

"combined with the significant population reductions" due to WNS, "may further adversely

impact the species." 78 Fed. Reg. at 61,072; *id.* at 61,076 ("Although these threats (prior to

WNS) have not in and of themselves had significant impacts at the species level, they may

increase the overall impacts to the species when considered cumulatively with WNS").

Based on its assessment of the severity and immediacy of threats currently affecting the

species, FWS concluded that the best available scientific data supported a listing as endangered

throughout the Bat's entire range:

> We find that the [Bat] is presently in danger of extinction throughout its entire
> range based on the severity and immediacy of threats currently affecting the
> species. The overall range has been significantly impacted because a large portion
> of populations in the eastern part of the range have been extirpated due to WNS.
> [WNS] is currently or is expected in the near future to impact the remaining
> populations. In addition other factors are acting in combination with WNS to
> reduce the overall viability of the species. The risk of extinction is high because
> the species is considered less common to rare in the areas not yet, but anticipated
> to soon be, affected by WNS, and significant rates of decline have been observed
> over the last 6 years in the core of the species' range, which is currently affected
> by WNS; these rates of decline are especially high in the eastern part of the
> species' range, where rates of decline have been as high as 99 percent in
> hibernating populations of the species . . . We find that a threatened species status
> is not appropriate for the northern long-eared bat because the threat of WNS has
> significant effects where it has occurred and is expected to spread rangewide in a
> short timeframe.

78 Fed. Reg. at 61,076. Additionally, FWS concluded that because "[t]he threats to the survival

of the [Bat] occur throughout the species' range and are not restricted to any particular

significant portion of that range . . . [FWS'] assessment and proposed determination applies to the species throughout its entire range." *Id*.

FWS solicited independent peer reviews of the proposed rule and received comments from four peer reviewers. 80 Fed. Reg. at 18,006; LAR 24005; LAR 24007–10 (Dr. W. Mark Ford); LAR 24010–21 (Dr. Allen Kurta); LAR 24022–25 (Dr. D. Scott Reynolds); LAR 24026–29 (Dr. Michael J. Lacki). Bat expert Dr. Kurta highlighted the proposed rule's failure to discuss how the Bat's social behavior of forming maternity roost colonies in summer would be affected by WNS:

> If all your friends are dead (99% declines), who are you going to cuddle with, find out where the bugs are best, learn where that alternate roost tree is in case the primary roost falls over? If they have declined so precipitously, how are they going to maintain their social structure? We may not know specifically what the functions of being colonial are for northerns. However, they *are* social, and sociality likely evolved for a reason related to reproduction and/or survival. The disease has taken the populations in the East perhaps to a point where they cannot recover, even if we could eliminate the fungus.

LAR 24012. Dr. Kurta also stated: "I did not see the implications of the reproductive rate adequately discussed. The production of one young per female per year may not be enough to maintain a viable population or to regain its former size. Similarly, the question of genetic diversity with 99% of the population gone should be addressed." LAR 24019. Dr. Reynolds voiced similar concerns. LAR 24023; LAR 43017 ("The survivorship and reproductive success of colonial species is dependent on having some minimum number of individuals together.").

Despite the unanimous support for the proposal to list the Bat as endangered from the peer reviewers and many other experts on Bats and WNS, the proposal generated opposition from various industries, some state lawmakers, and some state wildlife agencies, and ultimately from certain members of Congress, who objected to an endangered listing because of their concerns about potential economic impacts. Between May 2014 and March 2015, various

members of Congress sent no fewer than 15 separate letters protesting the proposed endangered listing and opining that—at most—FWS should list the bat as threatened with a 4(d) rule. SuppAR 1–46. In September 2014, the House Natural Resources Committee held a field hearing on the proposed listing in Harrisburg, Pennsylvania.  LAR 27138; Seggerman Declaration ¶ 8 (Ex. 3). Prior to April 2, 2015, when FWS issued the final threatened listing and interim 4(d) rules, several bills and riders were introduced in the House and Senate with the express purpose of limiting the agency's discretion to list the Bat as endangered or to formulate a 4(d) rule, or even eliminating outright its ability to list the Bat under the ESA. Seggerman Declaration ¶¶ 7– 10 (Ex. 3) (and attached table); *see also* Fascione Declaration ¶¶ 10–12 (Ex. 6). The draft briefing paper prepared for FWS Director Ashe in mid-March 2015 noted that the agency "received many letters from Congress and State Governors voicing concerns as to . . .  the effect an endangered determination would have on their respective State's economy" and that "[s]everal members of congress also recommended a threatened determination and accompanying 4(d) rule if the Service determines that listing is still warranted." LAR 57424.

Between the proposed and final rules, FWS gave itself a six-month extension and re-opened the comment period multiple times. *See* 80 Fed. Reg. at 17,975. On December 2, 2013, the comment period was extended through January 2, 2014. 78 Fed. Reg. 72,058. On June 30, 2014, FWS announced a six-month extension and reopened the public comment period ending August 29, 2014. 79 Fed. Reg. 36,698. On November 18, 2014, the Service again reopened the comment period for an additional 30 days, ending December 18, 2014. 79 Fed. Reg. 68,657.

Notably, at no place in any of these Federal Register notices did the Service announce new rationales or that it had changed its understanding of the underlying threats to the Bat. [8]

The decision-making process that led to the final rule was highly unconventional. Rather than following the traditional bottom-up process in which species experts in field offices analyze the best available scientific data and make a listing recommendation for decision-maker review, NLEB-23661, the compilation, analysis, and drafting of the final rule (minus the determination) was divorced from the decision-making, drafting, and review process on the actual listing determination itself. LAR 30586 ("Rather than traditional field recommendation, the [regional directors] will make the listing recommendation."); LAR 32546 (describing bifurcated rule drafting and determination drafting processes); 4AR 8152 ("It appears that the agency has departed from the usual procedure, with the final decision to be made solely by the Regional Directors").

Indeed, two months before a multi-state team of field biologists had even produced a full draft of the final rule (minus the threatened determination section) for internal review, LAR 51054, five regional directors had already made the "threatened" recommendation and outlined the draft 4(d) rule in a two-day in-person meeting on December 16 and 17, 2014. Instead of reviewing a complete draft of the final rule to inform their recommendation, the regional directors attended a series of webinars in mid-November 2014. *See, e.g.*, LAR 32645. On the Friday before the in-person meeting, the regional directors received a 17-page white paper and a draft letter summarizing FWS' analysis of and response to comments provided by State wildlife

---

[8]       Plaintiffs provided comments, presented arguments, and supplied numerous scientific studies throughout the many comment periods on the Bat listing. *See* SuppAR 3542 (Center & Defenders Jan. 2014); SuppAR 40493 (Defenders Jan. 2014); SuppAR 40661 (Center & Defenders Aug. 2014); SuppAR 68191 (Center Dec. 2014); SuppAR 69755 (Center March 2015); SuppAR 69604 (Defenders March 2015); SuppAR 97351 (Sierra Club March 2015).

agencies. LAR 41021–22 (transmitting meeting materials and describing process); LAR 40656–72 (white paper); LAR 40674–92 (draft response to states). By the end of the two-day meeting, the regional directors had reached consensus that the Bat should be listed as threatened rather than endangered that and that FWS should move forward with a 4(d) rule. LAR 58575–93 (J. Utrup meeting notes); NLEB-03571–80 (J. Hogrefe meeting notes).[9]

From December 18, 2014, forward, the final rule (minus the determination) and the determination itself were drafted as two separate documents, reviewed by two separate groups of staff at FWS (field biologists vs. regional directors), and finalized separately. *Compare, e.g.*, LAR 43552 (first draft of determination); LAR 50441(draft determination will be sent to regional directors next week); LAR 50990 (draft determination sent to regional directors on Feb. 24, 2015, with comments due three days later) *with* LAR 50400 (heads-up on sending final listing rule for review by "staff from your Regions [who] have been integrally involved in helping to update and draft much of this final listing rule"); *id.* ("Tony Sullins is working on the determination section and plans to provide that to the Regions via the RD-team who participated in the decision-makers in December."); LAR 50399 (forwarding heads-up on field office review of final listing rule: "This won't have the determination, so it will be a bit tough to tell if the information supports the conclusion.").

On January 16, 2015, FWS published a proposed 4(d) rule for the Bat and again reopened comment on the proposed listing rule, taking comments on both proposals for 60 days. 80 Fed. Reg. 2371. Just two weeks after the close of this comment period, FWS issued the final rule listing the Bat as threatened and finalizing the proposed 4(d) rule as an interim rule. 80 Fed. Reg.

---

[9]     Plaintiffs have been unable to locate any other documentation of the two-day regional directors' meeting in the administrative record.

at 18,028–29. The interim 4(d) rule adopted along with the new "threatened" determination allowed most take of the Bats to continue unabated by removing the default take prohibition established by 50 C.F.R. § 17.31. FWS published its final 4(d) rule on January 14, 2016. 81 Fed. Reg. 1900. The final 4(d) rule provides even fewer protections for the Bats than the interim rule did protecting only known and occupied hibernacula and roost trees.

In the period between the proposed and final rule, from July 2013 and February 2015, the fungus and WNS spread still further. *Compare* 78 Fed. Reg. at 61,061 (WNS confirmed in 22 of 37 states with Pd detected on bats in four additional states where disease had not yet been detected) *with* 80 Fed. Reg. at 17,996 (Pd present in 28 of 37 states with WNS confirmed in 25 of 37 of the Bat's range states). This map (LAR 42365) illustrates the spread of WNS over the Bat's range at the time of the threatened determination:



**STANDARD OF REVIEW**

The Administrative Procedure Act (APA) supplies the standard of review for an ESA listing decision. *Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007) (citing *Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C. Cir. 1989)). The APA requires courts to hold unlawful and set aside federal agency actions that are "arbitrary, capricious, an abuse of discretion, or

19

otherwise not in accordance with law," or that were adopted "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A), (D). An agency decision is arbitrary when the agency

"relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983).

In reviewing FWS' decision to list the Bat as threatened rather than endangered, this

Court must determine whether FWS properly applied the ESA and "examine[d] the relevant data

and articulate[d] a satisfactory explanation for its action including a rational connection between

the facts found and the choice made." *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 98

(D.D.C. 2010) (internal quotations omitted). Courts should "not defer to the agency's conclusory

or unsupported suppositions." *McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d

1182, 1187 (D.C. Cir. 2004) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Nor may courts

"'rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate

or that frustrate the congressional policy underlying a statute.'" *Ariz. Cattle Growers' Ass'n v.*

*USFWS*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92

(1965)). The judicial deference owed to an agency's decisions made based on its technical

expertise is substantial but not unlimited; "the presumption of agency expertise may be rebutted

if its decisions, even though based on scientific expertise, are not reasoned." *Defenders of*

*Wildlife*, 958 F. Supp. at 679 (internal citation omitted); *Humane Soc'y of the U.S. v. Jewell*, 76

F. Supp. 3d 69, 133 (D.D.C. 2014) ("[S]uch deference may be suspended when an agency's

decision 'fail[s] to provide a reasoned explanation, or where the record belies the agency's

conclusion'" (quoting *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999))).

