# Exhibit 6

In Support of Plaintiffs' Partial Motion for Summary Judgment
on Their Endangered Species Act Listing Claims

in

*Center for Biological Diversity et al., v. Jim Kurth et al.,* No. 1:15-cv-00477-EGS

and

*Defenders of Wildlife v. Jim Kurth et al.*, No. 1:16-cv-00910-EGS

Consolidated Cases

## DECLARATION OF NINA FASCIONE

I, Nina Fascione, declare as follows:

1. I am the Vice President of Philanthropy for Defenders of Wildlife ("Defenders") and have been in this position since 2012. Previously I held conservation program positions with Defenders from 1995 to 2010, including the position of Vice President of Field Conservation. I am also a current member of Defenders, and have been a member of the organization since 2012. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently thereto under oath.

2. Founded in 1947, Defenders is a non-profit corporation with more than 1.2 million members and supporters. Defenders is headquartered in Washington, D.C., with field offices in Arizona, Alaska, California, Colorado, Florida, North Carolina, Idaho, Montana, Oregon, Washington and Mexico.

3. Defenders is dedicated to protecting native animals and plants in their natural communities. Defenders accomplishes its goals with partners at local, state, regional and national scales through demonstrated on-the-ground conservation, research, policy development, advocacy, and, when necessary, litigation. Defenders advocates sound, scientifically-based approaches to wildlife conservation that are geared to restoring imperiled species and preventing others from becoming threatened or endangered. On behalf of its members and supporters nationwide, Defenders has a long history of advocating for the protection of wildlife.

4. Many Defenders members live within the range of the northern long-eared bat ("Bat"), which encompasses areas in 37 U.S. states and 5 Canadian provinces. Many of these

1

members live within the northeastern and midwestern United States, the portions of the range where the Bat was most abundant prior to the onset of white-nose syndrome (WNS) and where it has suffered catastrophic declines since the WNS epidemic started. Many of Defenders' members have protectable scientific, professional, recreational, spiritual, aesthetic, and other interests in observing, studying, and otherwise enjoying the Bat.

5. On behalf of these members, Defenders has devoted substantial organizational resources to promoting federal protection of the Bat under the Endangered Species Act ("ESA") and to educate the public about the extinction crisis facing this and other North American bat species. Advancing the conservation of North American bats is part of the organization's 2013–2023 strategic plan, which identifies bats as one of twenty-five key imperiled species or groups of species around which we organize our conservation advocacy work.

6. On January 2, 2014, Defenders submitted comments signed by 32,000 of its members on the 12-Month Finding on a Petition to List the Eastern Small-Footed Bat and the Northern Long-Eared Bat as Endangered or Threatened Species; Listing the Northern Long-Eared Bat as an Endangered Species; Proposed Rule 78 Fed. Reg. 61,046 (Oct. 2, 2013). These comments urged the U.S. Fish and Wildlife Service ("Service") to finalize its proposed rule to list the Bat as endangered based on the best available scientific data showing that the species is at imminent risk of extinction.

7. Also on January 2, 2014, Defenders and its conservation allies submitted a detailed comment letter on the 12-Month Finding, supporting the proposed rule to list the Bat as endangered. This comment letter provided further scientific evidence that the species'

continued existence is imperiled not only due to WNS but also due to the individual and cumulative effects of stressors such as wind energy development, shale gas extraction, climate change, forest habitat fragmentation and destruction, pesticides and other chemicals, and collisions with vehicles and buildings. Indeed, this comment letter cited evidence that the Bat and other hibernating bat species were already in decline prior to the onset of WNS.

8. On March 17, 2015, Defenders submitted a comment letter on the Service's proposed 4(d) rule titled "Listing of the Northern Long-Eared Bat with a Rule Under Section 4(d) of the Act." 80 Fed. Reg. 2371 (Jan. 16, 2015). These comments reiterated Defenders' strong support for an endangered listing and opposed the proposed 4(d) rule as unsupported either by the best available scientific data or by the statutory mandate to provide for the conservation (i.e., both survival and recovery) of listed species.

9. Defenders' organizational interests in ensuring that ESA listing decisions are made with the full transparency, including public notice and comment, required by both the ESA and the Administrative Procedure Act ("APA"), were injured when the Service finalized its threatened listing determination for the Bat without giving the public notice via a revised proposed rule of its rationale for changing its proposed endangered designation to a final threatened designation.

10. During the rulemaking processes that concluded with the listing decision and final 4(d) rule in at issue in this lawsuit, Defenders also expended significant resources to monitor and ensure the defeat of proposed legislation that would have prohibited or undermined ESA protections for the Bat.

