# Exhibit 11

In Support of Plaintiffs' Partial Motion for Summary Judgment
on Their Endangered Species Act Listing Claims

in

*Center for Biological Diversity et al., v. Jim Kurth et al.,* No. 1:15-cv-00477-EGS

and

*Defenders of Wildlife v. Jim Kurth et al.*, No. 1:16-cv-00910-EGS

Consolidated Cases

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>       Plaintiffs,<br><br>     v.<br><br>DANIEL M. ASHE, *et al.*,<br><br>       Federal Defendants,<br><br>AMERICAN FOREST & PAPER ASSOCIATION, *et al.*,<br><br>       Defendant-Intervenors. | Case No. 1:15-cv-00477-EGS |
| DEFENDERS OF WILDLIFE,<br><br>       Plaintiff,<br><br>     v.<br><br>DANIEL M. ASHE, *et al.*,<br><br>       Federal Defendants.<br><br>AMERICAN FOREST & PAPER ASSOCIATION, *et al.*,<br><br>       Defendant-Intervenors. | Case No. 1:16-cv-00910-EGS<br>(Consolidated Case)<br>Honorable E.G. Sullivan |

## DECLARATION OF MOLLIE MATTESON

I, Mollie Matteson, hereby declare as follows:

    1.      I am over 21 years of age. The facts set forth in this declaration are based on my

personal knowledge. If called as a witness, I could and would testify competently to these facts.

1

As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.  I am a senior scientist at the Center for Biological Diversity (the "Center") where I have worked for over nine years. I am committed to the organization's mission of working to "secure a future for all species, great and small, hovering on the brink of extinction."

3.  I have a bachelor's degree in zoology and a master's degree in wildlife biology from the University of Montana, and have spent much of the last 30 years of my life as an advocate for imperiled species and the places they need to survive.

4.  I currently reside in Richmond, Vermont where I have lived for 15 years and where I raised my daughter and son.

5.  Bat protection has been a major focus of my work since early 2008, when the exotic, invasive fungal disease, white-nose syndrome, first started to spread from its epicenter near Albany, New York, to Vermont and other New England states. White-nose syndrome kills hibernating bats, including the northern long-eared bat, and is the primary cause of the virtual disappearance of several bat species in the northeastern United States. I have led the Center's numerous efforts to secure greater protections for bats from the spread of white-nose syndrome and other threats that cumulatively could push northern long-eared bats and other bats over the precipice of extinction.

6.  In January 2008, as news about white-nose syndrome's spread was first breaking, the Center sent a letter to the Department of Interior and U.S. Fish and Wildlife Service (FWS), calling for precautionary closures of bat hibernacula (where bats hibernate), education and research on white-nose syndrome, suspension of incidental take statements (authorizing the take of species protected under the Endangered Species Act), and all other agency actions likely to

2

adversely affect the federally Endangered Indiana bat until formal consultation, under Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), was reinitiated.

7.      In February 2008, the Center submitted a petition to FWS requesting it reinitiate formal consultation pursuant to Section 7 of the ESA on all federal activities likely to adversely affect the ESA listed Gray bat, Indiana bat, Ozark big-eared bat, and Virginia big-eared bat, due to the new information regarding the devastating bat disease, white-nose syndrome.

8.      In April 2008, the Center sent a 60-day notice of intent to sue to multiple federal agencies for failure to reinitiate ESA Section 7 consultation for Indiana bat, based on the new and grave threat of white-nose syndrome.

9.      In January 2010, the Center submitted an Administrative Procedures Act (APA) petition to the Departments of Interior, Agriculture, and Defense, asking for all federal land caves to be closed to non-essential human access to reduce the risk of human transmission of the white-nose fungus into new parts of the country. We also asked for all federal land caves to be declared "significant" under the Federal Cave Resources Protection Act and for a rule to be promulgated establishing that transfer of materials from a white-nose syndrome contaminated cave, to one not yet afflicted by the disease, could constitute a "take" of bats protected by the ESA.

10.      In January 2010, the Center also submitted an ESA listing petition to FWS requesting it to protect the northern long-eared bat and eastern small-footed bat. The Center's work on the petition took eight months. I oversaw the project and supervised a biology intern who collected much of the scientific information and wrote initial drafts of the petition. Together, she and I put in the equivalent of three-quarter of a full time employee (0.75 FTE) over

eight months on this effort. The petition is 61 pages long, and is supported by approximately 150

scientific references. We also consulted over two dozen academic and agency bat biologists and

other scientists in the process of gathering information. The leading threat to both species was

white-nose syndrome. In October 2013, FWS proposed listing the northern long-eared as

"endangered," the most protective status under the law. In April 2015, in the wake of intense

political pressure to list the northern long-eared bat in the less protective "threatened" category,

or sidestep listing altogether, FWS listed the northern long-eared as merely "threatened" – and

thus provided the species with fewer legal protections than it deserved. FWS also promulgated a

customized special rule, pursuant to Section 4(d) of the ESA, 16 U.S.C. § 1533(d), (the "4(d)

rule"), which exempted most forest management activities from the "take" prohibitions of

Section 9 of the ESA (16 U.S.C. §1538), and outside the areas currently infected with white-nose

syndrome, exempting essentially all activities causing incidental take of northern long-eared bats

from Section 9's protections.

