**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.,* | |
| Plaintiffs, | |
| v. | Civil Action No. 15-477 (EGS) |
| MARGARET EVERSON, *et al.,* | |
| Defendants | |
| and | |
| AMERICAN FOREST & PAPER ASSOCIATION, *et al.,* | |
| Defendant-Intervenors. | |
| DEFENDERS OF WILDLIFE, | |
| Plaintiff, | |
| v. | Civil Action No. 16-910 (EGS) (Consolidated with 15-cv-477) |
| MARGARET EVERSON, *et al.,* | |
| Defendants | |
| and | |
| AMERICAN FOREST & PAPER ASSOCIATION, *et al.,* | |
| Defendant-Intervenors. | |

<u>**MEMORANDUM OPINION**</u>

In April 2015, the United States Fish and Wildlife Service ("FWS" or "the Service") issued its final rule listing the

northern long-eared bat ("Bat") as a "threatened" species under the Endangered Species Act of 1973. *See* Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule, 80 Fed. Reg. 17,974 (Apr. 2, 2015) ("Listing Rule"). FWS found that while the Bat "resides firmly in th[e] category where no distinct determination exists to differentiate between endangered and threatened," the Bat "is appropriately categorized as a threatened species" as the Bat "is likely to become an endangered species in the foreseeable future." *Id*. at 18,020-21.

Plaintiffs—the Center for Biological Diversity, Ohio Valley Environmental Coalition, Coal River Mountain Watch, Sierra Club, and Defenders of Wildlife—challenge two separate decisions by FWS pertaining to the Bat that they claim fail to comply with mandates for the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.,* and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. These decisions are: (1) the decision to list the Bat as threatened rather than endangered, with an interim final species-specific 4(d) rule, Listing Rule, 80 Fed. Reg. 17,974; and (2) the final species-specific section 4(d) rule, 81 Fed. Reg. 1900 (Jan. 14, 2016). The Court bifurcated briefing on these two challenges, Min. Order of Jan.

13, 2017, and pending before the Court are the parties' cross-motions for summary judgment on plaintiffs' Listing Rule claim.

Upon careful consideration of the plaintiffs' motion, the Federal defendants' and defendant-intervenors' cross-motions, the oppositions and replies thereto, the arguments of amicus curiae,[1] the relevant law, the full administrative record, and for the reasons set forth below, the Court finds that FWS's decision to list the Bat as threatened under the ESA was arbitrary and capricious. Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** plaintiffs' motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** Federal defendants' and the defendant-intervenors' motions for summary judgment.

## I.   Background

### A. Statutory and Regulatory Background

The ESA has been described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978). Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The plain intent of

---

[1] The Court appreciates the analysis provided by amicus curiae.

Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth.,* 437 U.S. at 184.

The ESA's protections are triggered when a species is designated as either "threatened" or "endangered." A designation of "endangered" triggers a broad scope of protections, including a prohibition on "taking" individual members of the species. *See* 16 U.S.C. § 1538(a)(1)(B); *see also id.* § 1532(19) ("The term take means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). A designation of "threatened" requires the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." *Id.* § 1533(d).

An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The term "species" is defined in the Act to include species, subspecies, and "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

The ESA requires the Secretary of the Interior to publish and maintain a list of all species that have been designated as

threatened or endangered. *Id.* § 1533(c). Species are added to and removed from this list after notice and an opportunity for public comment, either on the initiative of the Secretary or as a result of a petition submitted by an "interested person." *Id.* § 1533(b)(1), (3), (5). The Secretary of the Interior and the Secretary of Commerce are responsible for making listing decisions. *Id.* §§ 1532(15), 1533(a)(2). The Secretary of the Interior is responsible for making listing determinations for the Bat. *See* 50 C.F.R. § 402.01(b).

A listing determination is made on the basis of one or more of five statutorily prescribed factors: "(A) the present or threatened destruction, modification, or curtailment of a species' habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other natural or manmade factors affecting a species' continued existence." 16 U.S.C § 1533(a)(1)(A)-(E); *see also* 50 C.F.R. § 424.11(c). The agency must list a species as long as "any one or a combination" of these factors demonstrates that the species is threatened or endangered. 50 C.F.R. § 424.11(c).

The decision to list a species must be made

> solely on the basis of the best scientific and
> commercial data available ... after conducting
> a review of the status of the species and after

> taking into account those efforts, if any,
> being made by any State or foreign nation, or
> any political subdivision of a State or
> foreign nation, to protect such species . . .
> .

16 U.S.C. § 1533(b)(1)(A).

## B. Factual and Procedural Background

The Bat is a medium-sized bat species with relatively long ears whose range extends "across much of the eastern and north-central United States . . . [including] 37 states, the District of Columbia," and "all Canadian Provinces." 80 Fed. Reg. at 17,975. The Bat has different winter and summer habitats. In winter, the Bat hibernates in hibernacula, typically caves and abandoned mines. *Id*. at 17,984. In summer, the Bat typically roosts alone or in colonies "underneath bark or in cavities or crevices of both live trees and snags," with no apparent preference for tree species. *Id*. The maximum lifespan of the Bat is estimated at 18.5 years, and adult females give birth to a single pup each year. *Id*. at 17,988.

A number of bat species are susceptible to White-nose syndrome ("WNS"), caused by a fungus known as "Pd," which has been "responsible for unprecedented mortality of insectivorous bats in eastern North America." *Id*. at 17,993–94. First documented in 2006, it "has spread rapidly." *Id*. at 17,994. The Bat has been found to be highly-susceptible to WNS. *Id*. at 17,998. As stated in the Listing Rule,

> A recent study revealed that the northern
> long-eared bat has experienced a precipitous
> population decline, estimated at
> approximately 96 percent (from hibernacula
> data) in the northeastern portion of its
> range, due to the emergence of WNS. WNS has
> spread to approximately 60 percent of the
> northern long-eared bat's range in the United
> States, and if the observed average rate of
> spread of Pd continues, the fungus will be
> found in hibernacula throughout the entire
> species' range within 8 to 13 years based on
> the calculated rate of spread observed to date
> (by both the Service and COSEWIC[2]). We expect
> that similar declines as seen in the East and
> portions of the Midwest will be experienced in
> the future throughout the rest of the species'
> range.

*Id.* at 18,000. Once a bat becomes infected with WNS, there is no
cure. *Id.* at 18,021.

In 2010, the Center for Biological Diversity petitioned FWS
to list the Bat as endangered or threatened and to designate
critical habitat for the species, and in October 2013, FWS
proposed to list the Bat as an endangered species. *See* 12-Month
Finding on a Petition to List the Eastern Small-Footed Bat and
the Northern Long-eared Bat as Endangered or Threatened Species;
Listing the Northern Long-Eared Bat as an Endangered Species, 78
Fed. Reg. 61,046 (Oct. 23, 2013) ("Proposed Rule"). Thereafter,
in April 2015, FWS issued its final rule listing the Bat as a

---

[2] COSEWIC stands for Committee on the Status of Endangered
Wildlife in Canada.

threatened rather than an endangered species. *See generally* 80
Fed. Reg. 17,974.

In describing the Bat's range, FWS divided the range into
four geographical sections, and explained that WNS has affected
three of the four sections, with WNS being undetected in the
section where the Bat is generally "uncommon" or "rare." The
eastern section of the range includes the District of Columbia,
Delaware, Connecticut, Maine, Maryland, Massachusetts, New
Hampshire, New Jersey, Pennsylvania, Vermont, Virginia, West
Virginia, New York, and Rhode Island. *Id.* at 17,976. As
explained by FWS,

> Historically, the [Bat] was widely distributed
> in the eastern part of its range," but due to
> the arrival of WNS, while the Bat "continue[s]
> to be distributed across much of the
> historical range, . . . there are many gaps
> within the range where bats are no longer
> detected or captured, and in other areas,
> their occurrence is sparse. . . . Since WNS
> has been documented, multiple hibernacula now
> have zero reported northern long-eared bats.
> Frick et al. (2015, p. 6) documented the local
> extinction of northern long-eared bats from 69
> percent of sites included in their analyses
> (468 sites where WNS has been present for at
> least 4 years in Vermont, New York,
> Pennsylvania, Maryland, West Virginia, and
> Virginia).

*Id.* at 17,976-77. The midwestern section includes Missouri,
Illinois, Iowa, Indiana, Ohio, Michigan, Wisconsin, and
Minnesota, with WNS documented in all but Iowa and Minnesota,

where the fungus that causes WNS has been confirmed. *Id.* at 17,979. "[H]istorically, [the Bat] was considered one of the more frequently encountered bat species in the region," *id.*, and "clear declines in winter populations of [the Bat] have been observed in Ohio and Illinois," *id*. The southern section includes Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, and Tennessee. *Id.* at 17,980. The Bat is considered more common in Kentucky and Tennessee and less common in the other states. *Id*. The only state in this section with survey data is Kentucky, and in Kentucky, WNS has been documented "with mortality confirmed at many sites." *Id*. The western portion includes South Dakota, North Dakota, Nebraska, Wyoming, Montana, and Kansas. *Id.* at 17,983. Historically, the Bat is less common in this portion than in the northern portion of its range. *Id*. In particular, the Bat "is considered common in only small portions of the western part of its range (e.g., Black Hills of South Dakota) and uncommon or rare in the western extremes of the range (e.g., Wyoming, Kansas, Nebraska)" although "there has been limited survey effort throughout much of this part of the [Bat's] range." *Id*. As of the publication of the Listing Rule, WNS had not been detected in the western portion of the range. *Id*.