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 16 U.S.C. § 1540(c) and 28 U.S.C. §§ 1331, 1361,

2201, because this action presents cases and controversies under the ESA and the APA, 5 U.S.C.

§§ 701–706. Plaintiffs notified FWS of its ESA violations pursuant to the 60-day notice

provisions of the ESA, 16 U.S.C. § 1540(g), more than sixty days prior to filing suit. *See* Mtn. to

Amend No. 15–477 (ECF No. 21-1) (Center Plaintiffs NOI); Defenders Compl. No. 16–910 ¶ 11

(ECF No. 1); Defs. Answer ¶ 11 (ECF No. 11).

Plaintiffs have standing to bring this action as evidenced by declarations from their

members submitted herewith. Exhibits 4–14. Plaintiffs' members have protectable aesthetic,

recreational, scientific, and other interests in the survival and recovery of the Bat and other

imperiled species affected by FWS' ESA policies. Exhibits 4–14. These interests have been

injured by FWS' unlawful decisions under review here. *Id.* These injuries are directly traceable

to FWS' challenged action, and are redressable by a favorable decision from this Court. *Friends

of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 180–84 (2000). Plaintiffs have

associational standing to represent their members' interests. *Hunt v. Wash. State Apple Adver.

Comm'n*, 432 U.S. 333, 342–43 (1977).

## ARGUMENT

The threatened determination for the Bat improperly pairs an unreasonably narrow

interpretation of "in danger of extinction" with an unreasonably broad and amorphous

conception of the "foreseeable future." The determination relies explicitly on the Polar Bear

Memo's interpretation of "in danger of extinction" to set an impossibly high bar requiring that

the Bat must be currently "on the brink of extinction in the wild" to warrant an endangered

listing. 80 Fed. Reg. at 18,020. Conversely, the determination fails to articulate what constitutes the Bat's foreseeable future in the face of the inexorable and deadly spread of WNS. The Service's undefined conception of "foreseeable future" substitutes temporal predictions on the spread of WNS for a rational analysis of the fate of the Bat itself. Ignoring the best available scientific data on the Bat's life history and response to WNS (i.e., catastrophic population declines), FWS' interpretation of "in danger of extinction" and failure to define "foreseeable future" resulted in the agency deferring any endangered finding to an unspecified future date when WNS will have caused the Bat's functional extinction across most if not all of its range.

The threatened determination arbitrarily relies on four rationales that, in the aggregate, purport to support the conclusion that the Bat is not endangered—in danger of extinction—but rather is likely to become endangered in the foreseeable future. As discussed below, these rationales lack any support in the best available scientific data and form a house of cards upon which the threatened determination teeters. The determination also unlawfully fails to consider the cumulative effects of all threats to the Bat.

Further, the Service's final threatened determination is not a logical outgrowth of the proposed endangered finding. The Service violated the notice and comment requirements of both the ESA and the APA by failing to allow public comment on the basis for the final determination, including all four rationales underpinning the determination, the decision to rely on the Polar Bear Memo, and the decision to rely on the SPR Policy to forego any analysis of whether the Bat is endangered in a significant portion of its range.

Finally, the 180 degree turn in the SPR Policy is contrary to the ESA and unreasonable. Its application to the Bat resulted in FWS unlawfully failing to analyze whether the core of the Bat's range, where it has suffered catastrophic population declines of up to 99%, is a significant

portion of its range that should have resulted in an endangered determination. 80 Fed. Reg. at

18,022.

I.     **The Threatened Determination Relies on Unreasonable Interpretations of Statutory Definitions, Fails to Base its Supporting Rationales on the Best Available Scientific Data, and is Not a Logical Outgrowth of the Proposed Rule**

    A.     **FWS Improperly Pairs an Unreasonably Narrow Interpretation of "In Danger of Extinction" and an Unreasonably Amorphous Conception of "Foreseeable Future" to Deny the Bat Endangered Status**

The threatened determination for the Bat is arbitrary and capricious because it improperly

pairs an unreasonably narrow interpretation of "in danger of extinction" and an amorphous,

overly broad conception of the "foreseeable future" that fails to articulate any coherent rationale

on the Bat's "future conservation status" in the face of WNS' inexorable spread. *See* M-Opinion

at 1 (Ex. 2).  At the outset, the Service's interpretation of "in danger of extinction" to mean

"currently on the brink of extinction in the wild" deserves no deference because it represents a

litigation position and has never been appropriately promulgated through the rulemaking

requirements of section 4(h) of the ESA.[10] On the record before FWS, if the Bat—which has

---

[10]     The Polar Bear Memo states that the FWS interprets "in danger of extinction" to mean that a species is "currently on the brink of extinction in the wild." It also purports to define additional criteria (beyond the statutory requirements of basing status determinations on the five listing factors and the best available scientific data) for determining whether to list species as endangered or threatened. LAR 23067–84. The Memo has not been not adopted using a section 4(h) process, which expressly requires FWS to propose, publish, and seek public comment on any criteria or guidelines for making listing decisions. 16 U.S.C. § 1533(h); *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 945–46 (D. Or. 2007). Furthermore, as a document prepared for litigation, the Memo expressly avers that "the explanation set forth in this memorandum does not represent a new interpretation of the statute and is not a prospective statement of agency policy." LAR 23068.
    FWS has now relied on the Memo in listing both the Bat, 80 Fed. Reg. at 18,020–21, and the lesser prairie-chicken, 79 Fed. Reg. 19,974, 20,065–66 (Apr. 10, 2014). Unlike the interagency policy development process it has followed for interpreting other terms in the ESA, *see, e.g.*, 76 Fed. Reg. at 76,988 (discussing joint development of SPR and distinct population segment policies), FWS has never coordinated with NMFS on the Memo's contents. FWS has also never provided public notice and comment on the Memo. Because the Memo is a litigation

already suffered up to 99% population declines throughout the core of its range, with all evidence indicating that the species faces functional extinction when WNS reaches its peripheral range—does not meet the agency's interpretation of "in danger of extinction," then that interpretation is fundamentally flawed.

FWS has also failed to define the Bat's "foreseeable future" in a way that explains or supports the agency's conclusion that the Bat will be in danger of extinction *only* in the foreseeable future—as opposed to being in danger of extinction already. Although FWS predicts WNS will spread throughout the Bat's range within 8 to 13 years from April 2015, nowhere does it assess how WNS will impact ***the Bat*** over that timeframe. Defining the "foreseeable future" requires the Service to "correlate each threat . . . with the life history of the species for the period over which each threat . . . is foreseeable," a process that includes "assessing how the threat will affect different life history stages and multiple generations of the species, viewed in the context of what would constitute a reasonably foreseeable period for the threat." M-Opinion at 5 (Ex. 2); *see also id.* at 10 ("In evaluating the foreseeable future, the Secretary must look not only at the foreseeability of threats, but also at the foreseeability of the impact of the threats on the species."). Although the "foreseeable future" will vary by species, without a doubt the agency must rationally define it in listing a species as threatened. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681–82 (9th Cir. 2016); *Otter v. Salazar*, 11-cv-00358-CWD, 2012 WL 3257843, *18–20, 2012 U.S. Dist. LEXIS 111743, *50–56 (D. Idaho Aug. 8, 2012).

Both the Polar Bear Memo and the M-Opinion instruct FWS to determine whether a species is "in danger of extinction," or "likely to become [in danger of extinction] within the

document to which the Court should not defer, FWS should be foreclosed from relying upon it. *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991) ("agency 'litigating positions' are not entitled to deference" (citations omitted)).

foreseeable future" by analyzing the best available scientific data on the species' life history and ecology, the nature (and timing) of the threats, and the species' response to those threats over time. LAR at 23069, 23073; M-Opinion at 5 (Ex. 2). FWS entirely fails to complete this analysis, either with respect to whether the Bat is presently "in danger of extinction" or with respect to defining the "foreseeable future" when it will be. To take just one pertinent life history characteristic, FWS notes that an individual Bat can live up to 18½ years. 80 Fed. Reg. at 17,988. The 8 to 13-year predicted timeframe for the rangewide spread of Pd/WNS is well short of an individual Bat's maximum lifespan.[11] Yet FWS fails to discuss how this timeframe relates to the Bat's life history (lifespan or generation time) or its known response to WNS infection (catastrophic population declines) to determine the Bat's "foreseeable future." Rather than "determining what constitutes the future that is foreseeable when considering the effect that a particular threat" (*i.e.*, WNS) has on the Bat, M-Opinion at 12 (Ex. 2), FWS limited its analysis to the foreseeable future of the disease.[12]

In relying on its unreasonably narrow interpretation of "in danger of extinction" and its amorphous and undefined conception of "foreseeable future," FWS made a threatened determination for the Bat that is so temporally close to the point where the species will be functionally extinct that it renders the phrase "in danger of extinction" virtually meaningless.

---

[11] As discussed below, the other rationales FWS relies on to justify the determination similarly ignore the Bat's life history and ecology and its rapid catastrophic mortality following onset of WNS.

[12] The final rule's lack of any "foreseeable future" analysis of the impacts of WNS on the Bat is in stark contrast the final rule listing the polar bear as threatened. 73 Fed. Reg. 28,212, 28,239–40, 28,253–54 (May 15, 2008); *id.* at 28,239 (45-year foreseeable future for polar bear "is based on the timeframe over which the best available scientific data allow us to reliably assess the effect of threats–principally sea ice loss—on the polar bear, and is supported by species-specific factors, including the species' life history characteristics (generation time) and population dynamics.").

Defining the "foreseeable future" for the Bat would have provided the near-term temporal limit—or bookend—that FWS needed to make a rational determination to list the Bat as endangered before it reached the point of functional extinction (i.e., diminished beyond the point at which the species can sustain itself beyond the short term). The threatened determination is wholly inconsistent with the ESA's precautionary mandate and subverts Congress' intent to protect an imperiled species before it is already past the point of survival and recovery. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236.