11. In January 2015, Defenders staff prepared talking points against riders on the Keystone XL Pipeline bill (S. Amdt. 243 and 244) that would have barred the Bat from being listed as an endangered species. In March 2015, Defenders staff prepared talking points against an amendment on the budget resolution (S. Amdt. 422) that would have indefinitely delayed the listing of the Bat by requiring the establishment of a deficit-neutral reserve fund to ensure that the conservation of the Bat and local economies would be compatible. Neither the riders nor the amendment came to the floor for a vote.

12. On May 6, 2015, Defenders' Vice President Don Barry testified before Congress with respect to eight Senate bills, including one particular bill, S.655, introduced in March 2015, that would have prevented the Service from using funds to make a final listing determination on the Bat. Defenders staff members helped to write his testimony and prepare him for questions.

13. Between June and December of 2015, Defenders staff launched a robust—and ultimately effective—campaign to oppose all anti-ESA riders on the Senate and House Interior appropriations bills, a campaign that included working against two specific riders that would have weakened or barred altogether ESA protections for the Bat (Sec. 122 of H.R. 2822 and H. Amdt. 626 to H.R. 2822). Defenders staff were involved in spearheading the composition of three letters opposing all anti-ESA/anti-species riders: one from 92 representatives, another from 25 senators, and another from 161 environmental and animal organizations. Ultimately, none of the new anti-ESA amendments was attached to the appropriations bill, including those concerning the Bat.

14. Defenders has published blog posts on the organization's website regarding the status of the Bat, as well as online and print pieces aimed at educating the public about the threats

to bat species and the vital and valuable benefits that bat species contribute to our economy and our environment.

15. I have a held a personal and professional interest in bat species and bat conservation for many years. From March 2010 through May 2012, I was Executive Director of Bat Conservation International ("BCI"), an organization dedicated to protecting bats and their habitats around the world through innovative programs that blend education, research, and conservation. Much of my time as Executive Director was spent combatting WNS, the devastating disease eliminating bat populations in the United States. My work included overseeing BCI's WNS research, seeking and distributing funds for university-based WNS research, conducting extensive media appearances to raise the alarm about this emergent disease, lobbying on Capitol Hill and testifying before Congress about WNS, and educating the public on why we should care about bats and take steps to protect them.

16. I have been fascinated by bats since early in my professional career as a wildlife conservationist. In the 1980s, I worked at the Philadelphia Zoo, often with the bat collection. I wrote a play about bats for the zoo that was used for decades to educate the visiting public about how important these small mammals are. Throughout graduate school I kept two "ambassador" bats to further public education and conservation through interactive presentations, and spent many hours giving presentations about bats to schools, libraries and community centers.

17. I have studied bats in the wild in the eastern United States and Canada, including in Bat territory. Specifically, I have been caving in caves with northern long-eared bat

populations—prior to the onslaught of WNS—and helped with the collection of census data for this and other bat species.

18. I was overjoyed the first time I saw northern long-eared bats up close. While some bats have appearances that only a mother could love, these Bats are cute by anyone's definition, with large ears and sweet faces.

19. Even when they are not up close, I greatly value watching bats fly around at dusk and into the night. To this day, I thrill when I see my first bats of the year and know that spring has arrived along with my favorite mammals. I appreciate seeing their athletic aerodynamics. I also appreciate the sophisticated sonar system bats used to catch prey, and for years enjoyed using a bat detector device to listen to their vocalizations, which the bat detector converts from the ultrasonic range into the range of sound audible to humans.

20. Frankly, I also appreciate bats for the fact that they eat mosquitos and other pesky insects. Indeed, it was learning about their important ecological role that made me become a fan of bats in the first place.

21. On multiple occasions, I have taken my daughter with me on bat research trips. She was proud of her claim to fame in school of being the only kid to have handled live bats.

22. In my neighborhood in Silver Spring, Maryland, I'm known as the "bat woman," educating my neighbors to dispel myths about bats, and walking my dogs late at night to enjoy seeing the bats flying around.

23. As someone who has loved bats for decades, I intend to continue viewing and appreciating Bats and other bat species in the wild in my home state of Maryland for so long as there are opportunities to do so. I also intend to continue seeking opportunities to

view and enjoy the Bat in my husband's home state of New York, where we spend summer hours appreciating the aesthetic and ecological value of bat species. I am extremely concerned about the devastating effects that WNS has already had in extirpating local populations of the Bat in New York, the epicenter of WNS, as well as in Maryland.