      11.     In March 2010, the Center helped stop a plan to lease lands on the Monongahela

National Forest in West Virginia for oil and gas development. The drilling activity would have

taken place close to caves where bats were already stressed by white-nose syndrome.

      12.     In May 2010, the Center sent letters to the director of every state fish and wildlife

agency, asking for them to take action to minimize the chance of white-nose syndrome spreading

to their state, and to develop white-nose syndrome response plans in advance of the disease

showing up. Many of these states have since become sites of white-nose syndrome infection in

bats.

      13.     In December 2010, the Center and other conservation organizations sent a letter to

FWS requesting a status review of another white-nose syndrome affected species, the little

4

brown bat. We asked for emergency listing of the species under the ESA. Since that time the

Center has continued to seek federal protection for the little brown bat, due to its devastating

population losses (90 percent or greater in much of the Northeast) from white-nose syndrome.

14.     In May 2011 the Center notified the responsible federal agencies of its intent to

sue over their unreasonable delay in responding to the Center's Administrative Procedures Act

cave closure petition. The Center's notice letter was joined by a dozen organic farming and food

safety organizations.

15.     In July 2011, due to the potential risk of spread of white-nose syndrome, the

Center filed a lawsuit against the U.S. Bureau of Land Management to halt a permit for group

cave tours for a national caving convention in Colorado. The cave tours were allowed on both

Bureau of Land Management and Forest Service lands against the recommendation of the

Colorado Division of Wildlife.

16.     In January 2012, the Center submitted a 60-day notice of intent to sue to the

Shawnee National Forest concerning its proposal for a land exchange with a coal mining

company. The federal land proposed for trade to the company was occupied summer habitat for

endangered Indiana bats and gray bats. The land trade was not finalized and accordingly, the

Center did not sue.

17.     In April 2012, the Center submitted a petition to the Council on Environmental

Quality for the development of guidelines for federal land management agencies to prevent

further spread of white-nose syndrome.

18.     In May 2012, the Center filed a Freedom of Information Act lawsuit against the

U.S. Forest Service, Northern Region, for withholding documents related to a proposal for

precautionary cave closures in the Region that was never enacted. Our records request sought to

establish why the Forest Service did not act to protect caves and bats despite the urging of resource staff within the agency.

19.     In May 2013 the Center and the Wyoming Outdoor Council appealed the cave and white-nose syndrome management plans for national forests in the Rocky Mountain Region of the Forest Service, because they did not sufficiently protect bats from the potential human transmission of the deadly fungus into caves. Our appeal was denied, but the Forest Service incorporated several of our recommendations regarding cave visitation permits into their cave management policy.

20.     In September 2014, I testified before the House Natural Resources Committee at a field hearing in Pennsylvania on the FWS' proposed ESA listing of the northern long-eared bat as endangered, and spoke about the urgent need to protect this rapidly vanishing species as endangered.

21.     In December 2014, the Center organized a letter from concerned scientists in support of an "endangered" listing, and thus full federal protection under the ESA, for the northern long-eared bat. Over 80 scientists, predominantly bat biologists, signed the letter that was sent to the Secretary of the Interior and the Director of the FWS.

22.     In the last nine years, the Center has submitted numerous letters and comments on plans and activities affecting bats throughout the country, including a timber sale on the Ozark National Forest in Indiana bat habitat; the Bureau of Land Management's cave management plan in Colorado; scoping on a Habitat Management Plan for Indiana bats and northern long-eared bats in Pennsylvania with regard to forest management on state lands; a five-year cave closure plan for the Southern Region of the Forest Service; public access to a vital roosting cave for

sensitive Townsend's big-eared bats on the Wenatchee National Forest in Washington state; and a take permit for state-protected bat species for a wind energy project in Vermont.

23.     The Center has repeatedly sought greater federal funding for white-nose syndrome response, including research, management, and education. This effort has included spearheading group sign-on letters to Congress in support of more funding for white-nose syndrome response; meetings and phone calls with Congressional staff; and meetings with FWS, Forest Service, Bureau of Land Management, National Park Service, and U.S. Geological Survey staff with regard to their white-nose syndrome response needs.