FWS considers the portions of the range affected by WNS likely to be the core of the Bat's range:

Information provided to the Service by a number of State agencies demonstrates that the area currently (as of 2015) affected by WNS likely constitutes the core of the species' range, where densities of northern long-eared bats were highest prior to WNS. Further, it has been suggested that the species was considered less common or rare in the extreme southern, western, and northwestern parts of its range (Caceres and Barclay 2000, p. 2; Harvey 1992, p. 35), areas where WNS has not yet been detected. The northern long-eared bat has been extirpated from hibernacula where WNS, has been present for a significant number of years (e.g., 5 years), and has declined significantly in other hibernacula where WNS has been present for only a few years. A corresponding decline on the summer landscape has also been witnessed. As WNS expands to currently uninfected areas within the range of northern long-eared bat, there is the expectation that the disease, wherever found, will continue to negatively affect the species. WNS is the predominant threat to the northern long-eared bat rangewide, and it is likely to spread to the entirety of the species' range.

*Id.* at 17,998.

FWS noted that "[t]he Act defines an endangered species as any species that is 'in danger of extinction throughout all or a significant portion of its range' and a threatened species as any species 'that is likely to become endangered throughout all or a significant portion of its range within the foreseeable future.'" *Id.* at 18,020. FWS explained "that the phrase 'in danger of extinction' can be most simply expressed as meaning that a species is 'on the brink of extinction in the wild.'" *Id.* (quoting Dec. 21, 2011, Memorandum from Acting FWS Director Dan

Ashe Re: Determination of Threatened Status for Polar Bears

[hereinafter the "Polar Bear Memo."]. FWS explained:

> In at least one type of situation, where a
> species still has relatively widespread
> distribution, but has nevertheless suffered
> ongoing major reductions in numbers, range or
> both as a result of factors that have not been
> abated, the Service acknowledges that no
> distinct determination exists between
> "endangered" and "threatened." In such cases:
> "Whether a species . . . is ultimately an
> endangered species or a threatened species
> depends on the specific lift history and
> ecology of the species, the nature of the
> threats, and population numbers and trends.
> Even species that have suffered fairly
> substantial declines in numbers or range are
> sometimes listed as threatened rather than
> endangered. (Polar Bear Memo, p. 6)."

*Id.* FWS stated that the Bat "resides firmly in this category

where no distinct determination exists to differentiate between

endangered and threatened. Therefore, our determination that

this species is threatened is guided by the best available data

on the biology of the species, and the threat posed by [WNS]."

*Id.*

FWS stated that "[n]o one factor alone conclusively

establishes whether the species is 'on the brink' of extinction.

Taken together, however, the data indicate a current condition

where the species, while likely to become in danger of

extinction at some point in the foreseeable future, is not on

the brink of extinction at this time." *Id.* In explaining why the

Bat is appropriately categorized as a threatened species, FWS stated that

> WNS has impacted the species throughout much of its range, and can be expected to . . . within 8 to 13 years . . . spread and impact the species throughout its entire range. Once WNS becomes established in new areas, we can expect similar, substantial losses of bats beginning in the first few years following infection (Factor C). There is currently no effective means to stop the spread of the disease, or to minimize bat mortalities associated with the disease. The spread of WNS and its expected impact on the [Bat] are reasonably foreseeable, and thus the species is likely to become an endangered species within the foreseeable future.

*Id.* at 18,021.

Nonetheless, FWS concluded "that while the species is likely to become an endangered species within the foreseeable future, it is not . . . currently 'on the brink' of extinction" based on several factors taken together. *Id.* The four factors which, in the aggregate, led FWS to this conclusion are:

> 1.   "WNS has not yet been detected throughout the entire range of the species, and will not likely affect the entire range for . . . most likely 8 to 13 years."
>
> 2.   "[I]n the area not yet affected by WNS (about 40 percent of the species' total geographic range), the species has not yet suffered declines and appears stable."
>
> 3.   "[T]he species still persists in some areas impacted by WNS, thus creating at least some uncertainty as to the timing of the extinction risk posed by WNS. Even in New York, where WNS was first detected in 2007,

> small numbers of [Bats] persist . . . despite
> the passage of approximately 8 years."
>
> 4. "[C]oarse population estimates where
> they exist for this species indicate a
> population of potentially several million
> [Bats] still on the landscape across the range
> of the species."

*Id.* Because FWS determined that the Bat was threatened

throughout all of its range, it did not consider whether the Bat

was endangered in a significant portion of its range. *Id*. at

18,022 (citing Final Policy on Interpretation of the Phrase

"Significant Portion of Its Range" in the Endangered Species

Act's Definitions of "Endangered Species" and "Threatened

Species," 79 FR 37,577 (July 1, 2014) ("Final SPR Policy")).

## II.  Standard of Review

### A. Review of FWS's Listing Decisions

FWS's listing decisions are subject to review under the

APA. *See, e.g., Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997

(D.C. Cir. 2008). Under APA review, federal agency actions are

to be held unlawful and set aside where they are "arbitrary,

capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). To make this

finding, a court must determine whether the agency "considered

the factors relevant to its decision and articulated a rational

connection between the facts found and the choice made." *Keating*

*v. FERC,* 569 F.3d 427, 433 (D.C. Cir. 2009) (citing

*Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, (1983)).

The standard of review under the APA is a narrow one. *Citizens to Pres. Overton Park v. Volpe,* 401 U.S. 402, 416, (1971). The court is not empowered to substitute its judgment for that of the agency. *Id.* Deference to the agency's judgment is particularly appropriate where the decision at issue "requires a high level of technical expertise." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 375–77 (1989); *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C. Cir. 1976) ("[The court] must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality."). Specifically, with regard to FWS decisions, this Court has previously recognized that "[g]iven the expertise of the [FWS] in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the [FWS]." *Am. Wildlands,* 478 F. Supp. 2d at 96 (citing *Carlton v. Babbitt,* 900 F. Supp. 526, 530 (D.D.C. 1995)).

"If an agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making." *Defenders of Wildlife v. Babbitt*, 958 F. Supp

670, 679 (D.D.C. 1997) (citing *Carlton,* 900 F. Supp. at 533

("remanding FWS'[s] 12-month finding that the grizzly bear

should not be reclassified because the FWS 'failed to

sufficiently explain how it exercised its discretion with

respect to certain of the statutory listing factors'").

**B. Review of FWS's Statutory Interpretations**

Here, in addition to challenging FWS's listing decision,

plaintiffs also challenge FWS's interpretation of the ESA's

statutory language. The framework for reviewing an agency's

interpretation of a statute that the agency is charged with

administering is set forth in *Chevron, U.S.A., Inc. v. Natural

Res. Def. Council, Inc.,* 467 U.S. 837 (1984). The first step in

this review process is for the court to determine "whether

Congress has directly spoken to the precise question at issue."

*Id.* at 842. "If the intent of Congress is clear, that is the end

of the matter; for the court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress." *Id.*

at 842-43. In determining whether the statute unambiguously

expresses the intent of Congress, the court should use all the

"traditional tools of statutory construction," including looking

to the text and structure of the statute, as well as its

legislative history, if appropriate. *See id.* at 843 n.9; *see

also Bell Atlantic Tel. Co. v. FCC,* 131 F.3d 1044, 1047 (D.C.

Cir. 1997). If the court concludes that the statute is either

silent or ambiguous with respect to the precise question at issue, the second step of the court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843. The court must defer to agency interpretations that are not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

"If the agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron* deference." *Mount Royal Joint Venture v. Kempthorne,* 477 F.3d 745, 754 (D.C. Cir. 2007). "On the other hand, if the agency enunciates its interpretation through informal action that lacks the force of law, [courts] accept the agency's interpretation only if it is persuasive." *Id.* at 754 (citing *United States v. Mead Corp.,* 533 U.S. 218, 235 (2001); *see also Christensen v. Harris County,* 529 U.S. 576, 587 (2000) (explaining that if *Chevron* deference is not appropriate, courts may still accord an informal agency determination some deference under *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) and noting that *Skidmore* deference, however, is appropriate "only to the extent that those interpretations have the 'power to persuade'" (quoting *Skidmore,* 323 U.S. at 140)); *Power v. Barnhart,* 292 F.3d 781, 786 (D.C. Cir. 2002). The "power to persuade" is determined by "the thoroughness evident

in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier pronouncements." *Skidmore,* 323 U.S. at 140. An agency's interpretation "may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires[.]" *Mead,* 533 U.S. at 234 (internal quotation marks and citations omitted).

## III. Analysis

### A. The Threatened Determination is Arbitrary and Capricious

#### 1. The "40% of Total Geographic Range" Rationale is not Supported by the Best Available Scientific Data

Plaintiffs ask the Court to remand the threatened listing decision, arguing that the rationales FWS relied on are contradicted by the best available scientific data because: (1) the timeframe for the rangewide spread of WNS does not justify the threatened determination; (2) the "40% of the total geographic range" rationale ignores the fact that the Bat is uncommon to rare in the periphery of its range; (3) to the extent "potentially millions of bats" existed, they were in areas already affected by WNS by April 2015; and (4) there is no credible evidence that "some bats persist" in WNS-infected areas. The Court agrees that the second rationale invoked by FWS

is contradicted by the best available scientific data. Since these four rationales are interdependent, 80 Fed. Reg. at 18,021, the Court will remand the listing decision to FWS "for reasoned decision-making." *Defenders of Wildlife*, 958 F. Supp. at 679. The Court does not consider and expresses no opinion regarding plaintiffs' challenges to the other three rationales. *Cf. Friends of Animals v. Ross*, 396 F. Supp. 3d 1, *9 (D.D.C. 2019) (accepting one of six challenges to a listing determination and not considering or expressing a view about the five remaining challenges).