### B. The Four Rationales FWS Invokes to Support the Threatened Determination Are Contradicted by the Best Available Scientific Data

FWS arbitrarily relied on four rationales to justify the threatened determination. 80 Fed. Reg. at 18,021–22. First, FWS asserts that Pd/WNS will not spread throughout the Bat's entire range for another 8 to 13 years. *Id.* Second, FWS asserts that in those areas of the Bat's geographic range not yet affected by WNS, the species has not suffered declines and appears stable. *Id.* Third, FWS claims that even in areas affected by WNS, "some bats persist." *Id.* Finally, FWS relies on "coarse population estimates where they exist for this species indicat[ing] a population of potentially several million" individuals across the species' range. *Id.* at 18,021. These rationales are interdependent, not independent. FWS states that only "taken together" and "in the aggregate" can they support the conclusion the Bat "is not on the brink of extinction at this time." 80 Fed. Reg. at 18,021. "No one factor alone conclusively establishes whether the species is 'on the brink' of extinction." *Id.* Therefore, the necessary corollary is that, if this Court finds that FWS has arbitrarily or unlawfully relied on any one or more of the four rationales, it must set aside the entire threatened determination.

1.      **The 8 to 13-Year Timeframe for Rangewide Pd/WNS Spread Neither Justifies the Threatened Determination Nor Differs Meaningfully from the "Short Timeframe" of the Proposed Endangered Determination**

The first rationale is that Pd/WNS[13] will not spread rangewide for another 8 to 13 years from April 2015. 80 Fed. Reg. at 18,021–22. As explained above, FWS' quantification of this timeframe is no substitute for an analysis of why the Bat is not currently "in danger of extinction" but will be so in the "foreseeable future." Nor could it support a rational "foreseeable future" analysis, given that WNS has extirpated, or will soon extirpate, the species in the core of its range and will spread rangewide by 2018 to 2023.

FWS also fails to explain rationally how the 8 to 13-year timeframe meaningfully differs from the "in a short timeframe" articulation in the proposed endangered finding that FWS previously believed met the standard for "in danger of extinction." Indeed, both rationales relied on the exact same observational data on the rapid spread of WNS to justify first the proposed endangered and then final threatened determinations. FWS purports to differentiate its methods but in both instances, while taking predictive models into account, FWS ultimately relied on the observed rate of WNS spread as the best indicator of the future rate of WNS spread. *Compare* 78 Fed. Reg. at 61,064–65 (listing reasons why uncertainty as to timeframe suggested by results of various predictive models did not alter conclusions based on observed spread to date) *with* 80 Fed. Reg. at 17,997–98 (instead of models, "relied on the observed rate of spread to date of Pd to

---

[13]      The determination is internally inconsistent as to whether the 8 to 13-year timeframe is for the rangewide spread of Pd, WNS, either, or both. *Compare* 80 Fed. Reg. at 18,021 (referring to WNS) *with id.* at 18,022 (referring to Pd). The agency also refers to both. *Id.* ("Although Pd/WNS is predicted to spread throughout the range of the species by 2023–2028"); *id.* ("[b]ecause the fungus/disease may not spread throughout the species' range for another 8 to 13 years").

develop a calculation of projected rate of spread through the remaining portion of the [Bat's] range.").

The threatened determination implies that its newly-quantified timeframe relies on "voluminous input" on the issue of whether the Bat is currently on the "brink of extinction," and that it has "obtained and carefully considered another 18 months of data and knowledge regarding the continuing effects of WNS on the species, and the prospects for spread of the disease throughout the entire range of the species." 80 Fed. Reg. at 18,021. What this artfully drafted language conceals is that the threatened determination was not, in fact, based on new scientific data on either WNS's impacts or its rate of spread. The data FWS gathered between the proposed rule and the final rule on the effects of WNS on the Bat and the prospects for WNS spread confirmed what FWS already knew: that the catastrophic impacts of WNS were certain and rangewide spread was inevitable within a short timeframe. The only change was the Service's decision to treat this data as supporting a threatened rather than an endangered determination.[14]

---

[14]     *See* NLEB-26688 (Additional data "was not the driver for reconsidering the classification. The primary focus in the classification decision was a re-evaluation of the data in light of the definitions of T and E . . . ."); *see also* LAR 58575–93 (J. Utrup notes on December 2014 meeting); LAR 58584 ("WNS has had significant effects – still true" "Expected to spread rangewide in same time frame"); LAR 58586 ("8 year time frame – enough to say T" "Jennifer – best argument – time frame" "Saving grace – short – did not define- at least 8 years out – if imminent, E, if not T"); LAR 58588 ("Strongest argument – All we have is defining the time frame (Pd 4–8 years, WNS, 2–40 years) – did not in PR, define now."); NLEB-03575 ("WNS has spread 1000 miles over the past 8 years, so coarsely, we would expect it to go another 1000 miles in 8 years"); NLEB-03575–76 ( "Record has not changed regarding mortality, we have no info to indicate this."); NLEB-03577 (WNS Coordinator on timeline: "Okay, so I would go with 6-9 years for the disease (WNS) to happen across entire range (not just US)."); LAR 43018; LAR 41175.

**2.    The "40% of the Total Geographic Range" Rationale Ignores that
Bats are Uncommon to Rare in the Periphery of their Range**

The second rationale is the assertion that, "in the area not yet affected by WNS (about 40 percent of the species' *total geographic range*), the species has not yet suffered declines and appears stable (see *Distribution and Relative Abundance*, above)." 80 Fed. Reg. at 18,021 (emphasis added); *id.* at 18,022 ("no significant declines have occurred to date in the portion of the range not yet impacted by the disease"). This characterization is misleading because the Bat's abundance is not equal over its range. At the time of the final rule, those portions of the Bat's range where the species had previously been most abundant had already experienced massive mortality or were on the brink of imminent declines from WNS. However, the more distant portions of the range, where WNS had not yet spread, have *always* had low Bat density. Thus, the "40 percent of total geographic range" metric is not based on the best available scientific data on the Bat's varying distribution within its range.

The final rule does not explain how FWS arrived at the "40% of total geographic range" calculation in the first instance.[15] The *Distribution and Relative Abundance* section does not calculate any percentages by regional range, by U.S. range, or by total range of areas affected or

---

[15]    The record does not justify the change from core range to total range. The briefing materials prepared for the December 2014 RD meeting emphasized WNS impacts to the Bat in the core of its range. *See, e.g.*, LAR 40657; LAR 40659–63; LAR 40681 ("The [Bat's] range only extends into a small area in some of the States that remain uninfected with WNS to date; for example, only a very small portion of western MT and western WY are included in [the Bat's] range. Furthermore, the historic relative abundance/density of [Bats] in the area currently affected by WNS is generally higher than in those areas that remain."); LAR 41174 ("To date WNS has [a]ffected the portion of the [Bat's] range where we believe the greatest density of the population occurs"). Comments on the draft determination pointed out the disconnect between the language on "40 percent of the range" and FWS' understanding of the Bat's varying densities across its range. *See, e.g.*, LAR 50895 Comment [RL6] ("I believe we had some language that tried to put this number into perspective with regards to density of bats in that unaffected range."); LAR 50925 Comment [MLL2] (commenting that 40% of total geographic range "does not represent 40% of the population due to distribution").

not yet affected by WNS. Although FWS states that 40% of the Bat's global range is in Canada, this cannot be the source of the metric, as WNS had already been confirmed in five provinces in the eastern part of Canada where the bat was historically more abundant. 80 Fed. Reg. at 17,983–84, 17,994. While the *Effects of WNS on Bats* section contains two statements that might be read as providing a basis for the threatened determination's "40% of total geographic range," assertion, they are internally inconsistent. On one page, FWS states that "*Pd* [not WNS] now affects an estimated 60 percent of the [Bat's] *total* [not just U.S.] geographic range." 80 Fed. Reg. at 17,996 (emphasis added). On another, FWS states that "*WNS* [not Pd] has spread to approximately 60 percent of the species' range *in the U.S.* [but not Canada]," 80 Fed. Reg. at 18,000 (emphasis added).

The proposed and final rules are consistent in stating that the species' pre-WNS populations were concentrated in its northeastern and midwestern ranges, with much lower population densities in the northwestern, western, and extreme southern ranges. *Compare* 78 Fed. Reg. at 61,051–54 *with* 80 Fed. Reg. at 17,976 ("[h]istorically, the [Bat] was widely distributed in the eastern part of its range" and was consistently caught during summer mist-net surveys, detected during acoustic surveys, and known to occur in many hibernacula); *id.* at 17,979 (in midwestern range, the species was historically considered one of the more frequently encountered species in mist-net surveys, although observed infrequently and in small numbers in hibernacula); *id.* at 17,981–82 (within southern range, species is more common in more northerly states and less common in southerly states); *id.* at 17,983 (in western range, species is historically less common; it is considered uncommon or rare in the western extremes (e.g., Wyoming, Kansas, and Nebraska) and considered common only in small portions (e.g., Black Hills of South Dakota); *id.* (species "found in higher abundance in eastern than in western Canada").

30

The final rule's *Effects of WNS on Bats* section reiterates that FWS' overall understanding of WNS's disproportionate impacts on the species' core range had not changed from the proposed rule, even with an additional 18 months of data:

> Information provided to [FWS] by a number of State agencies demonstrates that the area currently (as of 2015) affected by WNS likely constitutes the core of the species' range, where densities of [Bats] were highest prior to WNS. Further, it has been suggested that the species was considered less common or rare in the extreme southern, western, and northwestern parts of its range . . . areas where WNS has not yet been detected.

80 Fed. Reg. at 17,998.

As of 2015, only eight states were free of Pd/WNS in the Bat's 37-state range in the U.S. 80 Fed. Reg. at 17,994 (Table 1). Six are in the western range, where, except for in the Black Hills of South Dakota, the species was uncommon or rare to begin with. 80 Fed. Reg. at 17,983. Two are included in the southern range where data is poor on the species' presence, *id.* at 17,981–92, or only occurs in part of the state. *Id.* at 17,982. Moreover, a week after the December 2014 meeting where regional directors decided to proceed with a threatened determination, FWS received highly relevant information about the Bats in these areas. The Epidemiology, Etiology and Ecological Research Working Group, comprising seven leading WNS experts, generated a statement on the spread of WNS for FWS that observed:

> Given the rarity of known hibernacula in the westward and southern periphery of the [Bat's] distribution, [Bats] may be primarily summer residents in this region. The core of their hibernating distribution occurs entirely in hibernacula currently or imminently affected by WNS (Figure 2). The absence of species from sampled hibernacula in the western and southern part of their distribution suggests that [Bats] could migrate to these regions from hibernacula already affected by WNS, thus hastening the rangewide population impacts to this species.