24. My husband (who is a professional wildlife biologist) and I spend as much time as possible in state and federal parks throughout Maryland, Pennsylvania, and New York. From Tuckahoe State Park on Maryland's Eastern Shore to Susquehanna State Park north of the Chesapeake Bay to Swallow Falls State Park in Western Maryland, we often canoe, camp, and hike on public lands. We enjoy opportunities for viewing wildlife, and particularly bats, during those activities. Notably, Swallow Falls State Park is located in Garrett County, which I understand is one of the counties in Maryland with identified hibernacula for the Bat. I seek out opportunities to view bats, including northern long-eared bats, on my trips to state and federal parks.

25. Stringent protection of the Bat under the ESA such that the species has the necessary legal protections to give it the best possible chance of survival and recovery in the places in the United States where I have viewed them, and where I hope to view and study them again, would protect my deep personal interest in viewing and studying the Bat into the future.

26. Defenders advocates for scientifically-grounded decisions that give the benefit of the doubt to species conservation in the face of scientific uncertainty. Further, Defenders advocates for interpretations of the ESA that apply the full statutory protections Congress intended for any species endangered or threatened in all or a significant portion of its

range. Because Defenders is concerned that the Service's decision to list the Bat as threatened rather than endangered in all or a significant portion of its range fails to reflect a rational assessment of the best available scientific data before it in light of the legal standards established by the ESA, and because the Service's final 4(d) rule is wholly inadequate to conserve the species and is similarly premised on legal violations of the best available data standard, Defenders brought suit to challenge those decisions in the present action.

27. Defenders has a long history of advocating for the Service to interpret and apply the statutory definitions of "endangered" and "threatened," including the phrase "significant portion of its range" contained in both those definitions, in a manner consistent with the plain language and meaning of the ESA. To that end, Defenders submitted detailed comments on March 12, 2012, objecting to the Service's Draft Policy (76 Fed. Reg. 76,987, Dec. 9, 2011) narrowly defining the statutory phrase "significant portion of its range." In that letter, Defenders wrote that "the policy's unreasonably narrow focus on species viability fails to accommodate the ESA's broader species conservation goals and purposes and is inconsistent with well-established legal precedent."

28. The Service's Final Policy (79 Fed. Reg. 37,578 (Jul. 1, 2014)) did not correct the deficiencies of the Draft Policy, and in fact created new deficiencies that fail to give full effect to the statutory definitions of endangered and threatened. As relevant here, Defenders asserts that that aspect of the Policy under which the Service will not engage in any analysis whatsoever of whether a species is endangered in a significant portion of its range if the Service determines it is threatened throughout its range is unlawful and injurious to Defenders' interests. The Service's approach essentially renders the term

"significant portion of range" in the definition of "endangered" superfluous, thus undercutting Defenders' institutional mission of ensuring that the ESA is appropriately implemented to protect not only the Bat but other endangered species to ensure these imperiled species receive the full range of statutory protections to which they are entitled. Moreover, because this aspect of the Final Policy was not presented in the Draft Policy, Defenders was denied any opportunity to comment on it and thus suffered injury to its procedural interests in ensuring that ESA policies, regulations, and decisions are made in full compliance with the public notice and comment requirements of both the ESA and the APA.

29. Defenders has fought for a rational and consistent interpretation of the phrase "significant portion of its range" for decades, dating back at least to our litigation beginning in 1997 challenging the Service's decision to withdraw a proposed rule to list the flat-tailed horned lizard. That litigation ultimately resulted in a Ninth Circuit decision strongly criticizing the Service for failing to account for loss of the species in a significant portion of its range. As the circuit court said, "a species can be extinct 'throughout ... a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

30. In the years since, Defenders has had to continue to expend significant organizational resources to challenge the Service's irrational interpretation of the phrase "significant portion of range" to species listing decisions both at the rulemaking/commenting phases and in subsequent litigation to challenge unlawful listing decisions. Examples that resulted in judicial decisions rejecting the Service's unlawful "significant portion of

9

range" interpretation include *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2002) (Canada lynx); *Defenders of Wildlife v. Secretary, U.S. Dept. of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) (gray wolf).

31. The Service's unlawful interpretation of the phrase "significant portion of range" and its application of that interpretation to ESA listing decisions interferes with our core mission of protecting the nation's biodiversity heritage and ensuring that ESA listing determinations are made consistent with the statute's requirements and Congress's express intent in enacting those requirements. The Final SPR Policy undercuts Defenders' organizational and its members' interests in ensuring the ESA is properly interpreted and implemented to meet congressional goals. Consequently, Defenders has expended substantial organizational resources on behalf of its members in attempting to obtain ESA protections for imperiled species in the face of the Service's ongoing refusal to develop an interpretation of "significant portion of range" that gives full effect to the statutory definitions of "endangered" and "threatened."