24.     I am a member of the White-Nose Syndrome Stakeholder Committee, part of the multi-agency effort under the White-Nose Syndrome National Response Plan, led by the FWS. This committee provides guidance and feedback to the FWS on its policy decisions regarding white-nose syndrome.

25.     As a child, I spent part of every summer on a farm about 20 miles from Mt. Aeolus in southwest Vermont, site of the largest bat hibernaculum in New England. The bats my family and I would watch on summer evenings from our back porch very likely hibernated at Mt. Aeolus. Since white-nose syndrome struck there in 2008, the Mt. Aeolus bat population has dropped precipitously, by greater than 90 percent. For the last 7-8 years, I have seen dramatically fewer bats in Vermont and the Northeast, unlike in the past. This is a personal loss to me.

26.     One of my favorite pastimes is observing wildlife in nature. Bats are among the most observable animals in places where they are abundant, because of their foraging flights at dusk. In the Northeast, northern long-eared bats were among those species that would be observable as they hunted insects on summer evenings, however because of their very small size (less than 4 inches snout to tail) and the dim lighting conditions at dusk it is extremely difficult to

positively identify northern long-eared bats in flight. In the last ten years, I have personally observed a dramatic decrease in the number of bats I see in the Northeast during the warm-weather months. Whereas I used to see dozens on many summer evenings from my deck, or while out camping or hiking, over the last eight years or so I have averaged a sighting of one or two bats per year. White-nose syndrome has caused a severe drop in numbers of bats in the eastern United States, and this has diminished my ability to observe bats around my home and in the region where I live. Northern long-eared bats, in particular, are associated with old growth forest, which is a rare habitat here in the Northeast. The northern long-eared bat shows a preference for roosting and foraging in this habitat in the summer. Over the last 30 years, I have made an effort to visit this kind of habitat in the Northeast at least two to three times per year. In some years, I have visited such habitat more than five or six times. Because this habitat is rare, I have driven from 45 minutes to over four hours to get to places with old-growth forest that may harbor northern long-eared bats. My goals in visiting this habitat include the possibility of seeing wildlife species, including the northern long-eared bat, that are associated with old-growth forest. I have also worked on more than a dozen projects and campaigns over the last 30 years to protect and restore old-growth forest in the Northeast, in order to safeguard the habitat of old-forest associated species, such as the northern long-eared bat. I have led hikes to old-growth areas, advocated for its protection, and written about its importance One of my leading goals has been to assure that the habitat the northern long-eared bat needs exists now and in the future for this species to survive.

27.     My interests in observing and enjoying northern long-eared bats have been harmed by the U.S. Fish and Wildlife Service's failure to provide the strongest protections of the ESA to this species. The Service had initially recommended, in October 2013, that this species

8

be listed as "endangered." The northern long-eared bat has experienced mortality rates of 98 percent or greater in nearly every portion of its range affected by white-nose syndrome. The disease has already spread to 29 of the 37 states in the species' range. Those states within the northern long-eared bat's range still unaffected by the bat disease are at the margins of its range, and the species is uncommon to very rare in those places. The U.S. Fish and Wildlife Service projects that the bat disease will encompass the entire range of the northern long-eared bat by 2022 or 2023. The Service also projects that the disease will have a similar level of impact on the species as it has already had in affected areas. Nonetheless, the U.S. Fish and Wildlife reversed its initial recommendation and listed the species, on May 4, 2015, as threatened, instead of endangered.  This decision was made after the Service faced political backlash to its proposed rule to list the species as endangered, primarily from the timber and energy industries. The threatened listing enabled the U.S. Fish and Wildlife Service to also enact a "4(d) rule," a provision that will harm the species by allowing take, and by failing to adequately protect the habitat the northern long-eared bat requires for roosting, foraging, migration, and reproduction. In particular, the 4(d) rule severely weakens the normal habitat protections of the ESA by allowing forestry activities, including clearcutting, to occur anywhere within the species' range except within a quarter mile of a known occupied hibernaculum, or within a quarter mile of a known maternity roost. A quarter mile buffer is dramatically less than northern long-eared bats require, and furthermore, because the 4(d) rule does not mandate pre-project surveys for roosts or hibernacula, it is highly unlikely that surveys will be done. Northern long-eared bats are small and cryptic species, and were little studied before the onset of white-nose syndrome. Very few states have any, let alone comprehensive, data on the summer roost locations of the species, and data on hibernacula locations for the northern long-eared bat are probably incomplete. Therefore,