FWS's second rationale for listing the Bat as threatened rather than endangered based on the species' current status is that "in the area not yet affected by WNS (about 40 percent of the species' total geographic range), the species has not yet suffered declines and appears stable." 80 Fed. Reg. at 18,021.

Plaintiffs argue that this characterization is misleading because "the Bat's abundance is not equal over all of its range . . . [and] the more distant portions of the range, where WNS has not yet spread, have *always* had low bat density," Pls.' Partial Mot. for Summ. J. on their Listing Claims ("Pls.' Mot."), ECF No. 52 at 41; and that "[a]t the time of the final rule, those portions of the Bat's range where the species had previously been most abundant had already experienced massive mortality or were on the brink of imminent declines from WNS,"

*id.* Thus, according to plaintiffs, "the '40 percent of total geographic range' metric is not based on the best available scientific data on the Bat's varying distribution within its range." *Id.* Plaintiffs point out that the proposed and final rules are consistent in that they both state that the pre-WNS populations were concentrated in the northeastern and midwestern ranges, and less dense in the northwestern, western, and midwestern ranges. *Id.* at 42. Plaintiffs conclude that FWS did not make the listing determination based on the best available scientific data, the record does not support this rationale, and therefore FWS arbitrarily and unlawfully relied on this rationale to justify the threatened determination. *Id.* at 44.

Federal defendants respond that its characterization is not misleading because as Plaintiffs acknowledge, "'[t]he proposed and final rules are consistent in stating that the species' pre-WNS populations were concentrated in its northeastern and Midwestern ranges, with much lower population densities in the northwestern, western and extreme southern range.'" Fed. Defs.' Opp'n and Partial Mot. for Summ. J. on the Listing Claims ("Fed. Defs.' Opp'n"), ECF No. 53 at 36 (quoting Pls.' Mot., ECF No. 52 at 42 (comparing 78 Fed. Reg. at 61,051-54 with 80 Fed. Reg. at 17,976)).

Plaintiffs respond that "[i]n relying on this rationale to support [] its threatened determination, FWS arbitrarily

ignored": (1) "the explicit findings stated in the final rule that the Bat has always been uncommon to rare in the as-yet-infected areas"; and (2) "evidence . . . that Bats in the far-flung parts of the range might primarily be summer residents, with the core of the species' hibernating entirely in the WNS-infected range." Pls.' Reply, ECF No. 59 at 26. Plaintiffs dispute that the threatened determination was "guided by the best available biology of this species," 80 Fed. Reg. 18,020, because there is no discussion of how the high population densities in the WNS-infected areas and low population the uninfected areas support the determination, Pls.' Reply, ECF No. 59 at 26-27. Plaintiffs conclude that FWS "should provide a rational explanation for why the same data can support two opposing conclusions"—the proposed endangered determination and the final threatened determination. *Id*. at 27.

Plaintiffs also argue that Federal defendants do not explain why FWS disregarded the expert advice "that any Bats in the westward and southern periphery of the species' range are likely primarily summer residents only, and that the core of the species' hibernating distribution was in areas already infected or imminently facing WNS infection." *Id*. at 27-28. On this point, Federal defendants respond that since "Bats are not long-distance migrants," the spread of WNS to currently uninfected

areas was unlikely to be hastened by any migratory behavior.
Fed. Defs.' Reply, ECF No. 63 at 20-21.

The Court is not persuaded that, as stated by FWS, it
"reasonably concluded at the time of the listing determination—
when 40 percent of the species' range was WNS-free—that Bats are
a threatened species as defined by the ESA." Fed. Defs.' Reply,
ECF No. 63 at 18. FWS did acknowledge the disparate population
densities between the WNS-infected range and the 40 percent of
the range that is WNS-free in its determination. *See supra*
Section I.B. In making the threatened determination, FWS
specifically relied on the rationale that "in the area not yet
affected by WNS (about 40 percent of the species' total
geographic range), the species has not yet suffered declines and
appears stable." 80 Fed. Reg. at 18,021. But FWS does not
provide a rational explanation for why the significant disparity
in population density between the 60 percent of the range that
is WNS-infected and the 40 percent that is not supports a
threatened rather than endangered determination. Such an
explanation is necessary in view of the significant population
disparities between the WNS-infected areas and those areas not
yet infected, *id*. at 17,976-83; the evidence that WNS "is
responsible for unprecedented mortality" and "has spread
rapidly," resulting in population declines of the Bat of 96 to
99%," *id*. at 17,994, 18,012; and that there are "no known

examples of [Bats] that have survived" a WNS infection, NLEB Listing 03573. Accordingly, FWS failed to "articulate a rational connection between the facts found and the choice made." *Keating*, 569 F.3d at 433.

### 2. FWS Did Not Consider the Cumulative Effects of Threats in Explaining the Basis for the Listing Determination

A listing determination is made on the basis of one or more of five statutorily prescribed factors: "(A) the present or threatened destruction, modification, or curtailment of a species' habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other natural or manmade factors affecting a species' continued existence." 16 U.S.C § 1533(a)(1)(A)-(E); *see also* 50 C.F.R. § 424.11(c). The agency must list a species as long as "any one or a combination" of these factors demonstrates that the species is threatened or endangered. 50 C.F.R. § 424.11(c). Accordingly, in making the listing determination, the ESA requires FWS to consider each of the listing factors both individually and in combination.

FWS focused on Factors A, C, and E. With regard to Factor A, FWS concluded that "[c]urrent and future forest conversion may have negative additive impacts where the species has been impacted by WNS." 80 Fed. Reg. at 17,991. FWS also stated that

"in areas with WNS, we believe [the Bats] are likely less
resilient to stressors and maternity colonies are smaller. Given
the low inherent reproductive potential of [the Bat] (max of one
pup per female), death of adult females or pups or both during
tree felling reduces the long-term viability of those colonies."
*Id.* at 17,993. FWS concluded that "[w]hile, these activities
alone were unlikely to have significant, population-level
effects, there is now likely a cumulative effect on the species
in portions of range that have been impacted by WNS." *Id.*

With regard to Factor E, FWS concluded that "[t]here is
currently no evidence that these natural or manmade factors
would have significant population-level effects on the northern
long-eared bat when considered alone. However, these factors may
have a cumulative effect on this species when considered in
concert with WNS, as this disease has led to dramatic northern
long-eared bat population declines." *Id.* at 18,005-06.

FWS analyzed the cumulative effects as follows: "although
the effects on the northern long-eared bat from Factors A, [D],
and E, individually or in combination, do not have significant
effects on the species, when combined with the significant
population reductions due to white-nose syndrome (Factor C),
they may have a cumulative effect on this species at a local
population scale." *Id.* at 18,006.

Plaintiffs argue—and the Court agrees—that despite this analysis, FWS disregarded the cumulative effects that factors other than WNS may have on the species when explaining the rationale for the threatened determination. The Court does not dispute that, as Federal defendants point out, "FWS considered the impacts of the threats to the species in almost 20 pages of analysis." Fed. Defs.' Reply, ECF No. 63 at 28; *see also* Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 30. However, in explaining the rationale for the listing determination, FWS relied solely on WNS, and failed to take into consideration the other factors and the cumulative effect of the other factors that FWS itself analyzed. The listing determination states:

> There are several factors that affect the northern long-eared bat; however, no other threat is as severe and immediate to the species persistence as WNS (Factor C). This disease is the prevailing threat to the species, and there is currently no known cure. While we have received some information concerning localized impacts or concerns (unrelated to WNS) regarding the status of the northern long-eared bat, it is likely true that many North American wildlife species have suffered some localized, isolated impacts in the face of human population growth and the continuing development of the continent. Despite this, based upon available evidence, the species as a whole appears to have been doing well prior to WNS.

*Id*. at 18,021.

With this rationale, however, FWS ignored its own analysis. Specifically, with regard to Factor A, FWS concluded that

"[w]hile, these activities alone were unlikely to have significant, population-level effects, there is now likely a cumulative effect on the species in portions of range that have been impacted by WNS." *Id*. at 17,993. And with regard to Factor E, FWS concluded that "[t]here is currently no evidence that these natural or manmade factors would have significant population-level effects on the northern long-eared bat when considered alone. However, these factors may have a cumulative effect on this species when considered in concert with WNS, as this disease has led to dramatic northern long-eared bat population declines." *Id*. at 18,005-06. Defendant-Intervenors argue that FWS's analysis is adequate because the "observed population trends" necessarily include any cumulative impacts. Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 30. But as plaintiffs point out, Pls.' Reply, ECF No. 59 at 32, this explanation was not relied on by FWS and so is irrelevant. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review [of agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court").

Because FWS disregarded the cumulative effects that factors other than WNS may have on the species when explaining the rationale for the threatened determination, it failed to articulate a rational connection between its own analysis and

its determination. Accordingly, the listing determination is arbitrary and capricious. *WildEarth Guardians v. Salazar,* 741 F. Supp. 2d 89, 103 (D.D.C. 2010) (finding that the Service's failure to consider cumulative impact of listing factors rendered the agency's decision not to reclassify the Utah prairie dog arbitrary and capricious).