LAR 42486–87; LAR 42481 (Fig. 2) ("The known winter distribution of [Bats] occurs almost entirely within the 25 US States and 5 Canadian provinces where [Pd]/WNS has already been detected (red shading)"). Although this information was before the agency, the final rule does not

address it at all, in violation of FWS' obligation to make decisions based on the best available

scientific data. *San Luis & Delta-Mendota Water Auth.*, 136 F. Supp. 2d at 1147 (Service may

not ignore available biological information in a listing determination).[16]

The record belies any meaning—scientific or otherwise—underpinning the "40 percent of

total geographic range" rationale. FWS arbitrarily and unlawfully relied on this rationale to

justify the threatened determination. *See Defenders of Wildlife*, 239 F. Supp. at 19 (rejecting

decision to list Canada lynx as threatened rather than endangered based on Service's arbitrary

consideration of only parts of the range).

### 3.   To the Extent "Potentially Millions of Bats" Existed, They Were in Areas Already Infected by WNS by April 2015

The third rationale is "the presence of potentially millions of [Bats] across the species'

range." Although FWS admits that this rationale is "by no means dispositive in its own right,"

the agency found that it "also indicates a current condition in which species [sic] is not 'on the

brink' of extinction." 80 Fed. Reg. at 18,022; *see also id.* at 18,021 ("Finally, coarse population

estimates where they exist for this species indicate a population of potentially several million

[Bats] still on the landscape across the range of the species"). The "potentially millions"

rationale comes from a population estimate of Bats in six midwestern states that was developed

for an ESA incidental take permit application. 80 Fed. Reg. at 17,979 (a "rough estimate" shows

that "there may have been more than four million bats" in Illinois, Indiana, Iowa, Ohio,

---

[16]     In fact, the regional directors at the decision maker meeting had this information read to
them from the EEER draft statement on December 16, 2014. NLEB-03575–76. The response:
"People believe that the uncertainty undercuts these statements." The RDs had no rational reason
for refusing to consider the EEER group's expert opinion and supporting data, especially on
vague "uncertainty" grounds. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028 (9th
Cir. 2011); *see also Am, Wildlands v. Norton*, 193 F. Supp. 2d 244, 255–56 (D.D.C. 2002) (ESA
listing decision that fails to address expert analysis is arbitrary and violates best available
scientific data requirement).

Michigan, and Missouri); [17] LAR 53217–18. This estimate was derived from summer mist-net surveys in each of these six states. LAR 55449.

The fatal flaw in the "potentially millions" rationale is that it is based on pre-WNS survey data. By April 2015, WNS had already spread to five of the midwestern states and Pd to the sixth, 80 Fed. Reg. at 17,994 (Table 1). The inevitable population crashes were well underway. *Id.* at 17,979–81.[18] "Early reports from WNS-affected States in the Midwest reveal that similar rates of decline in [Bats] are already occurring or are fast approaching." 80 Fed. Reg. at 17,997 (in Ohio, 94% Bat declines in the two hibernacula where 90% of the state's winter bat population hibernates; in Illinois, 97 to 99% declines of Bats in the two major hibernacula); LAR 25942 (97% winter hibernacula declines in 19 hibernacula in Illinois, Indiana, and Ohio with 2+ years of WNS infection); LAR 55161–62 (Missouri in midst of WNS events and is on the cusp of statewide declines as of February 2015); LAR 50041 (Bat populations in 15 Indiana hibernacula had shown 60% declines as of the winter of 2013–14).

FWS therefore arbitrarily relied on the "potentially millions" rationale without confronting the fact that it could not credibly rely on pre-WNS data to estimate post-WNS populations.[19] Under analogous circumstances, the Ninth Circuit rejected FWS' reliance on

---

[17]     Although the final rule does not cite it, the "potentially millions" rationale also relied on entirely separate estimate of 1.8 million Bats in Indiana. LAR 40662–63; LAR 58578; LAR 58581; NLEB-03573; LAR 37964–65; LAR 55743–48; NLEB-27309; LAR 56043; LAR 56583. There is no evidence that the "potentially millions" rationale was revised to avoid the error of double-counting Bats in Indiana.

[18]     To the extent that the final rule's "potentially millions" estimate purports to include Bats in Canada, 80 Fed. Reg. at 17,983, which is unclear in the Rule and not supported by the record, WNS had already been confirmed in five provinces, *id.* at 17,994, leading the Canadian government to determine in an emergency assessment to list the Bat as endangered under its Species at Risk Act on December 17, 2014. 80 Fed. Reg. at 18,019–20; LAR 41707.

[19]     The FWS staffer who drafted the determination stated that the "estimates, particularly the R3 estimate, are based upon pre-WNS data, so would need to be adjusted to account for the

grizzly bear population growth data from the time *before* an epidemic of insects and a tree disease started killing off whitebark pine trees, whose seeds are a major grizzly food source, to predict the effects on the bear's population *after* the epidemic had begun. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1026–27 (9th Cir. 2011). The Court should reach the same result here.

Another fatal flaw in the "potentially millions" rationale is that the population estimate is based on summer mist-net surveys. Yet FWS expressly states that the best available scientific data on the Bat's population trends come from winter hibernacula counts, not summer survey data. 80 Fed. Reg. at 18,01–11; LAR 40674–78. The Bat determination is explicitly premised not on an estimated population *size* but on population *trends*. *Compare* 80 Fed. Reg. at 18,015 (FWS used winter hibernacula data to "understand and estimate population trends for the species.") *with id.* at 18,021 ("[w]e do not have firm rangewide population size estimates for this species (pre-WNS or post-WNS)"); LAR 40658; LAR 40675. By FWS' own reasoning, the "potentially millions" number is an entirely meaningless yardstick. The determination fails to draw a logical conclusion between this rationale and the best available scientific data.

## 4.   There is No Credible Evidence that "Some Bats Persist" in WNS-Infected Areas

The fourth rationale is that there is some uncertainty as to whether Bats are resilient to WNS because "some bats persist" even in WNS-infected areas. 80 Fed. Reg. at 18,021–22. As evidence, FWS cites the fact that some Bats continue to be trapped on Long Island, New York, in a state that has been the epicenter of the WNS epidemic since 2006. *See* 80 Fed. Reg. at 18,021 ("presence of surviving [Bats] in areas infected by WNS for up to 8 years creates at least some

---

impact of WNS in this Region," yet the only adjustment made was adding the qualifier "potentially" to the word "millions." LAR 56043; LAR 56583.

question as to whether this species is displaying some degree of long-term resiliency"); *see also id.* at 17,997; *id.* at 18,014. FWS provides no credible explanation as to why the anecdotal data on Long Island Bats should outweigh the numerous studies that, by April 2015, WNS had extirpated Bat *populations* throughout the rest of New York State and the remainder of its eastern range and that the disease is well on its way to blanketing the midwestern and southern ranges as well. 80 Fed. Reg. at 17,996–97.

The Service was fully aware that the Long Island Bats' existence did not support a hypothesis that Bats are resilient post-WNS. *See* NLEB-03573; LAR 58578–79. FWS' National White-Nose Syndrome Coordinator informed the December 2014 meeting participants that there is "no information to indicate resiliency – no known examples of [Bats] that have survived," and further that there is insufficient information to determine whether Bats still detected on the landscape are displaying resiliency or if they are in isolated pockets not suffering the full effects of infection. In short, there is "no evidence from main known [hibernacula] that indicate any resiliency." NLEB-03573; *see also* LAR 43016–17. Nevertheless, the December 2104 decision makers decided to rely on the Long Island Bats and a few other remnants to create the perception of uncertainty of persistence to justify a threatened determination. NLEB-03577 ("*Why the change from E? Another point for the change is the new info on the surviving long island and other population (also the WV remnants). Provides uncertainty on survivors and timeframe."); LAR 58589 (Long Island survivors "Creates small uncertainty – WNS impact after it hits" "less certainty – timeframe"). [20]

---

[20]     Although the December 2014 meeting participants cited the potential presence Bats in West Virginia as support for their decision to proceed with a threatened determination, the record shows that the Long Island Bats became the focus of the "some bats persist" rationale in the determination drafting process. LAR 50250; LAR 50259–60; LAR 50264 (J. Utrup: "I think he's

The threatened determination never answers the explicit question raised at the December 2014 meeting: "How to consider that experts have predicted extinction where WNS exists?" NLEB-03577. Biologists have no idea why some Long Island Bats, although demonstrably reduced by WNS, have so far escaped the functional extirpation experienced by Bats in the rest of New York (and the majority of the species' range), let alone whether the Long Island Bats will survive and reproduce in the future. 80 Fed. Reg. at 17,997; *id.* at 18,014 (Comment/Response 43); *see also* LAR 40060; LAR 41174; LAR 41193–94. In contrast, the best available scientific data clearly demonstrates that the Bat lacks resilience to WNS. Individual Bats are extremely susceptible to WNS. 80 Fed. Reg. at 17,998; *id.* at 18,000; *see also* LAR 28457–64; LAR 28500–84. There is no evidence that any individual Bat has ever avoided WNS infection after encountering Pd or survived WNS infection. 80 Fed. Reg. at 18, 010; *id.* at 18,012; LAR 41188; LAR 41203; NLEB-03573–74. The best available data uniformly demonstrates that WNS causes catastrophic population declines to the point of functional extirpation. 80 Fed. Reg. at 17,996–97; LAR 50040–41, LAR 50045; LAR 43137.

Because the threatened determination fails to explain how FWS could rationally have discounted the best available data on the Bat's lack of resiliency in favor of limited anecdotal evidence, its reliance on the latter as the best available "evidence of persistence (i.e., stable and viable populations)" of the species was arbitrary. *See Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009). FWS impermissibly "disregarded available data" on the Bat's (lack of resilience) in favor of "drawing a conclusion based on a dearth of data." *Rocky Mountain*

---

wanting super recent info. So he can say that 'WNS has been in NY for 8 years and the species found on the landscape'"); LAR 50268.

*Wild v. Fish and Wildlife Serv.*, No. 13-042, 2014 WL 7176384, *12, 2014 LEXIS 177042, *33

(D. Mont. Sept. 29, 2014).

Moreover, even if some Bats did manage to avoid or survive WNS, there is little

evidence that they could persist *in viable populations.*[21] The "some bats persist" rationale

entirely ignores the Bat's low reproductive rate and colony-based reproductive strategy. 80 Fed.