32. Defenders must work that much harder to find ways to protect species that the Service has deemed unworthy of full statutory protection under its unlawful and unreasonable policy. On multiple occasions, Defenders has expended significant organizational resources to write and submit complex listing petitions under section 4 of the ESA only to have to litigate Service decisions that were based on its erroneous interpretation of "significant portion of range."

33. For example, Defenders and our conservation allies petitioned to list the lesser prairie-chicken. After the Service erroneously listed the species as threatened without considering whether it might be endangered in a significant portion of its range,

Defenders filed suit. Before that suit could be adjudicated, however, the Service lost a separate case related to the species and is now reconsidering its listing decision.

34. Defenders and the Center for Biological Diversity also petitioned to list the cactus ferruginous pygmy-owl as an endangered species. The Service denied the pygmy-owl ESA protection based on its erroneous interpretation of "significant portion of range" as proposed in the Draft Policy and finalized in the Final Policy. Again, Defenders was forced to expend its organizational resources challenging this decision in court. Very recently, a federal district court ruled for Defenders and the Center, finding that the Service's interpretation of "significant portion of range" was invalid and ordering the agency to reconsider its decision not to list the pygmy-owl. *Ctr. for Biological Diversity v. Jewell*, No. 14-2506 (D. Ariz. Mar. 29, 2017).

35. The West Indian manatee is another of Defenders' key species, and Defenders has spent decades advocating for its protection at the national, state, and local levels, including through litigation. *Save the Manatee Club v. Ballard*, 215 F. Supp. 2d 88 (D.D.C. 2002) (Sullivan, J.). Most recently, the Service relied on the same "threatened in all, no analysis for endangered in a significant portion of its range" at issue in this case to justify downlisting the West Indian manatee from endangered to threatened, with no analysis whatsoever of the imperiled state of the Antillean manatee that is found in small populations in a 17-country range from the U.S. (Puerto Rico) to Brazil. 82 Fed. Reg. 16,668 (Apr. 5, 2017). Defenders expended significant organizational resources on this rulemaking to submit extensive comments opposing the proposed downlisting, supported by an expert report from a leading manatee scientist whom Defenders retained.

36. I share Defenders' concerns that the Service's decision not to list the Bat as endangered in either all or a significant portion of its range fails to reflect a rational assessment of the best available scientific data before it as per the standards of the ESA.

37. I also share Defenders' concerns about the Service's Final Policy on "significant portion of range" that has resulted in the denial of critical statutory protections for the Bat and other species.

38. The Service's failure to protect the Bat as an endangered species harms my personal interest in continuing to observe and study the species in the wild for the scientific, spiritual, aesthetic, recreational and professional benefits that I derive from those activities.

39. The Service's failure to list the Bat as endangered harms the interests of Defenders in protecting the personal interests of its members, who derive scientific, professional, spiritual, aesthetic, or recreational benefits from observing the Bat in the wild.

40. The Service's reliance on its unlawful interpretation of "significant portion of range" to refuse to analyze whether the Bat is endangered in the significant portion of its range where WNS has already wiped out countless Bat populations harms the interests of Defenders in protecting the personal interests of its members, who derive scientific, professional, spiritual, aesthetic, or recreational benefits from observing the Bat in the wild.

41. Even if the Bat could lawfully have been listed as threatened rather than endangered, Defenders is concerned that the Service's decision to provide only minimal protections from incidental take fails to reflect a rational assessment of the best available scientific data before it in light of the legal standards provided by the ESA. For that reason,

Defenders also challenged the Service's decision to deny the Bat the blanket take protection conferred on threatened species through 50 C.F.R § 17.31 by promulgating a final species-specific 4(d) rule that confers almost no meaningful protections on the species from incidental take resulting from activities that, while not the primary drivers behind the species' imperilment in the first instance, are likely to have significant individual and cumulative impacts on the survival of individual Bats weakened by WNS and on the likelihood of survival and recovery of the critically endangered species as a whole. Furthermore, Defenders is concerned that the biological opinion evaluating the impacts of the final 4(d) rule also fails to reflect a rational assessment of the best available scientific data in light of the legal standards of the ESA.

42. I share Defenders' concerns that the final 4(d) rule, and the biological opinion on that rule, fail to reflect a rational assessment of the best available scientific data before it as per the standards of the ESA.

43. The Service's failure to provide full incidental take protection to the Bat harms my personal interest in continuing to observe and study the species in the wild for the scientific, spiritual, aesthetic, recreational and professional benefits that I derive from that observation and study.

44. The Service's failure to provide full incidental take protection to the Bat harms the interests of Defenders in protecting the personal interests of its members, who derive scientific, professional, spiritual, aesthetic, or recreational benefits from observing Bats in the wild.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of April, 2017, at Washington, D.C.

*Nina Fascione*

Nina Fascione