9

even quarter-mile buffers will not be enacted for most roost sites, and some hibernacula will not be protected, even minimally, either. Where occupied hibernacula are already known, the quarter mile buffer will fall far short of what northern long-eared bats need in terms of habitat protection. The species has been documented traveling as far as 8.2 miles from hibernacula to forage, roost, and swarm. A buffer area defined by a quarter mile radius constitutes less than one percent of the area defined by an 8.2-mile radius. The Service's 4(d) rule allows forestry activities, including clearcutting, within all but one percent of the hibernaculum area potentially used by northern long-eared bats, and that one percent is protected only when the project proponent voluntarily surveys for the species, or another entity has already documented an occupied hibernaculum in the area. Around roost trees, scientists have documented the northern long-eared bat using an area with a radius of 0.27 to 0.47 miles. The 0.25 mile buffer stipulated by the Service is less than the minimum recognized in the best available scientific literature. This less-than-minimum buffer also is only a seasonal buffer, because it applies only during the "pup season" (when bat young are not yet able to fly) which the Service has deemed to be June 1-July 31. Thus, forestry activities, including clearcutting, can occur at the roost site, and can include cutting down the known roost tree, at any time of year except for an 8-week window in early summer. The seasonal restriction is only aimed at preventing felling of roost trees while actually occupied by bat mothers and their young. But because forestry activities, including clearcutting, can occur any time outside the "pup" season, vital habitat can still be significantly damaged or destroyed. Even if pre-project surveys are conducted (unlikely because it is not required), and bat roost trees are identified, roosting areas can be logged after bats have left, or in the spring before bats arrive again. When bats return to the same area the next year they may find little or no suitable habitat remaining. Even when a forested roosting area is not completely cleared, logging

may have significantly diminished the number of suitable roost trees, or number of trees that could become suitable in the near future. Roost trees are ephemeral features, due to forces of decay, weather, or stochastic events. Adequate summer habitat for the northern long-eared bat must include enough intact forest with enough current and future potential roost trees. There may be no other suitable roost trees in the area to choose from if an area has been clear cut or otherwise heavily logged beyond a quarter mile from a known roost tree. Thus, the Service has proposed conservation measures, inadequate as they are, that will not be applied in most situations. If no one looks for northern long-eared bat roosts, no one will find any, and thus forestry activities that might otherwise be limited in at least the small .25 mile buffer area, will not be limited at all. The Service's threatened listing, and accompanying 4(d) rule, does not protect the northern long-eared bat, and therefore my interests in seeing this species and visiting its habitat are harmed.

28. Additionally, FWS's current "significant portion of its range" policy will prevent it from ever considering whether the northern long-eared bat is endangered in a "significant portion of its range." This policy actually prohibits the Service from determining whether a species is "endangered" in a "significant portion of its range" once they determine that it is "threatened" range wide. Without the possibility to be listed as "endangered," the northern long-eared bat will continue to decline.

29. My spiritual, aesthetic, scientific, recreational, and moral interests in the northern long-eared bat are injured by FWS's failure to list the northern long-eared bat as endangered. FWS's failure to recognize the species' "endangered" status has translated to lesser protections and will impede the species' recovery from the threat of extinction. I will also be injured if the

minimal ESA protections that currently apply to the northern long-eared bat as a threatened

species are removed.

30. Furthermore, my spiritual, aesthetic, scientific, recreational, and moral interests in

the northern long-eared bat are injured by FWS's "significant portion of its range" policy

because it effectively prevents the Service from ever determining whether the northern long-

eared bat may be endangered in a significant portion of its range while it holds its threatened

status. This Court has the power to remedy this problem by eliminating the "significant portion

of its range" policy and by demanding that the U.S. Fish and Wildlife Service move quickly to

reconsider listing the northern long-eared bat as "endangered".

31. I believe that if a proper National Environmental Policy Act review were prepared

for the northern long-eared bat 4(d) rule, more discussion would have resulted about impacts to

the bats and alternative ways to protect the species from extinction. Without this review, we

have a rule that does not go far enough at protecting northern long-eared bats or my interests in

observing them.

32. I hope to continue to enjoy observation of northern long-eared bats and to

continue to contribute to their conservation and recovery through my efforts as a biologist and

wildlife advocate. I will continue to go on walks and camping trips in my local area and in the

Northeast, and will look for bats. I generally hike in my local area at least once a week in the

summer. I will visit areas with mature forest and old-growth forests, the habitat preferred by

northern long-eared bats, and I will look for them in those areas. For the last fifteen years I have

gone on multi-day canoe camping and hiking trips at least twice per summer in an area within a

four-hour drive of my home. These places include habitats well-suited for northern long-eared

bats. I intend to make at least a couple trips like this again this coming summer.

12

33.     As a mother of two children with whom I shared my passion for nature and wildlife, and who grew up to love wildlife themselves, I feel very sad that their children, my grandchildren, will not have the opportunity to grow up seeing dozens of bats at dusk, and realize the richness and diversity of the natural world like I and my children did.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of March, 2017

Mollie Matteson
Richmond, Vermont

13