## B. FWS's Interpretation of "In Danger of Extinction" Articulated in the Polar Bear Memo is Persuasive

Plaintiffs argue that the threatened determination "is arbitrary and capricious because it improperly pairs an unreasonably narrow interpretation of 'in danger of extinction' and an amorphous, overly broad conception of the 'foreseeable future' that fails to articulate any coherent rationale on the Bat's 'future conservation status' in the face of WNS' inexorable spread." Pls.' Mot., ECF No. 52 at 35. Federal defendants respond that its interpretation of "in danger of extinction" is entitled to deference. Fed. Defs.' Opp'n, ECF No. 53 at 30-31. Defendant-Intervenors argue that FWS's interpretation of "in danger of extinction" cannot be "[a] one-size-fits-all interpretation," noting that nonetheless, FWS "has identified four typical fact patterns meeting the 'endangered' standard of a species 'on the brink of extinction in the wild.'" Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 14.

As discussed *supra* Section I.B., the listing determination relied on FWS's interpretation of "in danger of extinction" to be "on the brink of extinction in the wild" as articulated in the Polar Bear Memo. 80 Fed. Reg. at 18,020. As an initial matter, the parties dispute whether this interpretation is entitled to *Chevron* deference. To analyze this issue, it is necessary to explain the genesis and purpose of the Polar Bear Memo. The Polar Bear Memo was drafted in response to this Court's Memorandum Opinion in *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation ("Polar Bear I")*, 748 F. Supp. 2d 19 (D.D.C. 2010) (Sullivan, J.), in which this Court found that the term "endangered species" is ambiguous and "remand[ed] the [Polar Bear] Listing Rule to the agency for the limited purpose of providing additional explanation for the legal basis of its listing determination, and for such further action as it may wish to take in light of the Court's finding that the definition of an 'endangered species' under the ESA is ambiguous." *Polar Bear I* at 29-30.

In response, the Federal defendants submitted FWS's Polar Bear Memo to the Court. The agency stated that its submission was a "supplemental explanation of the meaning of the statutory phrase 'in danger of extinction' as applied in the Polar Bear Listing Rule," and explained the scope of the memo:

> As a supplemental explanation of the listing
> decision that was made previously for the
> Court to consider along with the
> administrative record in evaluating the
> Listing Rule, this explanation does not set
> forth a new statement of agency policy, nor is
> it a "rule" as defined in the Administrative
> Procedure Act. Indeed, given the narrow scope
> of the remand, the Court determined that
> notice-and-comment procedures were not
> required. As the Court explained in ordering
> this remand, it was not "require[ing] the
> agency to adopt independent, broad-based
> criteria for defining the statutory term "in
> danger of extinction." Mem. Op. at 24 n.18.
> Thus, the explanation set forth in this
> memorandum does not represent a new
> interpretation of the statute and is not a
> prospective statement of agency policy.
> Furthermore, consistent with the Court's
> remand order, the Service did not conduct
> additional fact-finding in the development of
> this supplemental explanation. The
> interpretation used in the Listing Rule is
> supported by the administrative record already
> lodged with the Court, as demonstrated more
> fully in this memorandum.

NLEB Listing 23,067-68.

Plaintiffs argue that FWS's "interpretation of 'in danger

of extinction' to mean 'currently on the brink of extinction in

the wild' deserves no deference because it . . . has never been

appropriately promulgated through the rulemaking requirements of

section 4(h) of the ESA." Pls.' Mot., ECF No. 52 at 35.[3] Federal

---

[3] Plaintiffs also argue that the Service's interpretation of 'in
danger of extinction' deserves no deference because it
represents a litigation position. Pls.' Mot., ECF No. 52 at 35.
Federal defendants respond—and the Court agrees—that just
because the memo was created in response to the Court's order,
that does not make the long-standing interpretations explained

defendants respond that the ESA "does not require FWS to provide the public with notice and an opportunity to comment on FWS's synthesis of how the agency has historically interpreted 'in danger of extinction' that is reflected in the Polar Bear Memo," Fed. Defs.' Opp'n, ECF No. 53 at 29-30, and that "because FWS applies its interpretation of 'in danger of extinction' on a species-by-species basis, the public has in fact had notice and numerous opportunities to comment on FWS's application of its interpretation," *id.* at 30. Federal defendants further argue that the agency's definition of "in danger of extinction" as articulated in the Polar Bear Memo is entitled to deference under *Chevron* for two reasons: (1) because FWS is charged with administering the ESA, the Court must apply the *Chevron* framework to FWS's interpretation of the phrase "in danger of extinction";[4] and (2) this Court has already determined that the phrase "in danger of extinction" is ambiguous and upheld the agency's interpretation of the phrase at *Chevron* step two in *In re Polar Bear Endangered Species Act Listing and 4(d) Rule*

---

in the memo to be a litigation position. Fed. Defs.' Opp'n, ECF No. 53 at 28-29. The agency clearly states that the memo explains the consistent application of the phrase over the agency's 37-plus years of administering the ESA rather than being a "litigation position." NLEB Listing 23,084.

[4] In the alternative, Federal defendants argue that FWS's interpretation of "in danger of extinction" is entitled to *Skidmore* deference. Fed. Defs.' Reply, ECF No. 63 at 13 n.1.

*Litigation* (*"Polar Bear II"*), 794 F. Supp. 2d 65, 90 (D.D.C. 2010) (Sullivan, J.). *Id.* at 30-31.

The Court disagrees with Federal defendants that *Chevron* is the appropriate standard for determining the level of deference to accord FWS's interpretation of "in danger of extinction" as articulated in the Polar Bear Memo. Rather, given the context, *Skidmore* is the appropriate standard. There is no dispute that FWS's interpretation of "in danger of extinction" set forth in the Polar Bear Memo did not undergo notice and comment. Furthermore, in the Polar Bear Memo, the agency specifically stated that the Memo "does not set forth a new statement of agency policy, nor is it a 'rule' as defined in the Administrative Procedure Act." NLEB Listing 23,067. The agency also stated that "the explanation set forth in this memorandum does not represent a new interpretation of the statute and is not a prospective statement of agency policy." *Id.* at 23,068. Because "the agency [has] enunciate[d] its interpretation through informal action that lacks the force of law, [the Court will] accept the agency's interpretation only if it is persuasive." *Mount Royal Joint Venture,* 477 F.3d at 754. In making this determination, "[t]he weight of [an agency interpretation] will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors

which give it power to persuade, if lacking power to control."
*Skidmore*, 323 U.S. at 140.

Plaintiffs argue that FWS's interpretation of "in danger of
extinction" set forth in the Polar Bear Memo is "unlawfully
stringent." The Court disagrees and finds FWS's interpretation
of "in danger of extinction," as a general matter, to mean "on
the brink of extinction in the wild" to be persuasive. As
explained in the Polar Bear Memo, the agency considered the
legislative history of the ESA in articulating its "general
understanding" of the phrase "in danger of extinction." NLEB
Listing 23,069. Senator Tunney, as designee of the majority
leader, explained that "[t]he goal of the [ESA] is to conserve,
protect, restore, and propagate species of fish and wildlife,
that are in imminent danger of extinction or are likely to
become endangered within the foreseeable future." 119 Cong. Rec.
25,668 (daily ed. July 24, 1973) (statement of Sen. Tunney). He
went on to state that the ESA provides a basis for listing
species which "are likely in the foreseeable future to become
extinct, as well as those which are presently threatened with
extinction." *Id.* He also stated that Congress intended "maximum
protection" for endangered species, which are those that are "on
the brink of extinction." *Id.* at 25,669. FWS's interpretation of
the phrase, as a general matter, is therefore consistent with
congressional intent. Accordingly, FWS's interpretation of "in

danger of extinction" to mean "on the brink of extinction in the wild" is persuasive. *Skidmore,* 323 U.S. at 140.

The Court, however, rejects Federal defendants' argument that because this Court has already upheld FWS's interpretation of "in danger of extinction" as articulated in the Polar Bear Memo—as a general matter—at *Chevron* step two in *Polar Bear II,* it must do so here as well. The Court's ruling in *Polar Bear II* was limited to the application of the interpretation of the phrase to the polar bear: "the Court concludes that the [Polar Bear Memo] sufficiently demonstrates that the Service's definition of an endangered species, *as applied to the polar bear*, represents a permissible construction of the ESA and must be upheld under step two of the *Chevron* framework." 794 F. Supp. 2d at 90 (emphasis added).

Plaintiffs also argue that the Listing Rule's reliance on the Polar Bear Memo was unjustified because that memo did not go through notice and comment as required by 16 U.S.C. § 1533(h) (providing that the "Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively."). Pls.' Mot., ECF No. 52 at 35 n.10. The Court is persuaded by Federal defendants' argument that 16 U.S.C. § 1533(h) does not require FWS "to provide the public with notice and an opportunity to comment on FWS's synthesis of how

the agency has historically interpreted 'in danger of extinction' that is reflected in the Polar Bear Memo." Fed. Defs.' Opp'n, ECF No. 53 at 29. But Federal defendants concede—as they must—that each time FWS applies its interpretation of 'in danger of extinction' to a specific listing determination, it must provide notice and opportunity to comment. As stated by Federal defendants, "because FWS applies its interpretation of 'in danger of extinction' on a species-by-species basis, the public has in fact notice and opportunities to comment on FWS's application of its interpretation." *Id.* at 30. Here, however, and as explained *infra* Section III.C., FWS failed to provide public notice and an opportunity to comment on its interpretation of "in danger of extinction" as applied to the Bat.