Reg. at 17,987–88, 17,993. Because this species "functions as colonies, not individuals," any

"[d]isruption of colony structure such as major reductions in colony sizes can significantly alter

biological functions such as breeding," LAR 41175; LAR 24012; LAR 24019; LAR 24023–24

(peer reviewer comments). Peer reviewers and other commenters explicitly raised these

resiliency concerns to FWS, *see* 80 Fed. Reg. at 18,007 (Comment 6) and *id.* at 18,010

(Comment 23), and agency decision makers and biologists were fully aware of them. LAR 40657

("With this extremely low reproductive rate, it takes many years to replace lost individuals");

LAR 41174–75; LAR 43017–18. Indeed, the first draft of the threatened determination's

resiliency discussion described the species' low reproductive potential and explicitly stated that

"the survivorship and reproductive success of colonial species, like the [Bat], are dependent on

having some minimum number of individuals occurring together." LAR 43555. Subsequent

drafts of the determination excised any discussion of the Bat's reproductive life history

---

[21]     *See* NLEB-04884 (only one possible explanation for why "some bats persist" rationale
supports a threatened determination: if "some bats are immune or able to fight off the disease,
are able to reproduce and their offspring are also immune or able to fight off the disease. The
document does not describe whether [Bats] within the boundary of WNS are successfully
reproducing, and this seems like an important piece of information. Without knowing the reason
for [Bat] persistence in the presence of WNS, the observation of [Bats] in WNS-positive areas
may or may not be a valid reason for threatened status.").

characteristics and inserted the "some bats persist" rationale instead, LAR 50709; LAR 50711–12.[22]

The "some bats persist" rationale and the final rule do not analyze how the Bat's reproductive life history characteristics affect its post-WNS resiliency (or lack thereof). 80 Fed. Reg. at 17,996–98.[23] FWS has therefore "entirely failed to consider an important part of the problem" in violation of its statutory duty to make listing decisions based on the best available scientific data. *Am. Wildlands*, 193 F. Supp. 2d at 255–56 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). The "some bats persist" rationale also impermissibly relies on the Service's finding "at least some uncertainty as to the timing of the extinction risk posed by WNS." 80 Fed. Reg. at 18,021. But "FWS cannot demand a greater level of scientific certainty than has been achieved in the field to date—the best scientific data available standard does not require that FWS act only when it can justify its decision with absolute confidence . . . ." *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1003 (D. Mont. 2016) (quotations and citations omitted). With respect to the "some bats persist" rationale, "[i]t is not enough for FWS to simply invoke 'scientific uncertainty' to justify its action." *Greater Yellowstone Coal.* 665 F.3d at 1028.

---

[22]    These changes were made over the objections of FWS staff. LAR 50898 Comment [RL21]; LAR 50895 [RL7] ("I think this weakens our argument. . . . A species can 'persist' but we don't know if it is viable and [can] sustain itself. It may be functionally extinct. I think it is too speculative to use this as a strong argument."). Similarly, specific language in the draft *Effects of WNS* section that linked the long-lived Bat's low reproductive rate and high susceptibility to WNS to its low resiliency was excised from the final rule. *Compare* LAR 52370–71 *with* 80 Fed. Reg. at 17,998. A biologist at FWS Headquarters had commented on this excised language: "This section does not help to support a not imminent threat. Can we discuss more of the uncertainty?" LAR 52371 Comment [cjg69].

[23]    FWS' response to comments from the peer reviewers misses the mark. Whether or not the Bat is "ultimately recoverable," 80 Fed. Reg. at 18,007, the intersection of the species' reproductive life history characteristics with the catastrophic threat of WNS is directly relevant to whether it is "in danger of extinction." *See also* LAR 52731 Comment [72] ("However, related more directly to WNS impacts, I think the implication is that the direct threat of WNS to [the Bat] is compounded by the indirect effect of a decimated population.").

"Otherwise [the court] might as well be deferring to a coin flip." *Id.*; *see also Rocky Mountain Wild*, 2014 WL 7176384 at *5, 2014 LEXIS 177042 at *12.

### C. FWS Arbitrarily Failed to Consider the Cumulative Effects of Threats Under Other Listing Factors in Determining to List the Bat as Threatened

The ESA requires FWS to consider each of the statutory listing factors both individually and in combination in making a listing determination. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c) ("A species shall be listed" if it is "endangered or threatened because of any one *or a combination* of" the five statutory listing factors (emphasis added)); *In re Polar Bear ESA Listing and 4(d) Rule Litigation*, 794 F. Supp. 2d 65, 111 (D.D.C. 2011). FWS' failure to undertake a cumulative effects analysis renders a listing decision arbitrary and capricious. *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 102 (D.D.C. 2010). The threatened determination is unlawful because it arbitrarily dismisses the cumulative effects that threats other than WNS have on Bats as WNS spreads throughout their range. 80 Fed. Reg. at 18,021. This omission is especially striking in view of the final rule's explicit finding to the contrary. 80 Fed. Reg. at 18,006.

Under Factor A, Habitat, FWS recognizes both forest conversion (i.e. loss of forest habitat) and forest management impacts to Bats in WNS-infected landscapes. 80 Fed. Reg. at 17,991–93. Under Factor E, Other Factors, FWS determines that wind energy, climate change, environmental contaminants, and prescribed burning, while not likely to have had significant population-level adverse effects on Bats in the absence of WNS, "may have a cumulative effect on this species when considered in concert with WNS, as this disease has led to dramatic [Bat] population declines." *Id.* at 18,005–06. The final rule's analysis of "Cumulative Effects from

Factors A Through E" concludes: "although the effects on the [Bat] from Factors A, [D][24], and

E, individually or in combination, do not have significant effects on the species, when combined

with the significant population reductions due to white-nose syndrome (Factor C), they may have

a cumulative effect on this species at a local population scale." 80 Fed. Reg. at 18,006; *see also*

*id.* at 18,014 ("[A]s [WNS] continues to spread and cause mortality, other sources of mortality

could further diminish the species' resilience or ability to survive. . . We expect that [Bat]

populations with smaller numbers and with individuals in poor health will be less able to persist

or rebound."); *id.* at 18,017 (it is reasonable to expect that with populations reduced by WNS,

"any additional stressors have the potential to reduce viability" although the scale of impact may

vary from rangewide vs. colony-level).

     This explicit finding notwithstanding, the threatened determination completely disregards

these cumulative effects of non-WNS stressors *when combined with WNS*:

> There are several factors that affect the [Bat]; however, no other threat is as severe and
> immediate to the species persistence as WNS (Factor C). This disease is the prevailing
> threat to the species, and there is currently no known cure. While we have received some
> information concerning localized impacts or concerns (unrelated to WNS) regarding the
> status of the [Bat], it is likely true that many North American wildlife species have
> suffered some localized, isolated impacts in the face of human population growth and the
> continuing development of the continent. Despite this, based upon available evidence, the
> species as a whole appears to have been doing well prior to WNS.

80 Fed. Reg. at 18,021. Thereafter, the threatened determination focuses solely on the impacts of

WNS. It arbitrarily fails to consider how—in addition to the threat posed by WNS—the

cumulative effects of non-WNS stressors on Bats in WNS-infected zones should factor into the

---

[24]    The reference to Factor B is a typographical error. FWS made a negative finding on
Factor B (overutilization), 80 Fed. Reg. at 17,993, and a positive finding on Factor D
(inadequacy of existing regulatory mechanisms), *id.* at 18,001.

threats analysis.[25] *See Ctr. for Native Ecosystems v. Fish and Wildlife Serv.*, 795 F. Supp. 2d 1199, 1207 (D. Colo. 2011) (Service cannot "disregard[] the reality that small, non-threatening injuries can incrementally lead to a fatal result, whether it is the 'straw that broke the camel's back' or "death by a thousand cuts."); *see also WildEarth Guardians*, 741 F. Supp. 2d at 102. Likewise, here FWS fails to articulate a rational connection between the explicit facts found on cumulative effects and its conclusion. *Defenders of Wildlife v. Babbitt*, 958 F. Supp. at 679 ("[T]he presumption of agency expertise may be rebutted if its decision, even though based on scientific expertise, are not reasoned.").

### D.     FWS Violated ESA and APA Notice and Comment Requirements

In addition to being arbitrary on the merits, the threatened determination is also the product of a procedurally flawed process that violated the ESA's and the APA's requirements. 16 U.S.C. § 1533(b)(5)(A)(i) (requiring FWS to "publish a general notice and the complete text of the proposed regulation in the Federal Register"); 5 U.S.C. §§ 553(b), 553(c) (requiring notice in the Federal Register of "rule making" including the "legal authority" for the rule). Despite what the public was led to believe, the record shows that by December 18, 2014—the date on which FWS closed the fourth comment period—the agency had already decided to list the Bats as threatened. LAR 58575–93; NLEB 03571–80; LAR 30409 (Oct. 2014 staff raising "predecisional" and "foregone decisions" concerns); LAR 43029 (Jan. 5, 2015 "We'd like to make sure everyone knows about the preliminary decision to list as threatened").

---

[25]     Service biologist L. Ragan suggested adding to this paragraph: "Although no significant decline due to these factors has been observed, they may have cumulative effects to the species in addition to WNS." Her comment: "I think it is important to add this, because we need to show that we have considered these other factors cumulatively (we get dinged on this a lot in litigation."). LAR 50896; *id.* at Comment [RL9]; *see also* NLEB-23663–64.

By creating a process that allowed the regional directors to reach their decision on the determination independent of the scientists evaluating the Bat's conservation status in drafting the final rule (minus determination), the Service effectively ignored science when it was needed most. The net result is a threatened determination that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43; *see also Defenders of Wildlife*, 176 F. Supp. 3d at 1000; *Western Watersheds Project v. Forest Serv.*, 535 F. Supp. 2d 1173, 1185 (D. Idaho 2007).

Moreover, after the December 2014 meeting at which decision makers decided to proceed with a threatened listing, staff at FWS were still reviewing the existing comments and gathering more comments. LAR 43080 (Jan. 2015 spreadsheet addressing comments from *second* comment period Dec. 2013–Jan. 2014); 79 Fed. Reg. at 68,657 (reopening comment period Nov. 18–Dec. 18, 2014). Thus, the public's comments from several of the comment periods had no bearing on the Service's decision, as it had already determined to list the Bat as threatened regardless of what information the comments might provide. *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 467–468 (D.C. Cir. 1998) ("An agency is required to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them"); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) ("Consideration of comments as a matter of grace is not enough" if the record suggests the agency possesses "too closed a mind").