Plaintiffs point out in their reply brief that Federal defendants do not respond to plaintiffs' argument "that the determination also unlawfully failed to define rationally the Bat's 'foreseeable future,'" Pls.' Reply, ECF No. 59 at 18, and Federal defendants do not dispute this in their own reply brief, *See generally* Fed. Defs.' Reply, ECF No. 63. Accordingly, Federal defendants have conceded this argument. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and

addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 Fed. App'x 8 (D.C. Cir. 2004). Defendant-Intervenors do respond, arguing that FWS "appropriately focused its foreseeability analysis on the impact of [WNS]—how quickly it would spread, the rate of impact within an affected community, and the susceptibility and potential for resistance to the disease within the population," Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 24 (internal citations omitted), as well as the Bat's life cycle relevant to the impact of WNS, *id.* Plaintiffs argue—and the Court agrees—that FWS policy requires FWS to "look not only at the foreseeability of threats, but also at the foreseeability of the impact of the threats on the species," Pls.' Reply, ECF No. 59 at 18 (quoting M-Opinion at 10).

## C. The Threatened Determination Violated ESA and APA Notice and Comment Requirements

Plaintiffs also challenge the threatened determination on procedural grounds, arguing that it was "the product of a procedurally flawed process that violated the ESA's and the APA's requirements." Pls.' Mot., ECF No. 52 at 53. Plaintiffs first argue that the record demonstrates that FWS decided to list the Bat as threatened rather than endangered before the close of the November 18, 2014 to December 18, 2014 comment

period.[5] *Id.* In support of this argument, plaintiffs point to the two-day "NLEB Decision Maker Meeting," which began on December 16, 2014, and at which they claim the decision to list the Bat as threatened was made. LAR 58,577-93; NLEB Listing 03571-80. Plaintiffs also point to an October 6, 2014 email in which FWS staff raised a concern regarding how to "balance . . . being predecisional vs the appearance of a forgone decision," NLEB Listing 30,409; and to a January 5, 2015 email stating "We'd like to make sure everyone knows about the preliminary decision to list as threatened," NLEB Listing 43,029. Finally, plaintiffs note that FWS staff was in the process of reviewing existing comments and gathering more comments following the December 16, 2014 "NLEB Decision Maker Meeting." Pls.' Mot., ECF No. 52 at 54 (citing LAR 43080) (January 2015 spreadsheet addressing comments from the comment period Nov. 18-Dec. 18, 2014). Plaintiffs point out in their reply brief that Federal defendants do not respond to plaintiffs' characterization of these procedural failures. Pls.' Reply, ECF No. 59 at 33-34; *see also* Fed. Defs.' Opp'n, ECF No. 53 at 67-69. Nor do Federal defendants, in their own

---

[5] Following the publication of the proposed rule on October 2, 2013, FWS extended the public comment period on the proposed endangered determination four times. *See* 78 Fed. Reg. 72,058-01 (Dec. 2, 2013) (comment period to close January 2, 2014); 79 Fed. Reg. 36,698-01 (June 30, 2014) (comment period to close August 29, 2014); 79 Fed. Reg. 68,657-02 (Nov. 18, 2014) (comment period to close December 18, 2014); 80 Fed. Reg. 2371-01 (Jan. 16, 2015) (comment period to close March 17, 2015).

reply brief, respond to plaintiffs having pointed out this failure to respond. *See* Fed. Defs.' Reply, ECF No. 63 at 47-49. Since Federal defendants did not respond to this argument, they have conceded it. *See Hopkins*, 284 F. Supp. 2d at 25 ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 Fed. App'x 8 (D.C. Cir. 2004).[6]

"An agency is required to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them." *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 467-68 (D.C. Cir. 1998). "Consideration of comments as a matter of grace is not enough" where the record "suggest[s] too closed a mind" on the part of the agency. *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988). Here, Federal defendants have conceded that the decision to list the Bat as threatened was made prior to the close of the comment period ending December 18, 2014, and prior to the opening of the final comment period on January 16, 2015. Despite this, in the January 16, 2015 proposed rule and reopening of the comment

---

[6] Defendant-intervenors do dispute plaintiffs' characterization, Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 9-13, but the Court finds it to be significant that Federal defendants, those with first-hand knowledge of the process, do not.

period, FWS stated that "[it] has not yet made a final listing decision regarding the status of the northern long-eared bat (e.g., not warranted, threatened, or endangered); however, in our review of public comments we did determine that if threatened status is warranted, a species-specific rule under section 4(d) of the Act rule may be advisable." 80 Fed. Reg. 2372. Accordingly, the record here "suggest[s] too closed a mind" on the part of the agency, *McLouth Steel Products Corp.*, 838 F.2d at 1323, to provide plaintiffs a "meaningful opportunity [to] comment[]," *Grand Canyon Air Tour Coal.*, 154 F.3d at 467-68.

Plaintiffs next argue that because FWS relied on the Polar Bear Memo in the Listing Rule, but not in the Proposed Rule, the Listing Rule was not a logical outgrowth of the Proposed Rule. Pls.' Mot., ECF No. 52 at 55-56. Federal defendants and defendant-intervenors respond that the decision in the Listing Rule was a logical outgrowth because it is one of "the three possible scenarios for a species' categorization at any given time" and point out that plaintiffs had numerous opportunities to comment on the Proposed Rule. Fed. Defs.' Opp'n, ECF No. 53 at 67-69; Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 13-15; Fed. Defs.' Reply, ECF No. 63 at 46-49. Federal defendants also respond that, as discussed above, FWS is not required to provide notice and opportunity to comment on the Polar Bear Memo and

that because it applies its interpretation of "in danger of extinction" as articulated in the Polar Bear Memo on a species-by-species basis, there have been "numerous opportunities to comment on FWS'[s] application of its interpretation, including as to the Bat." Fed. Defs.' Reply, ECF No. 63 at 47; *see also* Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 13-15.

The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has established the following test to determine whether a final rule is a "logical outgrowth" of a proposed rule:

> To satisfy the APA's notice requirement, the NPRM and the final rule need not be identical: "[a]n agency's final rule need only be a 'logical outgrowth' of its notice." *Covad Commc'ns Co. v. FCC,* 450 F.3d 528, 548 (D.C. Cir. 2006). A final rule qualifies as a logical outgrowth "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA,* 358 F.3d 936, 952 (D.C. Cir. 2004) (citations omitted). By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where "interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the proposed rule." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259-60 (D.C. Cir. 2005) (internal citations omitted).

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009).

Although Federal defendants assert that plaintiffs and the public had the opportunity to comment on FWS's application of its interpretation of "in danger of extinction" articulated in the Polar Bear Memo as applied to the Bat, the record does not support that assertion. As an initial matter, Federal defendants provide no citation to the record to support this statement, instead citing their own opposition and partial motion for summary judgment's discussion of the deference due the Polar Bear Memo. Fed. Defs.' Reply, ECF No. 63 at 47 (citing Fed. Defs.' Opp'n, ECF No. 53 at 30). Furthermore, the proposed rule contains no reference to the Polar Bear Memo, nor does it state that the agency intends to apply its interpretation of "in danger of extinction" to be "on the brink of extinction in the wild" to the Bat. *See generally* 78 Fed. Reg. 61,046-01. Neither do any of the four extensions of comment period or reopening of the comment period for the proposed rule provide such notice. *See generally* 78 Fed. Reg. 72,058-01 (Dec. 2, 2013); 79 Fed. Reg. 36,698-01 (June 30, 2014); 79 Fed. Reg. 68,657-02 (Nov. 18, 2014); 80 Fed. Reg. 2371-01 (Jan. 16, 2015). Rather, the first and only time FWS applied its interpretation of "in danger of extinction" as articulated in the Polar Bear Memo to the Bat was in the Listing Rule. 80 Fed. Reg. 17,974-01, 18,020-21 (Apr. 2, 2015). Federal defendants represented to this Court that the public has had opportunities to comment both specifically as to

the Bat, Fed. Defs.' Reply, ECF No. 63 at 47 ("because FWS
applies its interpretation of 'in danger of extinction' on a
species-by-species basis, the public has in fact had notice and
numerous opportunities to comment on FWS's application of its
interpretation, including as to the Bat."), and as a general
matter, Fed. Defs.' Opp'n, ECF No. 53 at 30 ("because FWS
applies its interpretation of 'in danger of extinction' on a
species-by-species basis, the public has in fact had notice and
numerous opportunities to comment on FWS's application of its
interpretation"). However, the record here demonstrates that FWS
did not provide plaintiffs nor the public with an opportunity to
comment on FWS's application of its interpretation of "in danger
of extinction" as applied to the Bat. For this reason alone, the
final rule is not a logical outgrowth of the notice in the
proposed rule. The Court also notes that in none of the four
extensions and reopenings of the comment period over more than a
year, did FWS put the public on notice of how it was applying is
interpretation of "in danger of extinction" specifically to the
Bat.

Because the Court agrees that the threatened determination
was procedurally flawed on these two grounds, the Court need not
reach plaintiffs' argument that the four rationales supporting
the threatened determination were "entirely new" and
consequently, they did not have the opportunity to make the

arguments to FWS that they have made to this Court. Pls.' Mot.,
ECF No. 52 at 55. As to plaintiffs' argument that "FWS relied on
a key change to the Final SPR Policy to justify its decision not
to analyze whether the Bat is endangered in a significant
portion of its range," a change that plaintiffs and the public
have never had the opportunity to comment on, Pls.' Mot., ECF
No. 52 at 56, as explained below, the Court agrees that the
Final SPR Policy was procedurally flawed. *See infra* Section
III.B.4.d.