Nor was the threatened determination the logical outgrowth of the agency's proposed rule to list the Bat as endangered—not because FWS changed its mind, but because it relied on key policy documents that themselves have never undergone a public process as well as brand-new rationales for the threatened determination that were never made public for comment. *CSX*

*Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–1080 (D.C. Cir. 2009) ("[A] final rule

fails the logical outgrowth test and thus violates the APA's notice requirement where 'interested

parties would have had to divine [the agency's] unspoken thoughts, because the final rule was

surprisingly distant from the proposed rule'" (internal citations omitted)). Despite receiving ever

more devastating accounts of Bat declines from state scientists,[26] and despite determining that

WNS would proceed as it had before to infect the Bat's range completely in only 8–13 years,

FWS completely reversed its determination from that of the proposed rule. 80 Fed. Reg. 18,021–

22. To justify its volte-face, the agency drastically changed the rationales for its determination.

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977) (agency must disclose in detail

the thinking and data that has formed its rule).

 The Service's procedural deficiencies prejudiced Plaintiffs, who were denied a

meaningful opportunity to present evidence and raise objections to try to convince FWS that the

law and the science required an endangered listing. *See, e.g.*, *CSX Transp., Inc.*, 584 F.3d at

1082–1083 (lack of notice was prejudicial where plaintiffs missed opportunity to persuade the

agency not to adopt the "rule in the first place" and would have "made additional objections and

presented significantly more (and different) evidence"); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76,

89–90 (D.D.C. 2007) ("actual prejudice" is not required). The final rule fails the logical

outgrowth test in three key areas. First, the four rationales purporting to support the threatened

determination were entirely new. Plaintiffs' arguments above exemplify what they would have

said had they been able to comment on these rationales. Second, as discussed above, FWS relied

---

[26] *See, e.g.*, Summary of State Information, LAR 01599–01601 ("I can tell you numbers of
[Bats] in hibernacula locations in CT have crashed (post-WNS)"); *id*. (Massachusetts officials
reporting "Numbers found in hibernacula pre-WNS were in hundreds at some sites and post-
WNS are all zero's"); *id*. ("100% decrease in mist–net captures post-WNS in NH"); *id*. (same for
Vermont).

on the Polar Bear Memo in its threatened determination, but not in its proposed rule, once again depriving Plaintiffs and the public of notice and the opportunity for comment. Third, as discussed below, FWS relied on a key change to the Final SPR Policy to justify its decision not to analyze whether the Bat is endangered in a significant portion of its range. Independent of the Bat determination, FWS has never given Plaintiffs or the public to comment on either the Polar Bear Memo or the key change in the SPR Policy. That the Service denied Plaintiffs the opportunity to comment on its reliance on these documents before issuing the final rule only compounds the prejudice. It was impossible for Plaintiffs to anticipate the need to address the various rationales and policies on which the threatened determination relies, because they were all absent from the proposed rule. *CSX Transp., Inc.*, 584 F.3d at 1079. FWS thus violated its obligation to give adequate notice of the drastic changes from the proposed rule to the final rule.[27]

## II.     FWS Developed and Relied Upon an Unlawful Significant Portion of Its Range Policy

The final SPR Policy departed dramatically from the draft Policy in one key respect, which FWS then relied on to list the Bats as threatened. 79 Fed. Reg. at 37,609. In a complete 180 degree turn from the draft Policy, the final SPR Policy states that if a species is threatened throughout its range, FWS will not consider whether it is endangered in a significant portion of its range. The SPR Policy is facially unlawful. It is contrary to the ESA's language and goals and

---

[27]     The Service's argument that its issuance of the proposed 4(d) rule for comment proved that the final rule was a logical outgrowth of the proposed rule and cured any notice defect must fail. 80 Fed. Reg. at 18,020 (Comment 76). The proposed 4(d) rule was limited to that proposal only and gave absolutely no indication that FWS would rely on the SPR Policy, the Polar Bear Memo, or the four rationales to justify a threatened determination. *See* 80 Fed. Reg. 2371 (Jan. 16, 2015). Plaintiffs' comments on the proposed 4(d) rule clearly informed FWS that it was required to issue a new proposed listing rule for comment. *See, e.g.*, SuppAR 69755.

fails at step one of the test established by *Chevron, U.S.A, Inc. v. NRDC*, 467 U.S. 837 (1984). The definitions of "endangered" and "threatened" unambiguously require consideration of a species' status "throughout all . . . its range" and in "a significant portion of its range,"16 U.S.C. § 1532(6), (20), but the SPR Policy renders the entire clause "or a significant portion of range" in the definition of an "endangered species" completely superfluous. Even if the Court were to determine ambiguity in this statutory language, the SPR Policy fails as an unreasonable interpretation under *Chevron* step two. The SPR Policy violates the goals of the ESA, relies on factors Congress did not intend the agency to consider, and its promulgation violated the APA's procedural requirements for notice and comment.

The application of the SPR Policy to the Bats illustrates why the 180 degree about-face is unlawful. The Bats have declined up to 99 percent in the core of their range, 80 Fed. Reg. at 17,996–98, yet under the SPR Policy FWS never analyzed if this core range constituted a significant portion of the species' range. Because the SPR Policy forecloses consideration of whether the "core" of a species' range is a "significant portion of its range," it is directly contrary to and ignores the plain language Congress included in the definition of "endangered species."

**A.      The Service Has a Long History of Improperly Interpreting "Significant Portion of Its Range"**

FWS' various interpretations of "a significant portion of its range" have repeatedly been rejected by the courts as inconsistent with congressional intent. *See, e.g.*, *Ctr. for Biological Diversity*, slip op. at 5–10 (Ex. 1) (summarizing history). Originally, FWS concluded that "a significant portion of its range" would provide grounds for listing a species "only if the species faced threats in a portion of its range that were 'so severe as to threaten the viability of the species throughout' all of its range." *Id*. at 6 (quoting SPR AR 428). The Ninth Circuit rejected this interpretation, holding that FWS must give "significant portion of its range" independent

meaning from "throughout all" of its range. *Defenders of Wildlife*, 258 F.3d at 1141–42.[28]

Subsequently, in 2007, the Department of Interior's Solicitor's Office issued a Memorandum

Opinion to aid FWS in developing a policy interpreting the "significant portion of its range"

language. SPR M-Opinion 3701, SAR 462. That opinion stated that where a species was

"endangered" or "threatened" in only "a significant portion of its range" it should be listed only

in that part of its range instead of throughout its entire range. Several courts rejected this

interpretation. *See e.g., Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).

FWS withdrew the SPR M-Opinion in 2011.

On December 9, 2011, FWS proposed a draft SPR Policy. 76 Fed. Reg. 76,987. This draft

addressed judicial concerns with the SPR M-Opinion by stating: "if a species is found to be

endangered or threatened in only a significant portion of its range, the entire species is listed as

endangered or threatened, respectively, and the Act's protections apply across the species' entire

range." *Id.* at 76,990. It also stated that listing decisions would consider four options: (1) whether

a species is endangered "throughout all" of its range; (2) whether a species is endangered in "a

significant portion of its range;" (3) whether a species is threatened "throughout all" of its range;

and (4) whether a species is threatened in "a significant portion of its range." *Id.* at 76,991.

Notably, FWS explained that if a species is "threatened throughout all of its range, we would

limit our SPR analysis to the question of whether the species is in danger of extinction in a

significant portion of its range; if so, we would list the species as endangered; if not we would

---

[28]     Judges in this district have found this Ninth Circuit ruling persuasive. *Defenders of Wildlife*, 239 F. Supp. 2d at 20–21; *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 132 (D.D.C. 2014); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 203 (D.D.C. 2012); *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 98–99 (D.D.C. 2010).

list the species as threatened." *Id.* at 77,002. The draft policy thus gave each part of the ESA's definitions of "endangered species" and "threatened species" independent meaning.

Without any public process or reasonable explanation, the final SPR Policy radically departed from the draft policy's approach. It provides that "[i]f a species is endangered or threatened throughout its range, no portions of its range can qualify as 'significant.'" 79 Fed. Reg. at 37,579.

**B.      The Final SPR Policy is Contrary to the Plain Language of the ESA**

The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all *or* a significant portion of its range." 16 U.S.C. § 1532(6) (emphasis added). Under the SPR Policy, whenever FWS establishes that a species is threatened throughout all of its range, Congress's inclusion of "or a significant portion of its range" in the definition of "endangered species" is rendered superfluous. This violates statutory interpretation principles and the ESA's legislative history.

As the D.C. Circuit has stated, "[w]e begin, as always, with the plain language of the statute in question." *Citizens Coal Council v. Norton*, 330 F.3d 478, 482 (D.C. Cir. 2003). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–843. "In determining whether Congress has directly spoken to the precise question at issue, the Court should use all the 'traditional tools of statutory construction,' including textual analysis, structural analysis, and (when appropriate) legislative history." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31 (D.D.C. 2010) (quoting *Chevron*, 467 U.S. at 843 n.9).

Courts have concluded the phrase "significant portion of its range" in the definition of "endangered species" is ambiguous. *See, e.g.*, *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 128–29 (D.D.C. 2014) (collecting decisions from this district). But the question of what Congress intends when it includes "or" in a statute is clear. Canons of statutory interpretation provide that when Congress uses "or" it does so to give the words it connects separate meaning. *See United States v. Woods*, – U.S. –, 134 S. Ct. 557, 566 (2013) (when Congress uses "or" in a statute, "the ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings" (internal citation omitted)). Here, Congress provides two distinct situations in which a species must be listed as "endangered": ***either*** 1) when it is in danger of extinction "throughout all . . . of its range" ***or*** 2) when it is in danger of extinction "throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6). The SPR Policy cannot render one of these scenarios virtually meaningless by refusing to consider it all. *Ctr. for Biological Diversity*, slip op. at 15 (Ex. 1) ("'Whatever the outer limits of the range of permissible constructions' of the ESA, the Court is 'certain that what lies beyond them' is an interpretation that renders key statutory language meaningless and redundant" (internal citations omitted)).

Yet this is exactly what the SPR Policy does. If FWS determines that a species is threatened throughout its range, it will always stop the analysis there, and will never consider whether the species is also endangered in a significant portion of its range. 79 Fed. Reg. at 37,579 ("significant" means a species cannot "qualify as both threatened throughout its range and endangered throughout an SPR"). This matters because a species that warrants listing as "endangered" because it is endangered in a significant portion of its range will only be protected as "threatened" and will not automatically receive the full protections of the ESA. *Compare* 16 U.S.C. § 1538(a)(1) *with id.* § 1533(d). Under the SPR Policy, FWS never even *considers* the

question whether the species is endangered in a significant portion of its range should it first decide that the species qualifies as threatened due to its status throughout its range. Because the SPR Policy renders a portion of the "endangered species" definition superfluous, it fails the *Chevron* step one test. *See Sw. Gen. Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015) ("'It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001))).