### D. The Challenged Aspect of the Manner in Which the Final SPR Policy is Applied is Unlawful[7]

The ESA defines an "endangered species" in relevant part as
"any species which is in danger of extinction throughout all or
a significant portion of its range." 16 U.S.C. § 1532(6). The
phrase "significant portion of its range" is not defined in the
ESA, and courts faced with the question have concluded that the
phrase is ambiguous for *Chevron* purposes. *Humane Soc'y of the
United States v. Jewell*, 76 F. Supp. 3d 69, 128 (D.D.C. 2014).

---

[7] Plaintiffs allege a number of procedural irregularities
regarding the decision-making process that resulted in the
Listing Rule. Pls.' Mot., ECF No. 52 at 54. Defendant-
Intervenors respond that the agency's decision-making process is
"entitled to a presumption of regularity and good faith." Def.-
Intervenors' Br. in Opp'n, ECF No. 56 at 15-16 (internal
quotations and citation omitted). Given that the Court has
determined that the Listing Rule is unlawful on various grounds,
the Court need not reach whether or not there were procedural
irregularities.

Accordingly, FWS "has a wide degree of discretion in determining whether the [species] is in danger 'throughout a significant portion of its range.'" *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d. 1166, 1184 (D. Idaho 2013) (citation omitted).

In 2014, FWS and the National Marine Fisheries Service (collectively, "the Services") promulgated the Final SPR Policy, which both interprets the phrase "significant portion of its range" and explains how the Services will implement their interpretation of the phrase. *See* 79 Fed. Reg. 37,578; 37,579. The Final SPR Policy defines "significant portion of its range" as follows: "a portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." *Id.* at 37,579. The Services explained that the following procedure would be used to implement the policy:

> The first step in our analysis of the status of a species is to determine its status throughout all of its range. If we determine that the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, we will list the species as endangered (or threatened) and no SPR analysis will be required. If the species is neither endangered nor threatened

> throughout all of its range, we will determine
> whether the species is endangered or
> threatened throughout a significant portion of
> its range. If it is, we will list the species
> as endangered or threatened, respectively; if
> it is not, we will conclude that listing the
> species is not warranted.

*Id.* at 37,585. Plaintiffs challenge one aspect of this procedure: that the Services will not analyze whether a species is endangered in a significant portion of its range if the Services have determined that the species is threatened throughout all of its range. Plaintiffs argue that this procedure is "facially irreconcilable with the ESA's unambiguous command to list any species as endangered if it is 'in danger of extinction . . . [in] a significant portion of its range.'" Pls.' Reply, ECF No. 59 at 36-37.

### 1. Plaintiffs' Challenges to the Final SPR Policy are Properly Analyzed Under the *Chevron* Standard

Plaintiffs challenge this aspect of the policy as "facially unlawful. . . contrary to the ESA's language and goals and fails at [*Chevron*] step one." Pls.' Mot., ECF No. 52 at 57. As an initial matter, the parties dispute the appropriate test for plaintiffs' facial challenge to the Final SPR Policy. Federal defendants argue that since plaintiffs have brought a facial challenge, they have the burden of establishing that "no set of circumstances exists" under which the policy would be valid. Fed. Defs.' Opp'n, ECF No. 53 at 42 (citing *United States v.*

*Salerno*, 481 U.S. 739, 745 (1987); *Reno v. Flores,* 507 U.S. 292, 301 (1993)). The Court is not persuaded that the "no set of circumstances" test applies to plaintiffs' challenge, however, because plaintiffs do not bring a pre-application challenge to the policy.[8] Other courts in this District have acknowledged that there is some confusion in this Circuit and others regarding when a court should apply the "no set of circumstances" test articulated in *Salerno* and *Flores* rather than *Chevron. See Chamber of Commerce of the United States of America v. Nat'l Labor Relations Bd.*, 118 F. Supp. 3d, 171, 184-85 & n.8 (D.D.C. 2015) (applying the "no set of circumstances" test to a "'pre-implementation challenge' to the discretionary aspects of [a] Final Rule" based on "an agency's purely legal interpretation of a statute" and acknowledging *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 188 (D.D.C. 2008) ("noting that the *Chevron* approach 'seem[ed] especially sound,' but deciding case on procedural grounds under the APA") and *Mineral Policy Ctr. v. Norton,* 292 F. Supp. 2d 30, 38–40 (D.D.C. 2003) ("noting that 'confusion in this Circuit remains' regarding the application of the *Flores* test to facial challenges to agency regulations, and analyzing the challenge in that case under *Chevron*")); *see also*

---

[8] Because the Court has determined that the "no set of circumstances" test does not apply, the Court need not consider whether or not the Final SPR Policy satisfies the test.

*Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946,

955 n.9 (D. Ariz. 2017) (noting that "[t]he Court is not

convinced that the 'no set of circumstances' test is applicable

here . . .").

Here, however, the Final SPR Policy has been in effect

since 2014, has been applied, and aspects of it have been

vacated both with and without geographical limitation. *See infra*

Section III.D.2. This situation is therefore distinguishable

from that in *Flores* where the Supreme Court applied the "no set

of circumstances" test to

> a facial challenge to INS regulation 242.24.
> Respondents do not challenge its application
> in a particular instance; it had not yet been
> applied in a particular instance—because it
> was not yet in existence—when their suit was
> brought ... and it had been in effect only a
> week when the District Court issued the
> judgment invalidating it. We have before us no
> findings of fact, indeed no record, concerning
> the INS's interpretation of the regulation or
> the history of its enforcement. We have only
> the regulation itself and the statement of
> basis and purpose that accompanied its
> promulgation.

*Flores*, 507 U.S. at 300-01. Nor is this situation similar to

that in *Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012),

where the D.C. Circuit applied the "no set of circumstances"

test to decide a facial challenge to an agency rule. Although

the court did not explicitly state that it was applying that

test because it was considering a pre-implementation challenge

to the rule, the context indicates that it was. The challenged rule was adopted on April 7, 2011, *Cellco P'ship*, 700 F.3d at 540, 549; and challenged on May 13, 2011, *see generally* Court of Appeals Docket # 11-1135, a few weeks before the rule became effective on June 6, 2011, 76 Fed. Reg. 26,199.

Furthermore, plaintiffs do not challenge a "discretionary aspect" of the rule, *see Chamber of Commerce*, 118 F. Supp. 3d at 184-85, but rather an aspect of the policy over which it has no discretion, specifically, "[i]f we determine that the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, we will list the species as endangered (or threatened) and no SPR analysis will be required." 79 Fed. Reg. at 37,585. And as plaintiffs point out, "FWS has already applied the Policy to foreclose all consideration of whether the Bat is endangered in any significant portion of its range after it first determined that the species is threatened throughout its range." Pls.' Reply, ECF No. 59 at 38 (citing 80 Fed. Reg. at 18,022; Pls.' Mot., ECF No. 52 at 67-69). Plaintiffs also note that the Services applied the policy in a similar manner in at least 13 other listing decisions. *Id.* Accordingly, the Court the will analyze plaintiffs' challenge under the *Chevron* standard.

**2. The Precise Question at Issue is Whether the Challenged Aspect of the Procedures Implementing the Final SPR Policy Is Consistent With the Plain Language of the ESA**

Applying the *Chevron* standard, the parties dispute what exactly is "the precise question at issue." *Chevron*, 467 U.S. at 842. Plaintiffs argue that the Final SPR Policy fails at *Chevron* step one because there is no ambiguity in the ESA regarding the two circumstances under which a species must be listed as endangered. Specifically, a species must be considered endangered (1) when it is "in danger of extinction throughout all . . . of its range"; or (2) when it is "in danger of extinction throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6). Plaintiffs argue that the Final SPR Policy is inconsistent with this statutory language because it "renders the entire clause 'or a significant portion of its range' in the definition of an 'endangered species' completely superfluous." Pls.' Mot., ECF No. 52 at 57, 59.

Federal defendants argue that the Final SPR Policy is properly analyzed under *Chevron* step two rather than step one because "the specific issue addressed by the" policy is how FWS should interpret "significant portion of its range" and there is no dispute that the phrase "significant portion of its range" is ambiguous for *Chevron* purposes. Fed. Defs.' Opp'n, ECF No. 53 at 45-48. Plaintiffs disagree, responding that "[t]he issue

presented by [p]laintiffs' claim is not whether the phrase 'significant portion of its range' is ambiguous . . . [but] whether the Service must consider a species' status in a 'significant portion of its range'—however defined—*at all*, in situations where that species is also threatened throughout its range." Pls.' Reply, ECF No. 59 at 43.

The Court is persuaded that the precise question at issue is whether this aspect of the procedures implementing the Final SPR Policy is consistent with the plain language of the ESA. Plaintiffs do not challenge the Services' interpretation of what "significant portion of its range" means. If they had, plaintiffs' challenge would arguably be moot because the Final SPR Policy's definition of "significant" in "significant portion of its range" has been deemed inconsistent with the ESA and has been vacated nationwide. *Friends of Animals*, 396 F. Supp. 3d at *10 (citing *Desert Survivors v. United States Dep't of Interior*, 321 F. Supp. 3d. 1011 (N.D. Cal. 2018) and *Desert Survivors v. United States Dep't of Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018)). Moreover, Federal defendants assert that the fact that its interpretation of "significant portion of its range" has been vacated has no impact on this case. *See* Fed. Defs.' Resp. to Notice of Suppl. Auth., ECF No. 77 at 2. Specifically, Federal defendants state that "[p]laintiffs do not challenge the Final SPR Policy's definition of 'significant' or determinations

that relied on that definition. . . . Instead, [p]laintiffs challenge the first part of the Final SPR Policy, which says that if [FWS] has already determined that the species is threatened or endangered throughout all of its range, the agency will not analyze whether the species is also threatened or endangered in a significant portion of its range." *Id.* at 3. Furthermore, the procedures implementing the Final SPR Policy are significantly broader than the meaning of the phrase "significant portion of its range." *See generally* Final SPR Policy. Accordingly, the Court will analyze the challenged procedure implementing the Final SPR Policy at *Chevron* step one.