In the face of this unambiguous statutory directive, FWS unsuccessfully attempts to justify the SPR Policy by explaining that Congress "placed the 'all' language before the SPR phrase," thereby suggesting "that Congress intended that an analysis based on consideration of the entire range should receive primary focus, and thus that the agencies should do an SPR analysis as an alternative to a rangewide analysis only if necessary." 79 Fed. Reg. at 37,580. There is no statutory canon of construction that suggests that words or phrases that appear in a statute before the use of "or" take priority or have primacy over words that come after the "or." To the contrary, "'no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Sw. Gen. Inc. v. NLRB*, 796 F.3d at 76 (internal quotation marks and citation omitted). Thus, FWS cannot invoke a non-existent statutory interpretation canon to refuse to give effect to the second half of the full definition of an "endangered species" merely because it follows the "or" after the first half of the definition.[29]

---

[29]    If "or" were to have this meaning throughout the statute it would create a sea change in how numerous ESA provisions are interpreted, since "'the same word appearing in different portions of a single provision or act is taken to have the same meaning in each appearance.'" *Mohamad v. Rajoub*, 634 F.3d 604, 608 (D.C. Cir. 2011) (citation omitted). For example, FWS' new reading of "or" creates a tension between the statutory definitions of endangered and threatened, which prioritizes threatened or no listings under the SPR Policy, and Section 4 of the ESA directing FWS to evaluate whether a species is "an endangered *or* threatened species," 16

FWS' novel reading of the statute is further refuted by the legislative history of the ESA. When Congress enacted the ESA in 1973, some of the most significant changes it made from the prior 1966 and 1969 endangered species laws were to the definitions of "endangered species" and "threatened species." The legislative history specifically states that the inclusion of the significant portion of its range language represented "a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction." H.R. Rep. No. 93-412, (1973); *Defenders of Wildlife*, 258 F. 3d at 1144. Further, as Judge Kessler explained in noting "the expansive protection intended by the ESA," "when Congress enacted the ESA in 1973, it expressly extended protection to a species endangered in only a 'significant portion of its range.' The two earlier statutes enacted to protect and preserve endangered species narrowly defined endangered species as including only those species facing total extinction." *Defenders of Wildlife*, 239 F. Supp. at 19 (internal citations omitted). In other words, Congress explicitly intended the "significant portion of range" language it added to the definitions of endangered and threatened to enable FWS to act sooner to avoid a species' extinction, rather than having to wait until it is threatened with worldwide endangerment to act. Thus, the legislative history of the ESA demonstrates that Congress specifically intended that there be two independent bases for listing species as endangered. Because the SPR Policy negates the second basis, it is directly contrary to congressional intent.

To illustrate how the SPR Policy leads to outcomes contrary to congressional intent, consider this: a species at lower risk of extinction because it is not endangered or threatened throughout its entire range, but that is endangered in a significant portion of that range, will

---

U.S.C. § 1533(a)(1) (emphasis added), which would prioritize endangered listings first followed by threatened determinations. As this example demonstrates, "or" should be given its ordinary meaning.

receive the full protections of the Act because it will be listed as endangered throughout its

range. Yet a species at higher risk because it is threatened throughout its entire range will receive

no automatic statutory protections even if it is endangered in a significant portion of that range.

In other words, under the Policy, the *only* situation in which a SPR analysis would lead to an

endangered listing would be if (1) a portion of a species range was "significant" and the species

is "endangered" in only that portion of the range and (2) the remainder of the species' range was

viable (i.e., the species is not threatened throughout its range). However, if (1) the same portion

of a species' range was "significant" and "endangered," but (2) the remainder of the range was

"threatened," then the species would be listed as threatened and not endangered even though the

species is more imperiled. As threatened species receive no automatic statutory protections and

receive lower priorities for recovery planning, this outcome contravenes the ESA's express

language and Congress' explicit intent. *Ctr. for Biological Diversity*, slip op. at 15 (Ex. 1). In

short, the SPR Policy has vitiated a phrase that Congress specifically added to the definition of

"endangered species" as one of the most important changes made in the1973 expansion of the

Act's protective reach.

### C.    The SPR Policy is an Unreasonable Interpretation of the ESA Under Chevron Step Two

Even if the Court finds that Congress' use of "or" in the definition of "endangered

species" is ambiguous, the SPR Policy offers an unreasonable interpretation of the ESA. The

SPR Policy is contrary to the goals of the ESA, considers factors Congress did not intend the

agency to consider, and was adopted through a procedurally deficient process. The SPR Policy

thus fails at *Chevron* step two. *Northpoint Tech. Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005)

(a "'reasonable' explanation of how an agency's interpretation serves the statute's objectives is

the stuff of which a 'permissible' construction is made . . . an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not" (internal citations omitted)).

The express goal of the ESA is to recover imperiled species to the point where they no longer require listing. 16 U.S.C. § 1531(b); *id.* § 1532(3). As threatened species do not automatically receive the broad protections conferred upon endangered species, the SPR Policy directly subverts the ESA's conservation goal by foreclosing any consideration of whether a species threatened throughout its range should be listed as endangered because of the threats it faces in a significant portion of its range. 79 Fed. Reg. at 37,580.[30]

In addition, the SPR Policy injects impermissible considerations into the listing determination process. The ESA explicitly limits FWS to making listing determinations solely on the basis of the best available scientific data on each of the five listing factors. 16 U.S.C. §§ 1533(a)(1), 1533(b)(1)(A); 50 C.F.R. § 424.11(b); s*ee also* 49 Fed. Reg. 38,900 (Oct. 1, 1984) (FWS explaining "[c]hanges made by the [1982] Amendments were designed to ensure that decisions in every phase of the listing process are based solely on biological considerations"). However, to explain its decision to reverse course in the final SPR Policy, the agency explicitly relies on its concerns over its heavy workload and limited "resources" to justify restricting a SPR analysis to the rare circumstance when a species is "imperiled" in only "a portion" of its range

---

[30]     Previous to this change, FWS acknowledged setting a high standard for when it would protect a species imperiled in a significant portion of its range in the draft Policy. 76 Fed. Reg. at 76,995. The high standard was set because of the need to protect species throughout their ranges even when they were threatened or endangered in only a portion of their range. Thus, the draft Policy specified that a portion of a species' range is significant "if its contribution to the viability of the species is so important that, without that portion, the species would be in danger of extinction." 79 Fed. Reg. at 37,578. This high standard, which is not at issue here, led to the outcome stuck down by the Ninth Circuit in *Defenders of Wildlife v. Norton*, 258 F.3d at 1140-42—i.e., setting the bar so high for the "significant portion" of a species range that it is subsumed by the "throughout all" its range provision. *Ctr. for Biological Diversity,* at 15 (Ex. 1).

rather than throughout its entire range. 79 Fed. Reg. at 37,582; *id.* at 37,581 ("limiting the applicability of the SPR language . . . reduce[s] the circumstances in which additional legal determinations are necessary"). These are non-biological factors that the ESA prohibits the agency from considering in a listing determination. 49 Fed. Reg. 38,900 (Oct. 1, 1984).

Moreover, expending resources to protect a species that is endangered due to its status in a significant portion of its range is not wasteful. To the contrary, using agency resources to protect imperiled species is the ESA's clear statutory directive. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("[t]he plain intent . . . to halt and reverse the trend toward species extinction, whatever the cost" "is reflected not only in the stated policies of the Act, but in literally every section of the statute"). FWS' decision to forego any analysis of whether an imperiled species warrants listing as endangered where it is endangered in a significant portion of its range and threatened in the rest of its range due to consideration of non-biological factors is flatly inconsistent with the ESA's conservation purpose and plain language. 16 U.S.C. §§ 1531, 1532(6).

Procedurally, the SPR Policy is deficient because the final policy's 180 degree course change barring consideration of whether a species is endangered in a significant portion of its range when it is threatened throughout its range is not a logical outgrowth of the draft policy. *CSX Transp., Inc.*, 584 F.3d at 1080–1083; *Methodist Hosp. v. Shalala*, 38 F.3d 1225, 1237–1238 (D.C. Cir. 1994) (applying logical outgrowth concept to agency policy). Neither Plaintiffs nor the public were aware that FWS was considering this change. The agency failed in the "Request for Information" section of the draft policy to provide notice to the public that it was considering this key change. To the contrary, FWS *explained in its proposal* that while the "overlap" between a species threatened throughout its range and endangered in a significant

portion of its range "could potentially be confusing to the public or to biologists conducting status evaluations, we conclude that in practice it will not be a significant hurdle to implementing our draft policy." 76 Fed. Reg. at 76,996.

Nevertheless, in the final SPR Policy the agency reverses itself citing some commenters' "confusion" "about a species being both threatened throughout its range and endangered throughout an SPR," as the reason for the complete about-face. 79 Fed. Reg. at 37,599. Even if such "confusion" was a valid justification for the reversal—which it is not as FWS itself noted— changing the policy to completely negate the fundamental operating assumptions of the draft was unreasonable, especially in the absence of public notice and comment. FWS' decision to adopt not just a slight change to avoid confusion but a wholly new approach to considering significant portions of a species' range (or not considering it, as the case may be) required notice and comment. 16 U.S.C. § 1533(h), 5 U.S.C. §§ 553(b), 553(c). This could easily have been accomplished in the two and a half years it took FWS to finalize the SPR Policy.

In sum, in refusing to analyze whether a species warrants listing as endangered due to its status in a significant portion of its range where it is threatened throughout its entire range, FWS fails to give independent meaning to the statutory terms rendering the "significant portion of its range" phrase superfluous. In adopting this policy, FWS relied upon impermissible factors, including its workload, rather than the biological factors the ESA mandates consideration of, and failed to engage in an adequate public process. As Judge Kessler explained in reviewing a prior FWS interpretation of significant portion of its range, "[b]ecause the Court concludes that FWS misinterpreted ESA's statutory scheme, it 'owes the Secretary's interpretation no deference under [*Chevron*].'" *Defenders of Wildlife*, 239 F. Supp. 2d at 21 n.10.

**D.    FWS Unlawfully Applied the SPR Policy to List the Bat as Threatened Without Considering if the Bat is Endangered in a Significant Portion of Its Range**

By applying the SPR Policy to the Bat, FWS failed to undertake the necessary analysis of whether the species is in danger of extinction throughout a significant portion of its range. 80 Fed. Reg. at 18,018; *id.* at 18,022. Specifically, FWS explained:

> According to that final [SPR] policy, an analysis of whether a species is endangered or threatened in a significant portion of its range is only undertaken when a species is found to not warrant listing under the Act throughout its range. We have determined that the northern long-eared bat warrants listing as a threatened species throughout its range, and, therefore, we did not conduct an SPR analysis for the species in this final listing determination.