### 3. The Challenged Aspect of the Final SPR Policy Fails at *Chevron* Step One

The parties agree that the ESA sets forth four separate bases for listing a species as endangered or threatened: (1) the species is "in danger of extinction throughout all of its range"; (2) the species is "in danger of extinction throughout . . . a significant portion of its range"; (3) the species "is likely to become an endangered species within the foreseeable future throughout all . . . of its range; and (4) the species "is likely to become an endangered species within the foreseeable future throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6), (20). The Final SPR policy acknowledges these four independent bases for listing a species,

79 Fed. Reg. 37,582, but in implementing the policy, FWS states that "[i]f we determine that the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, we will list the species as endangered (or threatened) and no SPR analysis will be required." 79 Fed. Reg. at 37,585. As a result, if FWS determines that a species is threatened throughout all of its range, it will not determine whether the species is endangered in a significant portion of its range. This is precisely what occurred with the Bat.

"In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988). The ESA defines an "endangered species," in relevant part, as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The ESA requires FWS to determine whether a species is endangered, and if it is, to list it as such. 16 U.S.C. § 1533(a). And if a species is listed as endangered, it is entitled to greater legal protections than a species that is listed as threatened. 16 U.S.C. § 1538(a)(1); *see also Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 13 (D.D.C. 2001), *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004) ("Endangered species

are entitled to greater legal protection under the ESA than threatened species.").

The plain language of the statute unambiguously requires FWS to determine whether a species should be listed as endangered by determining whether it is: (1) "in danger of extinction throughout all of its range"; or (2) "in danger of extinction throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6); *see also United States v. Woods*, 571 U.S. 31, 45 (2013) (when Congress uses "or" in a statute, "its ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings") (internal citation omitted)). Federal defendants do not dispute that under the procedures implementing the Final SPR Policy, if the Services determine that a species is threatened throughout all of its range, it will not determine whether the species is endangered in a significant portion of its range. Fed. Defs.' Opp'n, ECF No. 53 at 55. They argue that the policy "complies with the plain language of the ESA because it does not render any of the bases for listing superfluous." Fed. Defs.' Reply, ECF No. 63 at 32. However, FWS acknowledges that in implementing the policy, it will not determine whether a species is endangered in a significant portion of its range if it has determined that a species is threatened throughout all of its range. In so doing, the policy renders the "endangered in a significant portion of

its range" basis for listing superfluous when FWS has determined that a species is threatened throughout all of its range. Accordingly, this aspect of the procedures implementing the Final SPR Policy fail to give meaning to one of the two bases for listing a species as endangered—whether the species is endangered in a significant portion of its range. Second, the policy is inconsistent with the design of the statute, pursuant to which endangered species are entitled to more legal protection than threatened species, because the Services will not analyze whether a species that is threatened throughout all of its range is endangered in a significant portion of its range. In so doing, the Services fail to determine whether a species is entitled to the greater legal protection provided for in the ESA. *See Defenders of Wildlife*, 239 F. Supp. 2d at 19 ("[W]hen Congress enacted the ESA in 1973, it expressly extended protection to a species endangered in only a 'significant portion of its range.' The two earlier statutes enacted to protect and preserve endangered species narrowly defined endangered species as including only those species facing total extinction.").

For these reasons, the challenged aspect of the Final SPR Policy fails at *Chevron* step one.

### 4. Alternatively, the Challenged Aspect of the Final SPR Policy Fails at *Chevron* Step Two

Even if it were appropriate for the Court to consider the Final SPR Policy at *Chevron* step two because "the precise question at issue" is the meaning of the ambiguous phrase "significant portion of its range," it would also fail at that step because, despite the "substantial deference" due to the interpretation of such a provision, the implementation of the Final SPR Policy interprets the statute in a manner "that does not effectuate Congress' intent." *Ctr. for Biological Diversity v. United States Dep't of Interior*, 563 F.3d 466, 484 (D.C. Cir. 2009).

Plaintiffs argue that the policy is an unreasonable interpretation under *Chevron* step two for three reasons: (1) it "directly subverts the ESA's conservation goal by foreclosing any consideration of whether a species threatened throughout its range should be listed as endangered because of the threats it faces in a significant portion of its range"; (2) it impermissibly "relies on its concerns over its heavy workload and limited 'resources' to justify restricting the SPR analysis"; and (3) it is procedurally deficient because the "180 degree course change" in the final policy is not a logical outgrowth of the draft policy. Pls.' Mot., ECF No. 52 at 64-66.

Federal defendants respond that the Final SPR Policy is a reasonable interpretation of "significant portion of its range" because it: (1) does not render any basis for listing superfluous; (2) complies with the ESA principles; (3) is consistent with the ESA's conservation goals; and (4) does not require the Services to consider improper listing factors. Fed. Defs.' Opp'n, ECF No. 53 at 49-62. The Court considers each argument in turn.

### a. The Challenged Aspect of the Final SPR Policy Renders the "Endangered in a Significant Portion of its Range" Basis for Listing Superfluous

Federal defendants argue that the policy does not render any basis for listing superfluous because "'there is at least one set of facts that falls uniquely within each of the four bases [] without simultaneously filling the standard of another basis[].'" Fed. Defs.' Opp'n, ECF No. 53 at 49 (quoting 79 Fed. Reg. 37,582). However, as explained above, the policy renders the "endangered in a significant portion of its range" basis for listing superfluous because the Services will not determine whether a species is endangered in a significant portion of its range if it has determined that a species is threatened throughout all of its range.

Federal defendants also assert that "Congress's placement of the 'throughout all' language before the 'significant portion

of its range' language in the definitions of endangered species and threatened species indicates that Congress intended the Services to focus their analysis on a species' status throughout all of its range." *Id.* at 54. However, Federal defendants have neither pointed to a canon of statutory construction to support this argument nor provided any legal support for it. *See generally*, Fed. Defs.' Opp'n, ECF No. 53; Fed. Defs.' Reply, ECF No. 63.

Federal defendants argue that "there is no language in the ESA that requires the Services to analyze and make a determination on each of the remaining bases for listing *after* the Services determine that one of the bases for listing is applicable to the species . . . [n]or is there any language in the ESA that dictates in what order the Services should analyze the four bases for listing." Fed. Defs.' Opp'n, ECF No. 53 at 53-54. They also argue that it would "be illogical for the Services to continue analyzing whether a species fits within the three remaining bases for listing after they determine that a particular basis for listing is applicable to a species," stating that "if the Services did perform this analysis, it would lead to confusing results . . ." *Id.* at 54 & n.11.

The Court disagrees. Congress's intent in enacting the ESA and creating the two levels of classification was "to provide incremental protection to species in varying degrees of danger."

*Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001); *see also* 16 U.S.C. § 1531(b) ("The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species."). As explained above, if a species is listed as endangered, it is entitled to greater legal protections than a species that is listed as threatened. In 1973, Congress enacted the ESA to provide "broadened protection for species in danger of extinction throughout 'a significant portion of [their] range'  . . . a significant change" from then-existing laws protecting endangered species. *Defenders of Wildlife*, 258 F.3d at 1144. Accordingly, there is nothing illogical or wasteful of agency resources for the Services to analyze whether a species that is threatened throughout all of its range is also endangered in a significant portion of its range. Rather, not to do so is an unreasonable interpretation of the statute and inconsistent with Congress's intent in enacting the ESA. As stated above, Senator Tunney explained that "[t]he goal of the [ESA] is to conserve, protect, restore, and propagate species of fish and wildlife, that are in imminent danger of extinction or are likely to become endangered within the foreseeable future." 119 CONG. REC. 25,668 (daily ed. July 24, 1973) (statement of Sen. Tunney). With regard to

whether Congress intended that a species could be listed

simultaneously as endangered and threatened, it is clear that

Congress intended that a species could:

> Under [the ESA] . . . the Secretary may list
> an animal as "endangered" throughout all or a
> portion of its range. An animal might be
> "endangered" in most States but overpopulated
> in some. In a State in which a species is
> overpopulated, the Secretary would have the
> discretion to list that animal as merely
> threatened or to remove it from the endangered
> species listing entirely while still providing
> protection in areas where it was threatened
> with extinction.

*Id.* at 25,669. For these reasons, the challenged aspect of the

Final SPR Policy renders the "endangered in a significant

portion of its range" basis for listing superfluous.

### b. The Challenged Aspect of the Final SPR Policy is Inconsistent with ESA Principles

Federal defendants and defendant-intervenors argue that the

policy provides a reasonable interpretation of the "significant

portion of its range" phrase because logically, "a species

cannot simultaneously meet the definitions of 'endangered

species' and 'threatened species.'" Fed. Defs.' Opp'n, ECF No.

53 at 55;[9] Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 26.