80 Fed. Reg. at 18,018. In listing the Bat as threatened without an SPR analysis, FWS failed to follow Congress' directive, expressed in the plain language of the ESA, to consider whether the Bat warrants listing as endangered because it is in danger of extinction "throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6).

Specifically, FWS unlawfully relied on the SPR Policy to justify ignoring the clear and undisputed fact that the Bat has declined most significantly in the core of its range. As discussed previously, both the proposed and final rules explicitly acknowledged this fact. 80 Fed. Reg. 17,975–83; *id.* at 17,998; 78 Fed. Reg. at 61,065; *id.* at 61,076. Under the most basic principles of conservation biology, it is "so implausible" that the core of the range is not a "significant portion" of the Bat's range that the Service's refusal to consider whether the Bat's core range is a "significant portion of its range" cannot be "ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Nor was it lawful for FWS to rely upon this policy provision that never underwent public notice and comment to justify a final threatened determination that also never underwent a public process. While some Plaintiffs raised concerns about applying the new SPR Policy provision to

the Bat, FWS' utter failure to allow the light of public scrutiny to illuminate its decision to list the Bat as threatened based on the "threatened throughout then no SPR analysis" aspect of the SPR Policy also violated the procedural requirements of the ESA and APA. 16 U.S.C. §§ 1533(h), 1533(b)(5); 5 U.S.C. §§ 553(b), 553(c).

The Bat determination illustrates the precise problem with the total reversal in the SPR Policy: a species receives less protection when it is at relatively greater risk of extinction. Under the policy, if, and only if, the Bat was *not* threatened throughout the remainder of its non-core range, could FWS have determined through a SPR analysis to list the species as endangered due to the threat of WNS in its core range. But because FWS determined that the Bat is threatened throughout its entire range because of the impending arrival of WNS in its non-core range, FWS concluded its analysis with a threatened determination and never considered whether the Bat is endangered in a significant portion of its range. The SPR Policy thus directly enabled the agency to *not consider* whether the Bat is in danger of extinction in a significant portion of its range. In turn, the threatened determination enabled the agency to adopt a 4(d) rule that, as Plaintiffs contend, utterly fails to protect the species. Had FWS appropriately conducted the mandatory SPR analysis, based on the best available scientific data it would have had no way to conclude that the core range was not significant and could not have avoided an endangered listing. By failing to undertake the mandatory SPR analysis for the Bat, FWS violated the ESA.[31]

It is arbitrary and capricious (not to mention ironic) that FWS explicitly relies on the peripheral portions of the Bat's, range, where the species was never historically abundant in the

---

[31]   By ignoring a key part of the definition of endangered in the final SPR Policy, that interpretation is also not entitled to deference. *Int'l Longshoremen's Ass'n, AFL-CIO v. Nat'l Mediation Bd.*, 870 F.2d 733, 736 (D.C. Cir. 1989) (finding that deference "is not due when the [agency] has apparently failed to apply an important term of its governing statute").

first instance, to justify a threatened listing on the basis that those far-flung portions of the range are not yet infected with WNS. That a species might persist elsewhere is not enough to answer the question whether it is in danger of extinction in a different significant portion of range. *See, e.g.*, *Sw. Ctr. for Biological Diversity v. Norton*, No. 98–934, 2002 U.S. Dist. LEXIS 13661, *50 (D.D.C. July 29, 2002) ("FWS stated that even if the goshawk became extinct on Vancouver Island, it would still remain in sufficient numbers on the Queen Charlotte Islands and in southeast Alaska. While this may indeed be the case, it does not answer the question of whether the goshawk is likely to become extinct on Vancouver Island, which remains an independent ground for listing under the ESA."). At the very least, FWS had to consider whether the Bats are endangered in their core range.

The agency's failure to undertake the SPR analysis for the Bat is akin to its previous interpretation failures. For example, as Judge Kessler explained in reviewing a threatened listing for the Canada lynx, "FWS' focus on only one region of the Lynx's population—the Northern Rockies/ Cascades—to the exclusion of the remaining three-quarters of the Lynx's [range] . . . [wa]s antithetical to the ESA's broad purpose to protect endangered and threatened species." *Defenders of Wildlife*, 239 F. Supp. 2d at 19 (citing 16 U.S.C. § 1531(b)). Likewise, here FWS has focused on the portions of the Bat's range where WNS has not yet spread. But "[w]here a species or subspecies is unlikely to survive in a sizeable portion of its current habitat, the agency must provide some explanation as to why this portion is not 'a significant portion of its range.'" *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191 (D.D.C. 2012) (internal citation omitted). FWS has provided no such explanation here.

## REMEDY

Plaintiffs respectfully request that the Court remand without vacating the threatened listing of the northern long-eared bat and order the agency to make a new listing determination consistent with this Court's ruling. In light of the many legal violations underlying the threatened determination, it is imperative that the key policy documents on which the threatened determination is based be set aside and that FWS render a new listing determination based solely on the statutory listing factors and the best available scientific data, as the ESA requires.

While the APA enables the court to "hold unlawful and set aside [unlawful] agency action, findings, and conclusions," 5 U.S.C. § 706(2), the court has the discretion to shape remedies short of vacatur. *Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–151 (D.C. Cir. 1993). "The decision whether to vacate hinges on 'the seriousness of the regulation's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences' of vacatur." *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety and Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)). ESA listings have been found to warrant remand without vacatur due to the disruptive consequences of setting such decisions aside. *Id.*; *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1406 (9th Cir. 1995) ("equitable concerns weigh toward leaving the listing rule in place while FWS remedies its procedural error and considers anew whether to list the [the species]").

In listing the Bat as threatened instead of endangered, FWS undeniably violated numerous requirements of the ESA and APA. However, the harmful and disruptive consequences of de-listing the Bats and removing even the limited ESA protections they currently have would far outweigh any benefits of vacatur. *Humane Soc'y of the U.S.*, 579 F.

Supp. 2d at 21 (relying upon "the ESA's preference for protecting endangered species" in crafting relief (internal citation omitted)).

The same cannot be said for the SPR Policy or the Polar Bear Memo. FWS' failure to follow the plain language and intent of the ESA, offer a reasonable interpretation of the Act, or undertake a meaningful notice and comment process in creating the SPR Policy indicate the agency cannot readily remedy the defect with the Policy. *See Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 137 (D.D.C. 2014) (where FWS action "falls outside the FWS's statutory authority under the ESA and is predicated on an interpretation of the ESA that is contrary to the statute's purpose . . . the first factor strongly favors vacatur"); *see also Ctr. for Biological Diversity*, slip op. at 17 (Ex. 1) (vacating SPR Policy). Given the agency's long history of interpreting the key phrases "throughout all or a significant portion of its range" without a Policy, vacatur is unlikely to be disruptive. *See Nat'l Parks Conserv. Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (vacatur not disruptive when it restores long-held status quo). Thus, vacatur of the "new" SPR Policy provision providing that when a species is threatened throughout its range it cannot be endangered in a significant portion of its range is necessary. Vacatur of the Polar Bear Memo is also warranted because the agency failed to follow the ESA's own processes for developing policies, including consultations with FWS' sister agency NMFS and the agency's own scientists, raising a serious question whether the agency would reach the same result had it followed this process. *Id.* at 20. Starting anew without the Memo would not be disruptive, since the agency operated for decades without benefit of this litigation memorandum. *Id.* at 21. Given the history of the Memo and the agency's continued reliance upon it, Plaintiffs request that FWS be directed not to rely on the Memo in making non-polar bear listing decisions.

FWS' reliance upon these two fatally flawed policy documents and its failure to base its threatened determination for the Bat on the best available scientific data compel the conclusion that a wholly new decision—in lieu of a remand for a better explanation—is necessary. *Am. Wildlands*, 193 F. Supp. 2d at 248 (remanding "with instructions that [FWS] reconsider[]" its listing decision in light of the court's decision). Indeed, the record demonstrates that FWS has already anticipated the need to list the Bat as endangered. *See* 4AR 12802 ("we need to . . . discuss the likelihood of NLEB being . . . endangered at some point in the not so distant future. This would serve as a reminder to not get too excited about all the take exemptions (i.e., this is your chance to get your ducks in a row in advance of the endangered classification)."); 4AR 12313 ("it should be recognized that it is likely that this species will be uplisted to endangered where there will be no 4(d) rule"); 4AR 7020 ("thinking that we may end up at endangered in the not-too-distant future"); 4AR 18842.[32]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment, grant the requested relief detailed above, and grant such other and further relief as it deems appropriate.

---

[32]     As the D.C. Circuit has long acknowledged, "in cases where relief is at issue" the Court may look beyond the record for the agency decision before it. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989); *Franks v. Salazar*, 751 F. Supp. 2d 62, 70 n.2 (D.D.C. 2010) (noting that extra-record evidence can be considered where relief is at issue but that relief was not at issue where vacatur was not contested).

Respectfully submitted this 14th day of April, 2017.

/s/ Tanya M. Sanerib
Tanya M. Sanerib (D.C. Bar No. 473506)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
(971) 717-6407 (tel)
tsanerib@biologicaldiversity.org

Counsel for Plaintiffs Center for
Biological Diversity, Sierra Club,
Coal River Mountain Watch, and
Ohio Valley Environmental Coalition

/s/ Jane P. Davenport
Jane P. Davenport (D.C. Bar. No. 474585)
DEFENDERS OF WILDLIFE
1130 17th St NW
Washington, DC 20036
(202) 772-3274 (tel)
jdavenport@defenders.org

Counsel for Plaintiff Defenders of Wildlife

**Plaintiffs' List of Exhibits**

1. *Ctr. for Biological Diversity v. Jewell*, No. CV-14-02506-TUC-RM slip op. at 5–10 (Mar. 29, 2017) (Ex. 1)

2. Solicitor's Memorandum Opinion M-37021, The Meaning of "Foreseeable Future" in Section 3(20) of the Endangered Species Act (Jan. 16, 2009) (Ex. 2)

3. Declaration of Seggerman (Ex. 3)

4. Declaration of Andresen (Ex. 4).

5. Declaration of Bone (Ex. 5)

6. Declaration of Fascione (Ex. 6)

7. Declaration of Greenwald (Ex. 7)

8. Declaration of Jackson (Ex. 8)

9. Declaration of Johnson-Godsy (Ex. 9)

10. Declaration of Kotala (Ex. 10)

11. Declaration of Matteson (Ex. 11)

12. Declaration of Pelster (Ex. 12)

13. Declaration of Sachs (Ex. 13)

14. Declaration of Wood (Ex. 14)