---

[9] The Court is not persuaded by Federal defendants' argument
that a simultaneous listing for a species would be inconsistent
with two opinions in other district courts because, as explained
by plaintiffs, "[t]hese cases stand for the proposition that if
a species is (biologically) endangered in a significant portion
of its range, it must be protected as (legally) endangered
throughout its range" and "say nothing about whether the Service

Federal defendants state that under the Draft SPR Policy, it would have been "possible that a single 'species' could meet the definition of both 'endangered species' and 'threatened species'—it would be threatened throughout all of its range while simultaneously being endangered in a significant portion of its range," which would lead to confusion. Fed. Defs.' Opp'n, ECF No. 53 at 58. FWS also noted that the final policy eliminates the possibility of a species being simultaneously "threatened throughout all of its range and endangered throughout a significant portion of its range" so as to not confuse "the public." 79 Fed. Reg. at 37,581.

As explained above, however, in enacting the ESA, Congress specifically intended that a species could simultaneously meet both definitions. Furthermore, the Services did not rely on this interpretation of the statute as a basis for its Final SPR Policy. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (the propriety of agency action must be judged "solely by the grounds invoked by the agency"). Rather, the Services found that "[t]he Act . . . does not specify the relationship between the two provisions." 79 Fed. Reg. at 37,580. For these reasons, the

---

may lawfully choose to list a species as 'threatened' when it is 'endangered' in a significant portion of its range." Pls.' Reply, ECF No. 59 at 45-46.

challenged aspect of the Final SPR Policy is inconsistent with ESA principles.

### c. The Challenged Aspect of the Final SPR Policy Subverts the Conservation Goals of the ESA

Federal defendants argue that the policy does not subvert the ESA's conservation goals because species receive protection under either status and therefore "[p]laintiffs' argument that a species listed as threatened under the Final SPR policy are somehow not 'conserved' is meritless." Fed. Defs.' Opp'n, ECF No. 53 at 60-61. Federal defendants further argue that "the Final SPR Policy does not mandate or even suggest that the Services should consider factors other than those outlined in 16 U.S.C. § 1533(a)(1) or make decisions that are not based on the best scientific and commercial data available in determining whether or not to list a species." Fed. Defs.' Opp'n, ECF No. 53 at 61. Rather, "the [Final SPR] Policy reflects the Services' 'lawful and completely appropriate' effort of 'resolving ambiguities in the [ESA] and providing guidance for its implementation . . . consider[ing] a wide variety of factors' including 'both textual and practical reasons.'" *Id*. (citing 79 Fed. Reg. at 37,580; 37,591-92). Federal defendants state that in the Final SPR Policy, "the Services noted that there is a '*related benefit* of limiting the applicability of the SPR language" in order to conserve the Services "limited resources." *Id*. (quoting 79 Fed. Reg. at 37,581 (emphasis added)). But Federal defendants argue

that "this practical benefit has no bearing on what factors the Services consider when determining" whether to list a species as threatened or endangered. *Id.*

Plaintiffs respond that the ESA mandates that FWS "make listing determinations based solely on the best available scientific data" and that FWS's injection of "economic concerns (i.e. 'limited resources')" as a justification for not considering whether a species is endangered in a significant portion of its range if the Services have determined that it is threatened throughout its range is inconsistent with that mandate. Pls.' Reply, ECF No. 59 at 49.

The Court is not persuaded by Federal defendants' argument because the Services *have* decided, for economic reasons and to avoid confusion, to not reach the question of whether a species should be listed as endangered in a significant portion of its range after determining that it is threatened throughout all of its range. This is contrary to the statutory requirement to list a species as endangered if it is "in danger of extinction" in "a significant portion of its range," 16 U.S.C. § 1532(6), and to make that determination based "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A). And this mandate cannot be excused for "budgetary reasons." *Am. Lands All. v. Norton*, 242 F. Supp. 2d 1, 18 (D.D.C. 2003) ("it is beyond th[e] Court's authority to excuse

congressional mandates for budgetary reasons"). As plaintiffs point out, the ESA does not require FWS to spend its resources conducting redundant analyses, such as considering whether a species is threatened throughout its range or in a significant portion of its range where it has already determined that the species is endangered throughout its range or in a significant portion of its range. Pls.' Reply, ECF No. 59 at 50. Defendant-intervenors argue that plaintiffs seek to "strip[] the Service's discretion to tailor protections for threatened species." Def.-Intervenors' Br. in Opp'n, ECF No. 56 at 27. But as plaintiffs point out, requiring FWS to properly determine a species' listing is separate from FWS's section 4(d) authority to tailor protections. Pls.' Reply, ECF No. 59 at 51.

For these reasons, the challenged aspect of the Final SPR Policy subverts the conservation goals of the ESA. Accordingly, the challenged aspect of the Final SPR Policy is an unreasonable interpretation of the ESA under *Chevron* step two.

### d. The Challenged Aspect of the Final SPR Policy Violated ESA and APA Notice and Comment Requirements

Plaintiffs also challenge the Final SPR Policy on procedural grounds, arguing that the final policy was not a logical outgrowth of the draft policy due to "the final policy's 180 degree course change barring consideration of whether a species is endangered in a significant portion of its range when

it is threatened throughout its range." Pls.' Mot., ECF No. 52 at 65. "[A]n agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Envtl. Integrity Project v. E.P.A*, 425 F.3d 992, 996 (D.C. Cir. 2005) (citation omitted). The parties do not dispute that the "logical outgrowth" concept properly applies to agency policies. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237-38 (D.C. Cir. 1994). As Federal defendants point out, FWS specifically sought comment on the aspect of the draft policy that could result in a species being threatened throughout all of its range while also being endangered in a significant portion of its range:

> We recognize that under the draft policy, a species can be threatened throughout all of its range while also being endangered in an SPR. For the reasons discussed in this document, in such situations we would list the entire species as endangered throughout all of its range. However, we recognize that this approach may raise concerns that the Services would be applying a higher level of protection where a lesser level of protection may also be appropriate, with the consequences that the Services would have less flexibility to manage the species and that scarce conservation resources would be diverted to species that might arguably better fit a lesser standard if viewed solely across its range. The Services are particularly interested in public comment on this issue.

76 Fed. Reg. at 77,004. The Court is not persuaded, however, by Federal defendants' argument that seeking comment on this aspect

of the draft policy put plaintiffs and the public on notice that
FWS would decide to address this concern by deciding that it
would not analyze whether a species was endangered in a
significant portion of its range after it had determined that
the species is threatened throughout all of its range. Although
FWS solicited comment on this issue, it gave no indication that
this would be the "solution" it would choose, nor were
plaintiffs and the public given the opportunity to comment on
this solution. The Court's conclusion is bolstered by the fact
that FWS acknowledged that the draft policy would result in
"partial overlap among categories" which though potentially
confusing "in practice will . . . not be a significant hurdle to
implementing [the] draft policy because it is consistent with
Court decisions and FWS'[s] interpretation of the statutory
definitions." *Id.* at 76,996. Accordingly, the draft policy did
not provide "public notice of [FWS's] intent to adopt, much less
an opportunity to comment on" its decision to not analyze
whether a species is endangered in a significant portion of its
range after it determined that the species is threatened
throughout all of its range. *Envtl. Integrity Project*, 425 F.3d
at 997. The Court acknowledges that commenters responded to
FWS's solicitation of comments, 79 Fed. Reg. at 37,599, but that
does not change the fact that FWS did not provide notice and
opportunity to comment on its "solution." For these reasons,

this aspect of the Final SPR Policy was not a logical outgrowth
of the draft policy.

### e. The Application of the Final SPR Policy to the Bat was Unlawful

Plaintiffs' final argument is that when it applied the
Final SPR Policy to the Bat, "FWS failed to undertake the
necessary analysis of whether the species is in danger of
extinction throughout a significant portion of its range"
thereby "unlawfully rel[ying] on the SPR Policy to justify
ignoring the clear and undisputed fact that the Bat has declined
most significantly in the core of its range." Pls.' Mot., ECF
No. 52 at 67.[10] Federal defendants respond that the Final SPR
Policy is a reasonable interpretation under *Chevron* step two,
and that since FWS did not misapply the Final SPR Policy to the
Bat, nor do plaintiffs contend otherwise, plaintiffs' argument
is without merit. Fed. Defs.' Opp'n, ECF No. 53 at 63.

The Court agrees with Federal defendants that FWS correctly
applied the Final SPR Policy as written to the Bat. However, the
Court has determined that the challenged aspect of the Final SPR
Policy fails at *Chevron* step one, and in the alternative at
*Chevron* step two. *See supra* Section III.B.3-4. Consequently,

---

[10] As part of this argument, plaintiffs reiterate their arguments
that the Final SPR Policy and the final threatened determination
violated the procedural requirements of the ESA and APA. Pls.'
Mot., ECF No. 52 at 67. The Court has addressed those arguments.
*See supra* Sections III.C, III.D.4.d.

since the Final SPR Policy is unlawful, the application of the policy to support the threatened determination as to the Bat was unlawful.

## IV. Conclusion

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** plaintiffs' motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** Federal defendants' and the defendant-intervenors' motions for summary judgment. The Court **REMANDS**, but does not vacate the "threatened" listing decision, to FWS to make a new listing decision consistent with this Memorandum Opinion. The Court **VACATES** the provision of the Final SPR Policy which provides that if the Services determine that a species is threatened throughout all of its range, the Services will not analyze whether the species is endangered in a significant portion of its range. However, the Court declines to vacate the Polar Bear Memo. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**1/28/2020**